TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4
FACSIMILE: (671) 472-2601

*Attorneys for the Estate of
Roland Anthony Boudreau, Deceased*

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| CASSANDRA CHAU TRUONG, Administratrix of the Estate of ROLAND ANTHONY BOUDREAU, deceased,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | CIVIL CASE NO. 06-00022<br><br><br><br><br><br>**TRIAL BRIEF** |

I.

**FACTUAL SUMMARY**

This is a Federal Tort Claims Action ("FTCA"), 28 U.S.C. § 2671, *et seq.*, and this Court has jurisdiction of this action pursuant to 28 U.S.C. § 1346(b), and arises under the following factual circumstances.

Prior to April 2, 2005, three entities joined together to hold a *Three Doors Down* concert

on U.S. Navy property at *Polaris Point*, in Guam. Those three entities are the U.S. Navy's Morale, Welfare & Recreation Department ("MWR"), *Ambros, Inc. dba Shimbros Productions*, and the promoter, Karl Pangelinan, doing business as *Malafunkshun Productions* ("Malafunkshun"). Simply put, the arrangement was that MWR would supply the grounds and the security for the grounds, namely *Polaris Point*. Ambros and Budweiser would supply the drinks, and *Malafunkshun* would make arrangements for the *Three Doors Down* band to play at the concert. MWR was also responsible for picking up golf carts at the *Navy Golf Course* and transporting them to *Polaris Point* to be used by the various employees of the above-mentioned three sponsoring entities.

At some time prior to the actual concert, MWR personnel walked the *Polaris* grounds and determined that there were several hazards at the concert grounds, such as iron bars and holes in the ground, that needed to be identified, roped off, or protected, so that people would not trip over the holes, or drive their cars or golf carts over the holes. The MWR personnel, after identifying the hazards, hired a welding company to remove all of the protruding metal hazards. However, on the day of the concert, they merely placed orange traffic cones or 55-gallon trash barrels over the holes.

One day prior to the concert, the MWR personnel picked up twelve (12) golf carts from the *Navy Golf Course* and delivered them to *Polaris Point* for use by the various employees of the three entities. There was no training or instructions on the use of the carts given by MWR or the *Navy Golf Course*, or by anybody concerning the use of those golf carts.

The concert was heavily promoted, both on and off the base, and certain VIPs were invited to a special VIP pre-concert party at the *Hard Rock Café* in Tumon, prior to the concert. The decedent, Roland Anthony Boudreau, was invited to that VIP pre-concert party and, after attending that party, he, along with the other VIPs, were brought to the concert grounds at *Polaris Point* and

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4

were ensconced in VIP tents. Budweiser and Ambros, since they were one of the sponsors of this event, served beer at the VIP tents for the VIP guests. MWR's vendors served beer for the general public.

The Plaintiff, Cassandra Truong, is the widow of the decedent Boudreau and was working for Ambros as a Marketing Representative. She was at the concert premises from about 8:30 in the morning to about 8:00 o'clock p.m. on the day of the concert. After the concert was over, about 6:00 o'clock p.m., all of the personnel for the promoters and for MWR, etc., began cleaning up the concert grounds and during the breakdown of the concert, people were being ferried back and forth between the concert grounds and the parking area utilizing the MWR golf carts.

The Plaintiff, Cassandra Truong, was authorized to use a golf cart and, after the concert was over and about 7:00 o'clock p.m., she transported another employee of Ambros, Julia Pocaigue, and placed her in the passenger seat of the golf cart. She also picked up Julia's son, Donovan Rivera, and also her husband, the decedent, and put them on the back part of the golf cart where the golf bags are generally placed. Donovan was situated behind Cassandra and Roland was situated behind Julia. It was dark at that time and there were no lights on the golf carts, nor was the general area lit up with lights. Two other people also got into Cassandra's cart, but Shawn Pascua, also an Ambros employee, took two of those people and put them in his cart. Kaoru in the front and Eric Roberto in the back. Cassandra then began driving at a slow speed from the concert grounds over to the parking area with four people in her golf cart and was following the other golf cart that was being driven by Shawn Pascua. During that drive, she ran over one of the holes that had been previously identified by MWR, but had not been roped off and there were no traffic cones or trash barrels around the hole because they were probably removed or taken during the day. When Cassandra hit the hole, her husband was violently thrown from the golf cart and he landed on the back part of his

