# IN THE SUPERIOR COURT OF GUAM

CASSANDRA CHAU TRUONG,
Administratrix of the Estate
of ROLAND ANTHONY BOUDREAU,
deceased,

             Plaintiff,

       vs.

AIOI INSURANCE COMPANY, LTD.,

             Defendant.

) CIVIL CASE NO. CV1082-06
)
)
)
)
)
)
)
)
)
)
)
)

## TRANSCRIPTION

### OF

## HEARING BEFORE THE HONORABLE

## JUDGE ARTHUR R. BARCINAS

November 14, 2007

COPY

BY:   GEORGE B. CASTRO
      **DEPO RESOURCES**
      #49 Anacoco Lane
      Nimitz Hill Estates
      Piti, Guam 96915
      Tel:(671)688-**DEPO** • Fax:(671)472-3094

GOVERNMENT
EXHIBIT
3

2

IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| CASSANDRA CHAU TRUONG, Administratrix of the Estate of ROLAND ANTHONY BOUDREAU, deceased,<br><br>    Plaintiff,<br><br>  vs.<br><br>AIOI INSURANCE COMPANY, LTD.,<br><br>    Defendant. | ) CIVIL CASE NO. CV1082-06<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

  Hearing before the Honorable Judge Arthur R. Barcinas, Wednesday, November 14, 2007 at 10:24 a.m., at the Superior Court of Guam; Guam Judicial Center 120 West O'Brien Drive, Hagatna, Guam. That at said time and place there transpired the following:

**APPEARANCES**

For the Plaintiff    LAW OFFICE OF TEKER TORRES & TEKER, P.C.
            By: **Joseph C. Razanno, Esq.**

For the Defendant    LAW OFFICE OF DOOLEY ROBERTS & FOWLER, LLP
            By: **Tim Roberts, Esq.**

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel:(671)688-DEPO (3376) * Fax:(671)472-3094

Case 1:06-cv-00022  Document 21-2  Filed 08/15/2008  Page 2 of 42

1　**HAGATNA, GUAM, WEDNESDAY, NOVEMBER 14, 2007; 10:24 A.M.**

2

3　　　MR. ROBERTS:  Good morning, Your Honor.

4　　　JUDGE BARCINAS:  Good morning.  You're

5　going to have to educate me on this because

6　frankly I didn't have the time to review this

7　motion.

8　　　MR. ROBERTS:  Can do, Your Honor.

9　　　JUDGE BARCINAS:  Yes.

10　　　MR. ROBERTS:  Let me ask you first, is

11　Your Honor a golfer?  You've golfed before?

12　This involves a golf cart, this accident.  So

13　I'm wondering, do you know how the basic golf

14　cart --

15　　　JUDGE BARCINAS:  I have chased golf

16　balls and --

17　　　MR. ROBERTS:  Okay.

18　　　JUDGE BARCINAS:  -- operated golf carts

19　in fear of my life going down those slippery

20　bridges, but yeah --

21　　　MR. ROBERTS:  Okay.

22　　　JUDGE BARCINAS:  -- I have some sense

23　of that.  Yes.

24　　　MR. ROBERTS:  As I alluded to just now,

25　this accident involves a golf cart.  The

1  plaintiff is Cassandra Casey Truong. She is
2  the widow of a deceased person named Roland
3  Boudreau. This accident happened on April 2nd,
4  2005 after the Three Doors Down concert here on
5  Guam. The accident happened when Ms. Truong
6  was driving a golf cart with her friend in the
7  passenger seat. Her husband Roland Bouderau
8  and another person hanging on to the back of
9  the golf cart where your golf bags are stored,
10 they were driving down an asphalt paved area at
11 Polaris Point, where the concert was held, when
12 Mr. Boudreau either jumped off back or fell off
13 the back and was killed.
14        One month after the accident, Ms.
15 Truong gave a sworn statement to the Navy where
16 she didn't mention any potholes or dangerous
17 conditions or any other cause for the accident,
18 other than her understanding was that Roland
19 had jumped off the back of the golf cart to
20 retrieve one of his zories that had fallen off.
21        So, this being a modern society,
22 naturally a lawsuit results. Ms. Truong filed
23 a complaint against her employer, Ambros, which
24 was a sponsor, one of the sponsors of the Three
25 Doors Down concert. In her complaint, she had

1  -- there are two basic allegations of
2  negligence -- there's only two -- any
3  allegations of negligence in the complaint.
4  First, Ms. Truong alleges, "Well, Ambros failed
5  to train me how to drive a golf cart", and
6  that's how the accident happened. Second
7  ground for liability is that Ambros is liable
8  on a respondeat superior basis, because an
9  employee of Ambros, active of course in the
10 scope of her employment, negligent, drove the
11 golf cart and killed Mr. Boudreau, where, of
12 course the employee is Ms. Truong.
13         So, she is saying that, "I got in an
14 accident and killed my husband, and now my
15 employer's strictly liable for that, and must
16 pay me damages because I was acting of course
17 in the scope of my employment."
18         So, I took Mrs. Truong's deposition,
19 and I asked her about both of these grounds for
20 liability, or some grounds for alleged
21 negligence on Ambros's part. In regards to the
22 first one, "Ambros failed to train me how to
23 drive a golf cart", I said, "Casey, you're a
24 golfer, aren't you?" She said, yeah. And I
25 said, "Well, you already knew how to drive a

golf cart, didn't you?" She said, well, yeah. So that theory is gone, and in fact it's abandoned in the opposition to this motion to summary judgment, you won't find any argument in the opposition on this particular theory of relief (sic). So I suggest for all practical and legal purposes, it's gone.