head on the pavement and suffered a concussion. Security was called, the ambulance arrived, and the decedent was transported to the U.S. Naval Hospital and, despite the medical services rendered to him, he died the next day, April 3, 2005 at the U.S. Naval Hospital. He was survived by his minor son, Joshua Boudreau Chapman, and his wife, Cassandra Truong.

Cassandra Truong then applied for letters of administration on the Estate of the decedent in the Superior Court of Guam in Probate Case No. PR0151-05 and was appointed the Administratrix of the decedent's Estate. On January 12, 2006, Cassandra Truong filed a Claim for Wrongful Death with the United States of America but, as of August 21, 2006, the Defendant had neither accepted nor rejected the claim and, pursuant to 28 U.S.C. § 2675(a), Plaintiff elected to consider the failure to act on her claim as a denial of that claim and this lawsuit followed. A formal denial of claim was received from the U.S. months later.

## II.

## NEGLIGENCE OF THE DEFENDANT

Paragraphs 7, 8, 9 and 10 of the Complaint sets forth the specific acts of negligence of the Defendant, which were the proximate cause of the decedent's death. Those paragraphs read as follows:

> 7. The decedent was legally on the U.S. owned Premises at the time of the accident and the Defendant owed an affirmative duty to inspect the Premises and to exercise reasonable care to make the Premises safe for decedent's entry thereon.
>
> 8. The Defendant, the United States of America, and its employees and agents, negligently maintained, managed, controlled and operated said Premises in that there were bumps, holes and imperfections on the roadways and other portions of the Premises which the Defendant knew or, in the exercise of reasonable care, should have known, constituted a dangerous condition and unreasonable risk of harm of which decedent was at all times herein mentioned unaware of.
>
> 9. The Defendant negligently failed to take steps to either make the conditions safe or to warn decedent of the dangerous conditions, all of which caused the decedent to

fall from the golf cart, hit his head on the pavement and died as a result thereof.

10. In addition to the foregoing, the Defendant negligently permitted the use of the aforesaid golf cart by persons who were not trained in operating same and negligently failed to train or supervise the operators of said golf carts, which negligence contributed to the accident hereinabove described.

## III.

## THE APPLICABLE LAW

The Defendant, the United States of America, has waived immunity from suit under the FTCA and can be sued like a private person and the law of the place where the tort occurred is the law that should be applied. In this case, since the tort occurred in Guam, the law of Guam would be applied. "Under the Federal Tort Claims Act, the United States can be sued for its torts, but it is only liable 'if a private person [ ] would be liable to the claimant in accordance with the law of the place where the act or omission occurred, 28 U.S.C. § 1346(b); *see also* 28 U.S.C. § 2674-80...That means that the United States must be treated as a private person for purposes of our analysis..." *Ravell v. U.S.*, 22 F.3d. 960, 961 (9th Cir. 1994).

So we must determine what the law of Guam is in analyzing this matter.[1] The first reported FTCA case discussing the law of Guam and how it should be applied in an accident on the Navy base is *Lester v. U.S.*, 487 F.Supp. 1033, 1037 (Tex. 1980), where a Navy wife slipped and fell on some slippery steps at the Naval Station in Guam and was severely injured. The Texas District Court, utilizing Guam law, held as follows:

///

---

[1] There are very few California/Ninth Circuit cases on this point, but that is only because California has adopted a recreational use statute under § 846 of its Civil Code, and most accidents arising on federal property in California are immune from liability due to California's recreational use immunity laws. *See Ravell, supra*. Guam never adopted the same statute.