The second ground, respondeat superior liability, Mr. Razzano and I have gone back and forth in a fairly spirited way on this theory. I've argued, correctly, I think, that in order for respondeat superior liability to apply, the employee in question through whom the employer is acting has to be negligent. The employee is not negligent, then there's no respondeat superior liability. There's no reason to hold, or no grounds upon which to hold the employer strictly liable based on the actions of its employee.

So, I asked Casey in her deposition, "Casey, what did you do wrong?" "Nothing". "Was your negligent, were you negligent?" "No". "What did you do or fail to do that may have contributed to your husband's death?" "Nothing". I gave her three chances, she

1   denied it under oath each time, and I should

2   add that subsequently -- oh, I forgot to say

3   this. Ms. Truong is suing the United States

4   Government too, in Federal Court. She has sued

5   the United States Navy for maintaining a

6   dangerous condition at Polaris Point. So the

7   U.S. Attorney, Assistant U.S. Attorney Michael

8   Schwab took Casey's deposition in the federal

9   case and this is attached to a declaration in

10   filing support in his motion.

11        Michael asked her 6 or 7 times what she

12   did wrong. She said, "Nothing, nothing,

13   nothing." Denied it 6 or 7 times that she did

14   anything wrong. So in my favor, I've argued,

15   again correctly, I submit that this absolutely

16   precludes any recovery by a case against Ambros

17   in respondeat superior belief. Mr. Razzano has

18   characterized Ms. Truong's testimony as her

19   personal opinion. Her personal opinion is not

20   relevant here, well, if it's not her personal

21   opinion, I asked her what she did wrong, she

22   said nothing.

23        There's no evidence in the case right

24   now, Judge. There's no evidence that Ms.

25   Truong was in fact negligent. What she needed

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094

1   to do to save her respondeat superior case is

2   say, "Yeah, I was a little bit negligent." But

3   she didn't. Now, today, there's no evidence of

4   Ms. Truong's negligence, and in fact you'll

5   find no admission of Ms. Truong's negligence in

6   the papers filed by Mr. Razzano.

7       All right. So she loses as a matter of

8   law, Ms. Truong loses as a matter of law in a

9   respondeat superior liability. So there went

10   both grounds for negligence alleged in the

11   complaint, but, in her deposition another

12   theory surfaces. She said, "Polaris Point has

13   potholes in it. The ground is bumpy and that's

14   what caused the accident." This is a species

15   of a premises liability cause of action. She's

16   saying that Ambros controlled Polaris Point,

17   you know, it's owned by the United States Navy,

18   and that which certainly comes as a surprise to

19   the United States Navy that Ambros controlled

20   Polaris Point.

21       But, she's saying that it was a

22   dangerous condition, the potholes there, and we

23   were on notice of it, we're liable. But in

24   fact, I submitted three or four declarations in

25   support of my motions by Ambros management

1 | personnel saying, "We inspected this place
2 | before this concert, we inspected it before
3 | prior concerts, there's been several concerts
4 | here over the years, there's never been an
5 | accident, there've been golf carts used at this
6 | Polaris Point for Ambros-sponsored concerts
7 | before, there's never been an injury, never
8 | been an accident, no one's complaining." Casey
9 | Truong herself drove this golf cart all day
10 | long over that asphalt area without any
11 | incident, as did five other Ambros employees
12 | and, I forget the number, 10 or 15 Navy
13 | employees were driving golf carts. There were
14 | no accidents.
15 | So, it's undisputed on this motion
16 | today that Ambros had no actual or constructive
17 | knowledge of any danger expedition. That
18 | argument in favor of summary judgment, is not
19 | opposed in Ms. Truong's opposition papers.
20 | It's ignored, and so I suggest we ought to win
21 | on that one, as a matter of law too. They
22 | never even tried, the opposition, Ms. Truong
23 | has never even tried to prove that Ambros had
24 | actual destructive knowledge.
25 | And now the Guam Supreme Court,

1   McDonald -- Guerrero V McDonald's case of last

2   year without actual or constructive knowledge

3   or danger expedition on your property, you

4   can't be held liable as a controller or

5   possessor of land.

6       So, that was the only other possible

7   theory of relief that surfaced in the

8   deposition. And that's three of them now, and

9   I think they're all agreed on.

10      Another ground for -- the fourth one,

11  surfaced in Ms. Truong's opposition papers to

12  the motion for summary judgment. She's argued

13  that Ambros served too many beers to Mr.

14  Boudreau, and that's why -- I won't

15  mischaracterize Mr. Razzano's argument.