Under Guam law there is a specific statute that deals with responsibility for negligence. Section 1714 of the Guam Civil Code[2] states:

> Every one is responsible, not only for the result of his willful acts, but also for an injury occasioned by another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has willfully brought the injury upon himself...

Guided by these laws and by what this court believes to be their proper application, this court finds that the defendant, acting through the United States Navy, was negligent...by failing to exercise ordinary care in maintaining the steps in front of the Lester apartment.

That is precisely the situation that we have now in the case at bar, and it makes no difference whether the person who comes on to the property is a trespasser, licensee or invitee. In years past, there were cases that tried to show that there were different results depending upon if the person was a trespasser, licensee or invitee. But in ***Rowland v. Christian***, 69 C.2d. 108, 119 (1968), the California Supreme Court abrogated those old common law distinctions and stated that,

> The proper test to be applied to the liability of the possessor of land in accordance with § 1714 of the Civil Code, is whether in the management of his property, he has acted as a reasonable man in view of the probability of injury to others, and although the plaintiff's status as a trespasser, licensee, or invitee, may in the light of the facts giving rise to such status, have some bearing on the question of liability, the status is not determinative...where the occupier of land is aware of a concealed condition involving in the absence of precautions an unreasonable risk of harm to those coming in contact with it, and is aware that a person on the premises is about to come in contact with it, the trier of fact can reasonably conclude that a failure to warn or to repair the condition constitutes negligence.

***See also Grayson v. U.S.***, 748 F.Supp. 854, 859 (Fla. 1990), following Florida law "that the traditional distinction among business invitees, public invitees, and licensees by invitation were no longer valid, and all three classes are invited visitors who are owed a duty of reasonable care under

---

[2] Now recodified as 18 G.C.A. § 90107.

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4

the circumstances."

And this, of course, is in line with § 343 of the Restatement Second of Torts, entitled ***Dangerous conditions known to or discoverable by possessor***:

> A possessor of land is subject to liability for physical harm caused to his invitees by condition on the land if, but only if, he (a) knows or by the exercise of reasonable care, would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger.

Comment (b) to that section provides that:

> "An invitee enters upon an implied representation or assurance that the land has been prepared and made ready and safe for his reception. He is therefore entitled to expect that the possessor will exercise reasonable care to make the land safe for his entry, or for his use for the purposes of the invitation.

But more importantly, the Supreme Court of Guam, in a well-reasoned opinion, and citing to ***Rowland, supra***, and the ***Restatements, 2d., supra***, declared what the law of Guam is concerning premises liability:

> We follow the principle first enunciated in ***Nissan Motor Corp.***, 2002 Guam 5, that a property owner must exercise reasonable care in the management of his property in view of the probability of injury to others, and we hold specifically that in order to be liable for injury caused by a harmful or dangerous condition on a property, there must be negligence on the part of the property owner itself. The owner must have caused the condition, or have actual or constructive knowledge of the existence of the condition in sufficient time to correct it. ***Guerrero v. McDonalds, et al.***, 2006 Guam 2, headnote 23.

In this case, the government agents went on the ***Polaris Point*** property prior to the concert and marked the areas where the holes were located so that people wouldn't trip over the holes at nighttime or daytime, or wouldn't drive over the holes. They then proceeded to place orange traffic

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4

cones or trash barrels over the holes, but didn't take into consideration that those traffic cones or barrels, with thousands of people attending the concert that day, could be easily stolen or removed because, as the testimony will show, on the night of the accident, there were no traffic cones surrounding the holes that caused the death of the decedent. All of the people involved with this concert knew that there would be thousands of people attending the concert; that they would be driving or walking all over the concert grounds; and the possibilities of accidents occurring, whether by walking, driving cars, or driving golf carts, would take place and that proper precautions should have been taken to make certain that the holes the Navy had already identified as being dangerous would be identified and protected at all times during the concert, whether day or night.