16      Mr. Razzano has argued, if Mr. Boudreau

17  was intoxicated, it was because Ambros served

18  him too many beers. The problem with that,

19  that's a dram shop theory of liability. That's

20  a -- you're saying, you know, in some states

21  their statute said, you serve alcohol to a

22  minor or to an "obviously intoxicated person"

23  you can be held civilly liable. At common law,

24  prior to these statutes, you could not be held

25  simply liable, the court said, wait a minute.

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

It's not the salon's service of alcohol that's
the approximate cause of an accident it's the
drunk's voluntary consumption of alcohol that
is the approximate cause of an accident. So
you could not sue of tavern or a liquor server
at common law, because you drank too much and
hurt somebody, you hurt yourself.

A lot of states pass statutes saying,
we're going to oppose civil liability on
somebody but those statutes all say to a minor
or to an obviously intoxicated person. Guam
has a statute which it borrowed from California
which penalizes administratively -- if someone
with a ABC liquor license holder serves alcohol
to a habitual drunkard, I'm quoting, or
obviously intoxicated person, there's a penalty
imposed.

California, before one case in the 1973
Vessily versus Seeger (phonetic) had never
ruled that that statute serve as a basis for
civil liability, it's just an administrative
penalty. But when the California Supreme Court
held that in Vessily versus Seeger 1973,
California was outraged, everyone was up in
arms and so the California legislature

1  immediately amended the statute to add
2  subsection B and C saying, notwithstanding
3  anything that was said before, the service of
4  alcohol to an obviously intoxicated person
5  shall not serve as the grounds for civil
6  liability against the salon keeper.

7  So, under any scenario for this dram
8  shop theory which has been raised in the
9  opposition memorandum for the first time, not
10  really raised saying, if he was drunk, it was
11  Ambros' fault. Under any scenario it requires
12  some evidence that an Ambros employee served
13  alcohol to Mr. Boudreau at a time he was
14  obviously intoxicated.

15  You know, there's no evidence in the
16  record that you'll see on this hearing or in
17  the paper that are currently filed, but when
18  certain deposition transcripts are ready I will
19  file those. I took the depositions of three
20  witnesses, all the rest of the people that were
21  in the two carts that were in the vicinity of
22  this accident. Now, they've all been deposed,
23  I asked everyone of these people, all obviously
24  friends of Ms. Truong, "Was Roland Boudreau
25  obviously intoxicated at any time of day?" and

1  they all said, no, absolutely not.

2  So, there won't ever be any evidence

3  that Mr. Boudreau was served alcohol by an

4  Ambros employee at a time that he was obviously

5  intoxicated. Therefore, even if Guam did have

6  dram shop liability, which I don't think that

7  it does, Guam Supreme Court's never ruled that

8  it does. Even if it did, there'd be no grounds

9  for liability because there's no evidence that

10 Mr. Boudreau was served alcohol, at the time he

11 was obviously intoxicated.

12 Last point, there's another, I forgot.

13 There's a fifth, grounds for negligence raised

14 in the opposition memorandum. It is something

15 called a sponsorship for control theory of

16 relief. This was on as a separate section in

17 his opposition memorandum on .sponsorship

18 liability. He cites cases where an entity will

19 sponsor a 4th of July event but something goes

20 wrong, somebody gets hurt and the sponsor gets

21 held liable.

22 One of the case cited, a case cited is

23 -- man, what was it? Davidson versus somebody

24 case out of New York where a rock band,

25 somebody sponsored a show and a fire happened,

1 200 people got killed. And so -- was it Great

2 North, was that the band?

3 MR. RAZANNO: Gray versus Deerderring

4 (phonetic) the Whitesnake case.

5 MR. ROBERTS: Whitesnake. The

6 Whitesnake case. Well, lots of people were

7 killed and liability was opposed because --

8 well, imposed on the sponsor for a variety of

9 reasons. But in all those cases Judge, there's

10 still got to be negligent. You're not liable

11 as a sponsor just because you sponsored

12 something and an accident happens. There still

13 got to be negligence. And in those cases there

14 were. There was faulty wiring in the

15 Whitesnake case. There was negligent leaving

16 of dangerous fireworks for a minor -- or no,

17 the firework was fired negligently off the

18 premises and burned somebody's house.

19 And another case, a left fielder was so

20 angry by something that happened in a baseball

21 game, he threw a ball as hard as he could in to

22 the crowd. The sponsors in those cases were

23 held liable, but there was negligence on

24 someone's part. And here, there's no

25 negligence on Ambros' part, so this sponsorship

1  thing as a theory of recovery doesn't apply.

2  　　　　JUDGE BARCINAS:  Thank you.

3  　　　　MR. RAZZANO:  Of course, Judge, we

4  completely disagree.  I mean, let's just think

5  about this whole concept of Ms. Truong saying,

6  "Well, I wasn't negligent."  Well, if that was

7  all an employer had to view, and every time an

8  employer was sued for negligence, they would

9  simply bring in the employee, sign an affidavit

10  that says, "I didn't do anything wrong," and

11  then all of a sudden the employer would be

12  relieved of liability.