> [the owner's] duty is to anticipate and guard against lurking perils, inspect the premises and facilities and to keep the aisles and other passageways free from substances which might cause a person to slip. This is especially true in the case of a place in which many people assemble at all times of day and night. *Travis v. Metropolitan Theaters Corp.*, 91 C.A.2d. 664, 667 (1949).

Once the Navy undertook a survey of the *Polaris Point* premises and identified potential dangers, it then had a duty to ensure that the potential dangers on the property were made known to all invitees that came on that property. This principle was set forth in the leading case of *Indian Towing Co. v. U.S.*, 350 U.S. 61, 69, 76 S.Ct. 122, 127(1955):

> The Coast Guard need not undertake the lighthouse service, but once it exercised its discretion to operate a light on *Chandeleur Island*, and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act.

*See also Denham v. U.S.*, 834 F.2d. 518, 520 (5th Cir. 1987) to the same effect: "Once the government does undertake to supply a service, then it must be held responsible for negligent acts

in supplying the service....Denham was injured because the Corps. chose to ring the swimming site with concrete blocks and then failed to ensure that they did not drift into an area where they would endanger swimmers. The Corps. here was performing an operational function, and it did not have the discretion to do so negligently."

*See also Handy v. U.S.*, 867 F.2d. 1150 (8th Cir. 1989), applying Illinois law where the court imposed liability on the U.S. where Park Rangers were negligent in their duty to inspect and maintain the premises in a reasonably safe condition when a camper tripped on a wire clothes hangar in an unlit area; and *Borlandoe v. U.S.*, 86 F.Supp.2d. 493, 495 (Pa. 2000), applying Pennsylvania law where the government breached its duty of care to an invitee who tripped on a sidewalk brick at a national park that had been raised up by only one quarter inch; and, *see also Faircloth v. U.S.*, 837 F.Supp. 123, 126 (N.C. 1993), the court there applied North Carolina law and held that the owner of the premises must exercise ordinary care to keep the premises in a reasonably safe condition for invitees and must warn of any hidden dangers.

The case at bar is a fairly straight-forward case because it is not a case where the government "should have known of the dangerous condition" but, in fact, the government did have "actual notice" of the defective property condition and failed to take adequate precautions to make certain that the holes in the property were properly identified with guardrails, stakes, or lighting that could not be removed by the anticipated crowds that were coming to the concert that day. In short, the Defendant was negligent in maintaining its property and that negligence was the proximate result of decedent's death.

### IV.

### GOLF CARTS

As mentioned above, the MWR delivered twelve (12) golf carts to the *Polaris Point* premises

to be utilized by the employees of the sponsoring entities. Specifically, four (4) carts went to Ambros and Budweiser; four (4) carts went to NBG Security, and four (4) carts remained with MWR.

The Defendant has advanced the theory that it was improper for Cassandra to be driving a golf cart with four people on the golf cart. But it is undisputed that when MWR delivered the golf carts to *Polaris Point*, that no precautionary instructions or directions were given to anybody in the use of those carts. Specifically, there were no instructions given to Ambros prohibiting four riders from riding on the golf cart.[3] In point of fact, more than two people were riding in the golf carts all over *Polaris Point* that day and nobody stopped that usage. In Security Officer *Tina Lynee Rae's* statement to the United States Naval Criminal Investigative Service, she said:

> I also know throughout the day/evening, everyone was riding in the same manner as the victim and that the golf carts can really only go 5 MPH.

If the Defendant did not want more than two persons riding in the golf carts, then it should have notified Ambros or the other users of the golf carts that only two people could ride in the carts. This failure on the part of MWR to warn of any dangers in the use of the carts was negligence and a breach of their duty to properly supervise the use of their own equipment.