13  　　　　And in fact, the McDonald's case that

14  Mr. Roberts cites, says exactly that on Page 6

15  of the opinion.  It says, "We acknowledge that

16  a balance is necessary, on the one hand,

17  Plaintiff cannot be burdened with having to

18  show the Defendant's subjective knowledge of a

19  dangerous condition."  This is virtually

20  impossible because then a store owner needs

21  simply disavow knowledge -- the dangerous

22  condition and he avoids all liability.  That's

23  exactly what this is about.

24  　　　　Mr. Roberts wants to say that because

25  Ms. Truong says she's not negligent during this

1 that she actually wasn't negligent. That's not

2 true. You have to look at the facts of what

3 was on, and here are the facts. Ms. Truong is

4 at work for Ambros at this concert, she is the

5 marketing manager for Ambros. Ms. Truong has

6 submitted an affidavit, and said she was

7 drinking on the day of the concert, and then in

8 fact many employees were drinking on the day of

9 the concert. In addition, Mr. Roberts submits

10 her deposition transcript and on Page 18, line

11 20 through 25. He says, "Were you drinking?

12 Yes." So she's drinking at work. Now, whether

13 she thinks that drinking at work is negligent

14 or not, the fact of the matter is she drinking.

15 All right. Next, she decides that she

16 is going to put six people in a golf cart.

17 Okay? Now, this is an Ambros employee, comes

18 over to six people and invites them to get in

19 the golf cart. Six people, Judge. Mr. Roberts

20 says to her, "Well, why did you put six people

21 in the cart? I don't know. They all needed a

22 ride." Okay, they all needed a ride so she

23 puts six people in a golf cart after she's been

24 drinking, and she starts to drive the golf cart

25 going across a bumpy area with potholes. And

1  we submitted depositions and photographs to

2  show you the condition of the property.

3       Another Ambros employee, Sean Pascua

4  (phonetic), he realizes, "That's dangerous.    I

5  better go over there and do something."    He

6  goes over and says, "Hey, let me take some

7  people in this cart."   Two people then get out

8  of the cart and they get on to Mr. Pascua's

9  cart, another Ambros employee.   He puts two --

10  he puts three people in that cart, and has one

11  person standing on the back of the golf cart

12  where the golf bags go.

13       Mr. Aguon submitted a declaration and

14  had his deposition taken.   He says, "I told

15  people not to do that."   So that means that

16  Sean Pascua is in fact -- well, we know that

17  this is the facts.   Sean Pascua then violated

18  what Ambros told him and put three people in a

19  cart when he wasn't supposed to have three

20  people.

21       Now, you've got two golf carts with too

22  many people in it, employees drinking and

23  they're driving down a bumpy road full of

24  potholes and railroad tracks, by the way,

25  there's railroad tracks in the middle of this

concrete.    All   the   evidence   for   that   is   on

Casey   Truong's   deposition   Page   43   Line   9

through Page 44 Line 3.

In   addition,   this   accident   happens   at

7:00 at night.  So when he tells you that these

potholes are open and obvious, they're not open

and   obvious.    We   all   know   what   it's   like   7:00

at night in April.    It's pitch black outside.

How   are   you   supposed   to   see?    No   headlights   on

these   golf   carts,   and   you've   got,   so   now   you've

got    two    Ambros    employees    at    night,    no

headlights   on   the   cart,   driving,   more   people

than   Ambros   told   them   to   have   in   the   carts,

directly   down   the   road   after   being,   after

having cocktails.  That's what you got so far.

And   then   the   next   is,   of   course   we

know, I told you about the un-level ground full

of   potholes,   that's   even   --   look   at   Carlos

Lizama's   affidavit   and   a   photo   submitted,   and

well,   you   can   take   a   look   at   the   Truong

Deposition Page 19 Line 19 through Page 21 Line

19.    That'll   tell   you   about   the   condition   of

the   road.    And   in   fact   Mr.   Roberts   asked   her,

"Tell   me   about   the   condition   of   what   you   think

Ambros   did."    And   she   says,   "Ambros   had   the

opportunity to, and had a duty to make sure that when they invite 5,000 people at Polaris Point, that it's safe to have a concert there."

Mr. Roberts in his declaration, Tom Shimizu and a couple other Ambros employees, who say they went out there and they inspected it. Now his argument is, well, because Tom went out there and said he inspected it, he thought it was okay. Well then, it's fine. There's no negligence. There's nothing wrong with the property. Tom said it was fine. Well, that can't be right, Judge.

We have to look at the facts and circumstances on what went on that day. Not Mr. Shimizu's opinion of whether he should have to pay damages in this case or not. And of course, that is directly what McDonald's and Guerrero's report says.