> ...members of health clubs are owed a duty of reasonable care to protect them from injury while on the premises. Citing cases. This duty necessarily includes a general responsibility to insure that their members know how to properly use gym equipment.
>
> ...It is uncontested that Sports City had not instructed or supervised plaintiff in the use of the hack squat machine. This would normally be a breach of duty by Sports City as this machine could easily cause injury if not properly used. *Thomas v. Sports City, Inc.*, 738 So.2d. 1153, 1157-1158 (La. 1999).

---

[3] The only warning given was to make certain that the governors on the carts were not tampered with.

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4

A cause of action for the negligent supervision or negligent training of the use of a golf cart that causes injury is derived from §§ 388 and 392 of the *Restatement, 2nd of Torts* concerning the use of a chattel by the supplier and owner of that chattel, if the supplier

(a) Knows or has a reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

(b) Has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) Fails to exercise reasonable care to inform them of its dangerous condition or of the facts which might make it likely to be dangerous.

Consequently, because the Defendant has advanced the position that the Plaintiff and the Plaintiff's husband were negligent in permitting four people to ride on the golf cart, the evidence will show that nobody from MWR, the supplier of the golf carts, advised Cassandra that four people could not ride on the golf carts, and especially when she saw MWR personnel driving golf carts that day with more than two people in the golf carts. Then necessarily MWR was negligent in not directing or instructing on the proper use of those golf carts.

## V.

## DAMAGES

Roland Boudreau was thirty-six (36) years old at the time of his death and had a life expectancy of thirty-eight (38) more years.[4] He was making approximately Fifty Thousand Dollars ($50,000) per year at the time of his death, and had the opportunity to, of course, make much more than that. His 39.6 years of life expectancy, times Fifty Thousand Dollars ($50,000) per year, equals One Million Eight Hundred Thousand Dollars ($1,800,000). Cassandra and Roland's minor son are

---

[4] Plaintiff requests the Court to take judicial notice of the life expectancy table attached hereto. Source: *Am.Jur.2d. Desk Book*.

entitled to that amount of money, plus funeral expenses and hospital expenses, to properly reimburse them for his untimely death brought about by the negligence of the Defendant.

## VI.

## CONCLUSION

The Defendant was negligent in providing its property to the concert goers in a dangerous condition when it had notice of a dangerous condition on the property and failed to correct it. And, secondly, the Defendant was negligent in delivering golf carts for use by Ambros employees without adequate warnings, supervision or instruction on their use.

Respectfully submitted this 1st day of February, 2008.

TEKER TORRES & TEKER, P.C.

By_____
LAWRENCE J. TEKER, ESQ.
Attorneys for Plaintiff, *Cassandra C. Truong*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this date I caused to be served, via hand delivery, a file-stamped copy of Plaintiff's Trial Memorandum on the following:

Mikel Schwab, Esq.
Assistant U.S. Attorney
Office of the United States Attorney
108 Hernan Cortez Avenue, Suite 500
Hagåtña, Guam 96910

DATED at Hagåtña, Guam, on February 1, 2008.