So, when he says that Casey simply says she's not negligent, I mean, you basically got a woman who's involved in an accident, her husband passes away, and he asked her, is it your fault? I mean, what is she going to say? Well, that's why negligence historically for the last, well, since basically the beginning

1  of jurisprudence, has always been a fact issue
2  because even if somebody thinks they're not
3  negligent, you have to determine on the facts
4  and circumstances whether they actually acted
5  in a negligent manner. I mean, certainly,
6  Judge, if the rule was, I file a lawsuit, you
7  file an answer, and says you didn't do anything
8  wrong, I mean I could clear your docket almost
9  every case in this court room today. Because
10 I'm almost positive that most people have filed
11 an answer saying they didn't do anything wrong.
12          So that's the negligent -- now, let's
13 talk about this premises liability theory.
14 Now, Mr. Roberts tells you, and he tells you
15 correctly, the general rule is you have to be
16 an owner or in control of the property in order
17 to have premises liability theory. Well,
18 that's exactly what the sponsorship liability
19 cases say. A sponsorship liability cases say
20 that if you are the sponsor and you are in
21 control of the premises, you have a duty to
22 ensure that people are taken care of. Okay.
23          And that's what this whole motion was
24 about. It's about duty. They didn't have a
25 duty to do anything. They didn't have a duty

1 to inspect the premises. They didn't have a

2 duty to train anybody. They did not have a

3 duty to anybody. They just collected a bunch

4 of money that day. That's all they were in

5 charge of, you know, is collecting cash.

6     If you look at the sponsorship

7 liability cases, and actually I don't

8 understand where he's going with this dram shop

9 liability thing, because actually the only

10 reason we mentioned that in our brief is

11 because he submits evidence to the court that

12 the guy is intoxicated.

13     If you look at the Sponsorship

14 Liability Section in my brief, the reason we

15 talked about control of the beer is because

16 many, many courts have said they will impose

17 control upon a sponsor if they're controlling

18 the logistics of the concert, and one of the

19 main logistics of the concert is beer. We

20 didn't just cite beer cases. We cited a case

21 that Pepsi Cola sponsored a ride, the court in

22 that case found they didn't have control over

23 that ride.

24     So, when the child was injured during

25 that case, they didn't find they had

1   sponsorship liability, because someone else was

2   in control of the ride. So the key is control.

3   And we know from the interrogatory signed by

4   Mr. Shimizu that he was the one who decided

5   with Lee Vave (phonetic) from Anheuser-Busch to

6   have this concert.

7         They worked with Malafunction

8   Productions and Carl Pangelinan from the very

9   beginning to get the logistics to get in this

10   concert. Mr. Pangelinan's affidavit is on file

11   with the court, talks about his contractual

12   responsibilities with MWR, and the fact that he

13   knew immediately, he couldn't handle these

14   responsibilities, and Ambros decided they would

15   pick up those responsibilities in order to make

16   the money.

17         So, Shimizu and Bab (phonetic) decided

18   we're going to do this concert. They have

19   meetings weeks before. All you got to do is

20   look at the affidavits, and as a matter of fact

21   we're going to submit these other deposition

22   transcripts, and those deposition transcripts

23   will talk about the meetings that were attended

24   between Ambros and MWR, and they went out

25   inspecting the premises. And that's with Mr.

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094

1   Shimizu's declaration says, we inspected the
2   premises. Well, what did you do? I mean, he
3   didn't see the potholes, everyone else saw the
4   potholes, everyone else saw the train tracks,
5   but he decided that it was okay. So, that's
6   Mr. Robert's theory that there's no negligence.
7   But back to the sponsorship case. The
8   Whitesnake case actually, I mean, there's a lot
9   of good cases in this section, but the
10  Whitesnake case is actually the most important
11  case. It's the most recent case on sponsorship
12  liability, it comes out of the District Court
13  of Rhode Island, and I think we all know the
14  Whitesnake case because we all heard about the
15  fire that occurred there and the people were
16  trapped and 200 people died. They sued the
17  sponsor in that case, and of course, the
18  sponsors insurance carriers said, "We're not
19  responsible for this. We don't have anything
20  to do with it. It was the guy who had
21  maintained the fireworks portion of the
22  concert."
23  When I lay out in Page 7, 1, 2, 3, 4
24  and 5 going on to Page 8, citing the evidence
25  in the deposition transcripts and the

1 affidavits in that section, those five factors
2 are exactly what the Rhode Island District
3 Court looked at to impose sponsorship
4 liability, i.e. a duty to protect those
5 patriots. Okay.

6 Even though they subcontracted out the
7 fireworks portion of the concert, because the
8 sponsor was in control of the bar, in control
9 of the beer, in control of the promotional
10 activities, in control of the tickets sales,
11 they were the ones who were responsible, not
12 the subcontractor. Okay. And that's the key
13 to those -- key is, who ran the concert. All
14 you got to do is look at the facts.

15 Ambros ran the concert. Ambros sold
16 the tickets. Ambros coordinated the
17 promotional activities, including the radio
18 sponsors. Ambros hired the MC, Rick Nauta from
19 Hit Radio 100. And when Mr. Roberts tells you
20 that I haven't brought back any facts that
21 contravert (sic) his assertions, I think you'll
22 notice in his reply that he doesn't mention
23 sponsorship liability one time.

24 Now, and he doesn't bring any evidence
25 forth from any of his witnesses to say that

1  they weren't in control of the concert. Why?

2  Because they were in control of the concert.

3  He decides to go ahead and tell you about some

4  dram shop liability theory. Then he tells you,

5  he doesn't even know what the law on dram shop

6  liability theory is. He might be responsible

7  under that theory but he just doesn't know.