_____
LAWRENCE J. TEKER

LJT:cs
PLDGS:TRUONG, CASSANDRA-U.S. NAVY:019

Item No. 94

# Expectation of Life and Expected Deaths, by Race, Sex, and Age: 1994

| AGE IN 1994 (years) | EXPECTATION OF LIFE IN YEARS | | | | | EXPECTED DEATHS PER 1,000 ALIVE AT SPECIFIED AGE [1] | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Total | White | | Black | | Total | White | | Black | |
| | | Male | Female | Male | Female | | Male | Female | Male | Female |
| At birth | 75.7 | 73.3 | 79.6 | 64.9 | 73.9 | 8.01 | 7.21 | 5.88 | 17.42 | 14.05 |
| 1 | 75.3 | 72.8 | 79.1 | 65.1 | 73.8 | 0.62 | 0.60 | 0.45 | 1.22 | 0.90 |
| 2 | 74.4 | 71.8 | 78.1 | 64.1 | 73.0 | 0.45 | 0.43 | 0.34 | 0.86 | 0.73 |
| 3 | 73.4 | 70.9 | 77.1 | 63.2 | 72.0 | 0.36 | 0.32 | 0.27 | 0.63 | 0.58 |
| 4 | 72.4 | 69.9 | 76.1 | 62.2 | 71.1 | 0.28 | 0.26 | 0.22 | 0.51 | 0.46 |
| 5 | 71.4 | 68.9 | 75.2 | 61.3 | 70.1 | 0.24 | 0.23 | 0.18 | 0.45 | 0.37 |
| 6 | 70.5 | 67.9 | 74.2 | 60.3 | 69.1 | 0.22 | 0.22 | 0.18 | 0.42 | 0.30 |
| 7 | 69.5 | 67.0 | 73.2 | 59.3 | 68.2 | 0.20 | 0.21 | 0.15 | 0.39 | 0.25 |
| 8 | 68.5 | 66.0 | 72.2 | 58.3 | 67.2 | 0.18 | 0.19 | 0.14 | 0.33 | 0.22 |
| 9 | 67.5 | 65.0 | 71.2 | 57.3 | 66.2 | 0.16 | 0.18 | 0.12 | 0.25 | 0.21 |
| 10 | 66.5 | 64.0 | 70.2 | 56.4 | 65.2 | 0.14 | 0.14 | 0.12 | 0.18 | 0.21 |
| 11 | 65.5 | 63.0 | 69.5 | 55.4 | 64.2 | 0.14 | 0.16 | 0.12 | 0.17 | 0.23 |
| 12 | 64.5 | 62.0 | 68.2 | 54.4 | 63.2 | 0.20 | 0.21 | 0.15 | 0.31 | 0.27 |
| 13 | 63.5 | 61.0 | 67.2 | 53.4 | 62.3 | 0.31 | 0.36 | 0.20 | 0.63 | 0.31 |
| 14 | 62.6 | 60.0 | 66.3 | 52.4 | 61.3 | 0.46 | 0.55 | 0.26 | 1.07 | 0.36 |
| 15 | 61.6 | 59.1 | 65.3 | 51.5 | 60.3 | 0.63 | 0.77 | 0.34 | 1.57 | 0.43 |
| 16 | 60.6 | 58.1 | 64.3 | 50.6 | 59.3 | 0.79 | 0.97 | 0.41 | 2.04 | 0.50 |
| 17 | 59.7 | 57.2 | 63.3 | 49.7 | 58.4 | 0.91 | 1.13 | 0.48 | 2.43 | 0.56 |
| 18 | 58.7 | 56.2 | 62.3 | 48.8 | 57.4 | 0.98 | 1.23 | 0.47 | 2.70 | 0.62 |
| 19 | 57.8 | 55.3 | 61.4 | 47.9 | 56.4 | 1.01 | 1.28 | 0.47 | 2.86 | 0.68 |
| 20 | 56.8 | 54.4 | 60.4 | 47.1 | 55.5 | 1.04 | 1.32 | 0.45 | 3.02 | 0.74 |
| 21 | 55.9 | 53.4 | 59.4 | 46.2 | 54.5 | 1.07 | 1.36 | 0.44 | 3.19 | 0.81 |