8        Nevertheless, the most important part

9  of the motion is Sponsorship Liability -- in

10  those cases carefully, and the proceeding cases

11  that are holding sponsors liable when they're

12  in control of the concert and the premises, et

13  cetera, et cetera, and that's where this all

14  comes from.

15        Now, he draws this -- well, let me make

16  one other point. In all these sponsorship

17  liability cases in the -- I wrap it up on, I

18  think on page -- after I talk about the Double

19  Play Tavern case, I think I wrap it up by

20  saying it's the reasonable inferences that are

21  the most important portion of the Sponsorship

22  Liability.

23        Reasonable inferences are just saying -

24  - are basically fact issues Judge. And if you

25  take a look at the McDonald's case where he's

deciding he wants to draw the battle line,
Footnote 3 in that case talks about Ortega and
the theory of liability in the duties imposed
under the Ortega case out of California. This
is a quote. "An inference is the deduction
which the reason of the judge or jury makes
from the facts proved without an express
direction of law to that effect". And the
court cites 6GCA 5103.

And so, basically they are telling us
that an inference is a fact issue. That's
exactly what they're telling us. McDonald's,
is a very limited rule. I mean, if you
remember, I mean, we all cited Johnson's, it's
about the only case on negligent theory out of
the Supreme Court. But what they say is that,
I want to make sure I give you this quote
correctly, because this is what they say --
okay. "We agree with said policy on underlying
requirement that Plaintiff provided the
property owner, caused to dangerous condition
or had actual or constructive knowledge of such
condition."

Well, when Mr. Roberts submits his
declarations from Mr. Shimizu and the other

Ambros employees saying that they went out and inspected the premises, they had. They definitely, they didn't have constructive knowledge. They had clear knowledge. They went out there. They inspected the premises. They saw that there were train tracks. They saw that there were potholes. And not only did they decide they were going to have a concert there, they go ahead and say, "Let's go ahead and use some golf carts as well."

Now, duly, when he says we had -- they had a duty to train Ms. Truong how to use the golf cart, they had more than duty to train Ms. Truong. They had a duty to train any Ambros employee who's going to operate that vehicle on that day to ensure that everybody at that concert was safe.

Julia Pocaigue resubmits an affidavit to the court saying she's an Ambros employee. She was given a cart. She had no idea how to drive a golf cart. I mean, Ms. Pocaigue had to ask her son to instruct her on how to use the golf cart. So they gave somebody who didn't know how to use a cart, they just launched to use it.

1       On the 18th GCA 9108R, I disagree with
2  Mr. Roberts' assertion. I don't think the
3  estate has any liability. Nevertheless, I'm
4  not going to belabor the point. We've briefed
5  it. Judge, if you think that's the winning
6  argument for his case, then I just simply ask
7  you to let me amend and I'll bring forth a
8  different, I mean, I'll just get a different
9  administrator. He not take this woman's case
10  away from her based on that type of theory.
11  Nevertheless, I still do work right along. We
12  opened an obvious document, we didn't really
13  cover it, but it's pitch black outside, the
14  thing happened at 7:00 at night, there's no
15  headlights, I think we all know it's difficult
16  to deal an obvious when we can't see.

17       Again, it's not a dram shop liability
18  theory case. Nevertheless, he admits he
19  doesn't know what the law is under Dram Shop
20  Liability, anyway. This negligence case is
21  based on Ambros duty and control and their
22  failure of their responsibility to protect the
23  invitees that they had. Ambros asks us all the
24  time to drink responsibly, and they had a
25  seminar regarding that over the next three

1  days, and all we're asking is that they act
2  responsibility in this case and realize that
3  they had a duty, the court acknowledge that
4  duty, and in the future, avoid these types of
5  accidents. Judge, thank you very much.
6      JUDGE BARCINAS: Thank you. Mr.
7  Roberts?
8      MR. ROBERTS: I think Mr. Razanno made
9  one reference to a statute. I know the court
10 had said they hadn't read the briefs.
11     JUDGE BARCINAS: Right.
12     MR. ROBERTS: So I'll explain what
13 reference he's -- what he's talking about.
14 This is in response to, in connection with the
15 respondeat superior theory of relief. I have
16 argued that under Guam's Contributory
17 Negligence Statute, Casey is legally barred
18 from recovering under respondeat superior
19 theory, because under that statute, if the
20 negligence of the person from whom recovery is
21 sought, is as -- excuse me, let me start again.
22 Under that statute, if your negligence is as
23 great as the person from whom recovery is
24 sought, you can't recover.
25     Well, here, Casey, Ambros' negligence

is Casey's negligence. Her negligence will always be as great as or as small as. It'll always be equal to Ambros', because Ambros only acts through Casey, in connection with the respondeat superior argument. In a respondeat superior case, there is no negligence on the part of the employer. The negligence is by the employee which is attributed to the employer who is strictly liable as a matter of policy, respondeat superior means in Latin, I think, let the master answer. So I've argued that there can't be any respondeat superior because Casey's negligence will always be the same as Ambros is negligent. It's the same negligence.