| 22 | 55.0 | 52.5 | 58.5 | 45.3 | 53.5 | 1.10 | 1.41 | 0.44 | 3.32 | 0.88 |
| 23 | 54.0 | 51.6 | 57.5 | 44.5 | 52.6 | 1.12 | 1.43 | 0.45 | 3.40 | 0.96 |
| 24 | 53.1 | 50.7 | 56.5 | 43.6 | 51.6 | 1.13 | 1.43 | 0.47 | 3.45 | 1.04 |
| 25 | 52.1 | 49.7 | 55.5 | 42.8 | 50.7 | 1.14 | 1.43 | 0.50 | 3.47 | 1.12 |
| 26 | 51.2 | 48.8 | 54.6 | 41.9 | 49.8 | 1.16 | 1.43 | 0.52 | 3.51 | 1.21 |
| 27 | 50.3 | 47.9 | 53.6 | 41.1 | 48.8 | 1.19 | 1.47 | 0.54 | 3.61 | 1.31 |
| 28 | 49.3 | 47.0 | 52.6 | 40.2 | 47.9 | 1.26 | 1.55 | 0.57 | 3.82 | 1.43 |
| 29 | 48.4 | 46.0 | 51.7 | 39.4 | 46.9 | 1.34 | 1.67 | 0.60 | 4.09 | 1.57 |
| 30 | 47.4 | 45.1 | 50.7 | 38.5 | 46.0 | 1.44 | 1.81 | 0.63 | 4.41 | 1.72 |
| 31 | 46.5 | 44.2 | 49.7 | 37.7 | 45.1 | 1.53 | 1.94 | 0.66 | 4.72 | 1.87 |
| 32 | 45.6 | 43.3 | 48.7 | 36.9 | 44.2 | 1.62 | 2.06 | 0.71 | 5.00 | 2.03 |
| 33 | 44.6 | 42.4 | 47.8 | 36.1 | 43.3 | 1.71 | 2.16 | 0.76 | 5.23 | 2.18 |
| 34 | 43.7 | 41.4 | 46.8 | 35.3 | 42.4 | 1.80 | 2.24 | 0.82 | 5.44 | 2.33 |
| 35 | 42.8 | 40.5 | 45.9 | 34.5 | 41.5 | 1.89 | 2.33 | 0.89 | 5.64 | 2.50 |
| 36 | 41.9 | 39.6 | 44.9 | 33.8 | 40.6 | 1.99 | 2.44 | 0.96 | 5.87 | 2.67 |
| 37 | 41.0 | 38.7 | 43.9 | 32.8 | 39.7 | 2.10 | 2.55 | 1.03 | 6.19 | 2.84 |
| 38 | 40.1 | 37.8 | 43.0 | 32.0 | 38.8 | 2.20 | 2.66 | 1.10 | 6.60 | 3.01 |
| 39 | 39.1 | 36.9 | 42.0 | 31.2 | 37.9 | 2.32 | 2.79 | 1.15 | 7.09 | 3.18 |
| 40 | 38.2 | 36.0 | 41.1 | 30.5 | 37.0 | 2.44 | 2.94 | 1.22 | 7.63 | 3.36 |
| 41 | 37.3 | 35.1 | 40.1 | 29.7 | 36.1 | 2.58 | 3.10 | 1.31 | 8.17 | 3.56 |
| 42 | 36.4 | 34.2 | 39.2 | 28.9 | 35.3 | 2.73 | 3.25 | 1.41 | 8.68 | 3.78 |
| 43 | 35.5 | 33.3 | 38.2 | 28.2 | 34.4 | 2.88 | 3.41 | 1.54 | 9.08 | 4.04 |
| 44 | 34.6 | 32.5 | 37.3 | 27.4 | 33.5 | 3.04 | 3.57 | 1.70 | 9.45 | 4.33 |
| 45 | 33.7 | 31.6 | 36.4 | 26.7 | 32.7 | 3.22 | 3.74 | 1.87 | 9.82 | 4.66 |
| 46 | 32.8 | 30.7 | 35.4 | 26.0 | 31.8 | 3.44 | 3.96 | 2.07 | 10.26 | 5.00 |
| 47 | 31.9 | 29.8 | 34.5 | 25.2 | 31.0 | 3.69 | 4.24 | 2.28 | 10.79 | 5.35 |
| 48 | 31.1 | 28.9 | 33.6 | 24.5 | 30.1 | 4.00 | 4.60 | 2.52 | 11.45 | 5.69 |
| 49 | 30.2 | 28.1 | 32.7 | 23.8 | 29.3 | 4.36 | 5.02 | 2.79 | 12.22 | 6.05 |