Neither Mr. Razzano or I could find a case saying that or not saying that. There are no cases on it that we've been able to find. But it makes sense. It's logic, it's common sense. And if I'm wrong and Mr. Razzano's right, then we'll have a rule on Guam that a wife, anytime a wife kills her husband when she's performing a job related task, she could sue her employer and make it strictly liable to pay her damages, and I don't think society would tolerate a rule like that. Anyway,

that's the argument that Mr. Razzano referred
to near the end. I'll go back to the beginning
now.

In reference to Casey's statement that,
"Hey, I wasn't negligent." I didn't
manufacture that testimony. I didn't put a
declaration in front of my own client and say,
"Sign to say you weren't negligent, and we'll
get you off the case." This is an -- this is a
plaintiff. I gave her a chance to say what she
did wrong. I didn't manufacture this
testimony.

So, the argument that anytime a
defendant signs an affidavit saying I didn't do
anything wrong, that doesn't make sense. These
aren't my own client's words, these are Joe's
client's words. And the second, then Joe went
and talked about the McDonald's case, and again
he referenced where a storekeeper -- or signs
an affidavit saying he's not on notice of any
dangerous condition. Can he thereby avoid
liabilities by signing that affidavit? That
was a different situation at McDonald's.

What the court, the Guam Supreme Court
was talking about was, in the absence of any

evidence of actual inspections, the storekeeper can't just sign an affidavit saying, "I didn't know nothing. So I can't be liable." In McDonald's, there was evidence of regular inspections, the same as there is in this case. In other words, Ambros is not saying, "I didn't know anything about any dangerous conditions," and just say, "You can't hold me liable now." It's saying, "I went out and inspected this place and there has never been any previous accidents. I didn't see any dangerous condition. Nobody else fell off the back of a golf cart and died that day. Nobody else has fallen on back of a golf cart in previous concerts. Nobody has ever complained to us."

I've submitted evidence to show that we've inspected and we acted reasonably. And under those circumstances we can't be held liable. Whereas, and the same reason McDonald's couldn't be held liable because they actively inspected. If McDonald's hadn't actively inspected, they would not have been able to get out of the case by a simple affidavit saying, "We didn't know anything."

In a third matter on Casey's

negligence, her attorney is now arguing for the first time she was negligent. He said Casey was negligent, look at all these facts. Because everybody knows the rule where a party can't say one thing in her deposition, and then based on a motion for summary judgment, say something completely different. That being the case, an attorney is barred from arguing facts that his client has denied under oath. He is stuck with Casey's factual statements that "I was not negligent. Nothing I did or didn't do contributed to my husband's death."

I'll turn now to sponsorship liability, I see as other business. Mr. Razzano has gone on and on and on about sponsorship liability. There's no such thing as sponsorship liability. There's only negligent liability. There's only liability for negligent. Sponsors aren't liable just because they're sponsors, they still have to be negligent in order to be found liable, and it's not called sponsorship liability then, it's called negligence liability, and here there's no evidence of negligence.

He mentioned that Julia Pocaigue

testified in her deposition that she didn't
know anything about how to use a golf cart,
that Ambros negligently gave her a golf cart.
Negligence requires damages, Julia Pocaigue
didn't kill her husband, Casey did. Casey knew
how to drive a golf cart because Casey was a
golfer, so it wasn't negligent to let Casey use
that golf cart. She admitted it. She
admitted, "I knew how to drive a golf cart."

The last thing was, and this was only
touched on briefly. I think it was what Mr.
Razzano said. Well, what is it? Everybody
else saw the potholes, except Tom Shimizu when
he inspected. Well, Casey said she saw the
potholes. She said, "I must have seen them
during the day." When she was driving her golf
cart around. So that's what she said, "I
must've seen it, but I don't remember today
when I'm testifying. I must have seen them."
And I said, "Well, how do you know today that
there were potholes there?" She said, "Well, I
was at the concert. I saw them after the
accident." If she saw them during the day, and
she saw them after the accident, she knew they
were there. They opened an obvious -- bars.

1  That's all I have.

2  JUDGE BARCINAS: Thank you, gentlemen.

3  How much time do we need to submit the

4  additional depositions that are still being

5  typed up?

6  MR. RAZZANO: We just took depositions

7  from Wednesday. So I would guess, 30 to 45

8  days, I mean they have to have an opportunity

9  to read their depo transcripts and make any

10  changes to it. So.

11  JUDGE BARCINAS: Yeah. At some point I

12  want to close off the submission of evidence so

13  I can start working on this.

14  MR. ROBERTS: Okay. Just so you know,

15  Judge --

16  JUDGE BARCINAS: Yes.

17  MR. ROBERTS: -- I took those

18  depositions because the discovery cut off

19  deadline is November 19, but I wanted to take

20  those depositions --

21  JUDGE BARCINAS: Understood.

22  MR. ROBERTS: -- at a sufficient time

23  that I could do follow-up depositions if

24  necessary.

25  JUDGE BARCINAS: Okay. Well --

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

1          MR. ROBERTS:   When is the existing

2  motion cut-off deadline?

3          JUDGE BARCINAS:  December 31st.

4          MR. ROBERTS:  Well, how would you like

5  to handle it?  Just wait?

6          MR. RAZZANO:  (pauses)

7          MR. ROBERTS:   To submit the depo

8  transcripts on the record.