| 50 | 29.3 | 27.2 | 31.7 | 23.1 | 28.5 | 4.76 | 5.51 | 3.08 | 13.06 | 6.42 |
| 51 | 28.4 | 26.4 | 30.8 | 22.4 | 27.7 | 5.20 | 6.04 | 3.41 | 13.94 | 6.84 |
| 52 | 27.6 | 25.5 | 29.9 | 21.7 | 26.9 | 5.67 | 6.61 | 3.76 | 14.84 | 7.35 |
| 53 | 26.7 | 24.7 | 29.1 | 21.0 | 26.1 | 6.16 | 7.19 | 4.12 | 15.78 | 7.97 |
| 54 | 25.9 | 23.9 | 28.2 | 20.3 | 25.3 | 6.68 | 7.82 | 4.50 | 16.70 | 8.69 |
| 55 | 25.1 | 23.0 | 27.3 | 19.6 | 24.5 | 7.25 | 8.49 | 4.91 | 17.68 | 9.48 |
| 56 | 24.3 | 22.2 | 26.4 | 19.0 | 23.7 | 7.87 | 9.25 | 5.38 | 18.74 | 10.29 |
| 57 | 23.4 | 21.4 | 25.6 | 18.3 | 22.9 | 8.82 | 10.17 | 5.93 | 19.97 | 11.13 |
| 58 | 22.6 | 20.6 | 24.7 | 17.7 | 22.2 | 9.50 | 11.31 | 6.58 | 21.43 | 11.95 |
| 59 | 21.9 | 19.9 | 23.9 | 17.1 | 21.5 | 10.51 | 13.62 | 7.33 | 23.05 | 12.80 |
| 60 | 21.1 | 19.1 | 23.1 | 16.5 | 20.7 | 11.82 | 14.05 | 8.15 | 24.86 | 13.69 |
| 61 | 20.3 | 18.4 | 22.2 | 15.9 | 20.0 | 12.77 | 15.56 | 9.01 | 26.77 | 14.66 |
| 62 | 19.6 | 17.7 | 21.4 | 15.3 | 19.3 | 13.96 | 17.11 | 9.90 | 28.57 | 15.75 |
| 63 | 18.9 | 17.0 | 20.6 | 14.7 | 18.6 | 15.14 | 18.69 | 10.79 | 30.19 | 16.93 |
| 64 | 18.1 | 16.3 | 19.9 | 14.2 | 17.9 | 16.36 | 20.32 | 11.70 | 31.70 | 18.22 |
| 65 | 17.4 | 15.6 | 19.1 | 13.6 | 17.2 | 17.64 | 22.06 | 12.68 | 33.11 | 19.56 |
| ... | ... | ... | ... | ... | ... | ... | ... | ... | ... | ... |
| 80 | 14.1 | 12.5 | 15.4 | 11.0 | 14.1 | 26.44 | 33.19 | 19.66 | 48.61 | 29.36 |
| 81 | 11.0 | 9.6 | 12.0 | 8.9 | 11.2 | 39.29 | 49.61 | 30.62 | 55.60 | 40.79 |
| 82 | 8.3 | 7.2 | 9.0 | 6.5 | 8.5 | 60.17 | 76.21 | 48.38 | 80.75 | 58.95 |
| 85 and over | 6.1 | 5.2 | 6.4 | 5.3 | 6.3 | 1,000.0 | 1,000.0 | 1,000.0 | 1,000.0 | 1,000.0 |

[1] Based on the proportion of the cohort who are alive at the beginning of an indicated age interval who will die before reaching the end of that interval. For example, out of every 1,000 people alive and exactly 50 years old at the beginning of the period, between 4 and 5 (4.78) will die before reaching their 51st birthdays.

Source: U.S. National Center for Health Statistics, *Vital Statistics of the United States*, annual; and unpublished data.

Statistical Abstract of the United States 1997.