9          MR. RAZZANO:  Yeah.  I mean if you want

10  to take some, we can talk about the others.

11          JUDGE BARCINAS:  Well, this is under

12  the old rules.  This case.

13          MR. RAZZANO:  Well, actually, Judge, I

14  kind of disagree with that.  I mean, I think --

15          JUDGE BARCINAS:  I don't know the date

16  of the filing but I assume it's August 2006.

17          MR. RAZZANO:  Yeah.  And Judge, I think

18  that the -- well, I think it's under the old

19  schedule order, for sure.

20          JUDGE BARCINAS:  Right.

21          MR. RAZZANO:  But as far as under the

22  old rules, I mean, I'm pretty sure that the

23  promulgation order from the Supreme Court on

24  June 1st says that all cases are going to be

25  handled retroactively and all cases are now

1 handled under the new rules. So, that's just a

2 little point. But nevertheless, we have the

3 same schedule in order --

4      JUDGE BARCINAS: They begrudgingly gave

5 us a little bit of discretion.

6      MR. ROBERTS: I have to read those

7 rules again?

8      JUDGE BARCINAS: Yeah. They gave us

9 just that tiny bit that said, if it would not

10 work, that the judges should be allowed to

11 decide which rule that would go and best manage

12 that case. And so, I don't know. I'll leave

13 it to you guys to, you know, you guys are not

14 amateurs at this so --

15      MR. ROBERTS: But we are. We're all in

16 a kind of tough time in between the old rules

17 and the new rules. So I don't mind asking

18 this, Judge. And I have an expert, I've

19 identified my expert, but your current schedule

20 in order requires me to identify this expert in

21 December 10th, it doesn't order me to produce an

22 expert report.

23      JUDGE BARCINAS: Okay.

24      MR. ROBERTS: Whereas under the new

25 rules, I believe your initial brief trial is

1  where it would require a report.  I have to get
2  an expert --
3          JUDGE BARCINAS:    Under  the  new  rules,
4  yeah.  So --
5          MR.  ROBERTS:    Do  I  need  to  submit  an
6  expert report by December 10th?  So I need more
7  time.
8          JUDGE BARCINAS:  Counsel?
9          MR.  RAZZANO:    Judge,  of  course  he  has
10 to  submit  an  expert  report  but  --  we  can  work
11 time,  we  don't  need  to  bother  the  court  with
12 this,  the  Court  has  a  motion  under  advisement.
13 We'll  submit  whatever  requirements.    If  you
14 want  to  take  another  discovery  reports  on  that,
15 no  need  to  bother  the  Judge.
16         MR.  ROBERTS:    Well,  I'd  really  like  to
17 know.   The  old  rules,  I  don't  need  to  submit  an
18 expert    report,    and    that's    the    current
19 discovery.   The  current  order  is  identify  your
20 expert  on  December  10th.    I'm  not  on  any  order
21 to   produce   an   expert   report.    If   the   Court
22 orders  me  right  now  to  produce  an  expert
23 report,  I  will.
24         JUDGE BARCINAS:   What  I'm  going  to  say
25 is  that,  I  think  and  I  feel  that  this  case  is

1  governed by the scheduling order that I issue

2  and is governed by the old rules, and I leave

3  it at that. That's the best way I can say it,

4  because we're too far into this scheduling

5  order to then switch and change the rules about

6  how we're going to conduct this lawsuit. So at

7  this juncture I'm going to stay with the old

8  rules, and that means you guys are free to come

9  back and forth into this courtroom to adjust

10  the schedule under the old rules to fit the

11  needs of the parties. Is that clear as mud for

12  you, Mr. Roberts?

13        MR. ROBERTS: I understand, Judge.

14        JUDGE BARCINAS: Okay. Because, you

15  know, the court is still also learning how to

16  adjust to those new rules, and that's a lot of

17  money to produce those reports if we're not on

18  track for getting a decision out on time. The

19  other thing that I'm looking at is on

20  scheduling this trial date in December may not

21  go anyway because of the criminal trial

22  schedule that's pushing in the background

23  before the end of the holidays.

24        MR. ROBERTS: This case is going to

25  trial in December?

1          MR. RAZZANO:  January.

2          JUDGE BARCINAS:  January.  That's what

3    I'm saying, but a lot of the things are going

4    to be done.

5          MR. ROBERTS:  Otherwise --

6          JUDGE BARCINAS:  I'm sorry.  Selection

7    in trial on February 11.

8          MR. ROBERTS:  Yeah, February.

9          MR. RAZZANO:  And then the trial.

10         JUDGE BARCINAS:  Pre-trial conferences

11   on February 4th.

12         MR. ROBERTS:  Thanks, Judge.

13

14         (Hearing concluded at 11:04 a.m.)

15   **HAGATNA, GUAM, WEDNESDAY, NOVEMBER 14, 2007:**

16

17

18

19

20

21

22

23

24

25

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094

# REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 40 pages to be a true and correct transcript of the audio recording provided to me in the time and place as set forth herein.

I do hereby certify the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 11th day of February 2008.

COPY

_____

George B. Castro

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

# CHANGES TO TRANSCRIPTION

Page          Change                                    Initial

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094