FILED
SUPERIOR COURT
OF GUAM

2007 OCT 31 PM 4: 38

CLERK OF COURT

BY:_____

1  **TEKER TORRES & TEKER, P.C.**
SUITE 2A, 130 ASPINALL AVENUE
2  HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4
3  FACSIMILE: (671) 472-2601

4  *Attorneys for the Estate of Roland*
*Anthony Boudreau, Deceased*

*Need Federal
complaint —
allege Navy had
sole control*

5

6

7          IN THE SUPERIOR COURT OF GUAM

8                    ----------

9  CASSANDRA CHAU TRUONG,        )     CIVIL CASE NO. CV1082-06
Administratrix of the Estate of      )
10 ROLAND ANTHONY BOUDREAU,     )
deceased,                            )
11                                   )
              Plaintiff,             )     **PLAINTIFF'S OPPOSITION TO**
12                                   )     **DEFENDANT'S MOTION FOR**
      vs.                           )     **SUMMARY JUDGMENT**
13                                   )
AIOI INSURANCE COMPANY, LTD.,        )
14                                   )
              Defendant.            )
15
                    ----------
16

17      NOW COMES Plaintiff, CASSANDRA CHAU TRUONG, Administratrix of the Estate

18  of ROLAND ANTHONY BOUDREAU, deceased, through her counsel of record, Lawrence J.

19  Teker, Esq., of the law offices of Teker Torres & Teker, P.C., hereby opposes Defendant's

20  Motion for Summary Judgment for the following reasons:

21  ///

22  ///

23  ///

RECEIVED
OCT 31 2007
DOOLEY ROBERTS & FOWLER LLP

**GOVERNMENT
EXHIBIT
4**

# I.

## FACTS

On or about March 1, 2004, Ambros, Inc., Shimbros, Inc. and Anheuser Busch Asia, Inc. were reviewing the opportunity to sponsor the Three Doors Down Concert at Polaris Point. After careful consideration, Lee Babb of Anheuser Busch Asia, Inc. and Tom Shimizu of Ambros, Inc. decided to sponsor the concert. In accordance with their decision, Ambros, Inc. took control of the marketing of the concert and ticket sales.

On April 2, 2005, the decedent, Roland A. Boudreau, was attending the Three Doors Down concert at Polaris Point, Guam, which concert was sponsored by Budweiser and Bud Light, by and through Ambros, Inc. and Shimbros, Inc (hereinafter collectively referred to as "Ambros"). Mr. Boudreau was invited as a V.I.P. to attend the concert, pre-party and post-party where all Ambros brands were being supplied free of charge to all V.I.P. guests. After the concert ended, Mr. Boudreau was invited to be transported to his vehicle by an Ambros/Shimbros employee. Mr. Boudreau accepted the invitation and was told to stand on the back of the golf cart. The golf cart had no headlights and the sun had already gone down making visibility difficult. The group of six (6) headed to the cars all in one cart. A second cart, realizing the first cart was overloaded, then arrived and took two (2) passengers in their cart.

After the passenger exchange, the first cart containing Mr. Boudreau and three (3) other passengers, pulled away. Mr. Boudreau was hanging onto the back of the golf cart, the area designed to transport golf bags. While decedent was being transported on the golf cart, the golf cart hit a bump and the decedent fell off the golf cart and violently hit his head on the pavement. See Deposition transcript of Donovan Rivera taken on March 26, 2007 at P. 10 Lines 8 through P. 11 Line 4, a copy of relevant transcript pages are attached to the Declaration of Joseph C.

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4

1   Razzano filed contemporaneously herewith. The decedent was transported to the U.S. Naval

2   Hospital in Guam that same day for treatment, but died there the next morning as a result of the

3   injuries sustained in that accident.

4       The decedent was an invitee to the Ambros sponsored event at the time of the accident and

5   Ambros owed an affirmative duty of due care to Mr. Boudreau. The duty included the obligation

6   to inspect the Premises and to exercise reasonable care to make the Premises safe for decedent's

7   entry thereon.

8       Ambros and its employees and agents, negligently maintained, managed, controlled and

9   operated said event in that they were operating golf carts on road conditions with bumps, holes

10  and imperfections on the roadways and other portions of the Premises which the sponsors knew,

11  or in the exercise of reasonable care, should have known constituted a dangerous condition and

12  foreseeable risk of harm of which decedent was at all times herein mentioned unaware.

13      Ambros had the opportunity to easily remedy the dangerous conditions, but negligently

14  failed to take steps to either make the conditions safe or to warn decedent of the dangerous

15  conditions, all of which caused the decedent to fall from the golf cart, hit his head on the

16  pavement and die as a result thereof.

17      In addition to the foregoing, Ambros permitted the use of the golf cart by persons either

18  who were not trained in operating same or Ambros negligently trained and/or supervised the

19  operators of said golf carts. Ambros failed to have in place any rules for the safe operation of the

20  golf carts and/or failed to enforce any such rules and Ambros actions and non-actions negligently

21  contributed to this tragic accident. In fact, Ambros permitted the operation of golf carts without

22  operating headlights at night despite limited visibility.

23      The breach of the duty to Mr. Boudreau was the direct and proximate cause of his death

Case 1:06-cv-00022    Document 21-3    Filed 08/15/2008    Page 3 of 44

as described above.

On April 3, 2005, the date of decedent's death, decedent was thirty-six (36) years old and had a life expectancy of forty-one (41) more years. He was married to Cassandra Chau Truong and they had one minor child.

## II.

## NEGLIGENCE

Negligence is a mixed question of fact and law *Van Prog v. Gayle*, 40 P. 555 (1895); *Gray v. Breakerhoff*, 258 P.2d 834 (1953); *Callahan v. Gray*, 279 P. 2d 963 (1955); *Hudson v. Rainville*, 297 P. 2d 434 (1956). The questions of causality and reasonableness of behavior are factual, and thus constitute questions for the trier of fact. *Warner v. Santa Catalina Island Com.*, 282 P. 2d 12 (1955); *Budette v. Rollefson Construction Co.*, 344 P. 2d 307 (1959); *Ewing v. Cloverleaf Bowl*, 572 P. 2d 1155 (1978). Negligence is determined as a matter of law only when reasonable men following the law can draw but one conclusion from the evidence presented. However, as a practical matter, the courts rarely consider negligence to be a matter of law. Ordinarily, the question is left to the trier of fact. *Wikbers v. Olson, Co.*, 71 P. 511 (1903); *Rudd v. Byrnes*, 105 P. 957 (1909); *Kelly v. Santa Barbara C. R. Co.*, 153 P. 903 (1916); *Jacobson v. Northwestern P. R. Co.*, 166 P. 3 (1917); *Austin v. Riverside-Portland Cement Co.*, 282 P. 2d 69 (1955); *Rogers v. Los Angeles Transit Lines*, 289 P. 2d 226 (1955).

In this case, Defendant mistakenly argues the law of Respondeat Superior when they state that because Ambros' Marketing Manager does not feel she was negligent or did anything wrong, her personal opinion somehow relieves them from liability. Mrs. Truong is not a lawyer and cannot render a legal opinion in this case. If Defendant's interpretation was the law, every negligence case could be dismissed by simply drafting an affidavit stating that they did not do

1  anything wrong, Defendant cites no case authority for this proposition because there is no

2  authority for this novel legal theory.

### III.

### DUTY OF CARE/SPONSORSHIP LIABILITY

5  Every negligence case begins with a consideration of whether a legally cognizable duty

6  runs from the defendant to the plaintiff. The existence of a duty is a question of law to be

7  determined by the court. However, there is no universal test to determine the existence of a duty,

8  but instead courts employ an ad hoc approach of considering all relevant factors. Where there

9  is a claim of **sponsor liability**, courts generally review the facts and circumstances to determine

10  whether the sponsor had any control over the sponsored event. For example, in *Lambert v.*

11  *PEPSICO Inc.*, 698 So. 2d 1031 (4th CIR 1997), summary judgment was granted in favor of a

12  beverage company that sponsored a fair where a carnival ride caught on fire, seriously injuring

13  passengers. In support of their motion, the sponsors produced written contracts among three co-

14  defendant entities allocating responsibilities for the rides and concessions at the fair as well as

15  liability insurance for same. Consequently, the sponsors were able to demonstrate that they had

16  no custody or control over the rides or their operation. *Id.* at 1032.

17  In *Sullivan v. Hemisphere Broadcasting Corp.*, 520 N.E. 2d 1301 (1988), the Supreme

18  Judicial Court of Massachusetts engaged in a similar analysis. In that case, a radio station and

19  a brewery company sponsored a party at which free beer was distributed. The Court held that

20  defendants were not liable because they had no control over the distribution of free beer. The

21  pivotal issue was the defendants lack of control. Had the defendant controlled the distribution of

22  free beer, the matter would have been decided differently. Similarly, as in the instant matter,

23  Ambros, who sponsored the event, advertised the event, and instructed its personnel to appear

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGATNA, GUAM 96910
TELEPHONE: (671) 477-9891-4

-5-

1    at radio stations promoting the event. See Declaration of Karl Pangelinan. During this event,

2    Mr. Boudreau one of the attendees invited by Ambros, who allegedly became intoxicated,

3    accepted a ride to his vehicle in a golf cart driven by an Ambros employee. During the ride Mr.

4    Boudreau was thrown from the golf cart causing his death. Ambros failed to adequately supervise

5    the distribution of free beer. Ambros was the *only* party who had *complete control* and the *right*

6    *to control* the distribution of free beer to the V.I.P. tent. See Affidavit of Cassandra Truong. In

7    addition, the purpose of the golf carts was not to transport concert goers to and from their

8    vehicles, but to control the flow of beer to the V.I.P. guests. See Declaration of Pierre "Tim"

9    Aguon filed on August 18, 2007. Ambros controlled the entire concert with respect to when the

10    concert would start, how the concert grounds would be set up and how much beer would be given

11    to the guests. It was this right to control that the Sullivan Court fixated on to determine the basis

12    of liability. *Id.*

13       In *Sroka v. Haliday*, 97 A. 965 (1916), the injury occurred when a little boy found and

14    detonated an unexploded Arial Bomb that had landed in his yard during a Fourth of July fireworks

15    display put on by the city of Pawtucket. Defendants were a group of citizens who had formed a

16    Fourth of July Committee to arrange this entertainment. Evidence presented at trial showed that

17    the Committee entered into a contract with a fireworks company to furnish the fireworks "in a

18    manner satisfactory to said Fourth of July Committee." *Id.* at 965. Plaintiffs appealed after the

19    Superior Court directed a verdict in favor of the defendants. The Rhode Island Supreme Court

20    concluded that the Fourth of July Committee had not relinquished control over the fireworks

21    display to the fireworks company.

22      "This clause then applies to everything to be done, not only to the quality and
       extent of the exhibit; but also to the manner of doing the firings; and it seems to

23      be unwarranted to say that under this language, the committee or any member

Case 1:06-cv-00022    Document 21-3    Filed 08/15/2008    Page 6 of 44

thereof did not have full authority to control the "manner" of doing anything which had to be done. If it had been observed in any portion of this display during the day or evening that the bombs or other fireworks were being discharged in such a manner as to be dangerous to property or to persons, or so as to show that the man engaged in the work of firing was incompetent, reckless or negligent, would have been not only the right but the duty of the committee or any member thereof, or the subcommittee or any member thereof, to have stopped the firing and either to have forbidden the continuance to the display entirely, or to have insisted that the incompetence, reckless or negligent person in charge should be removed, and that a man or men competent for the work should be substituted."

Therefore, by the terms of the contract itself and the "manner" in which responsibilities were divided, control of the concert was subject at all times to the full control of Ambros and its employees and staff. See Affidavit of C. Truong. If the decedent was in fact intoxicated, it is because he was served beer after beer after beer by Ambros employees, the same employees who should have been assisting and protecting their guests.

Turning now to the evidence adduced through the discovery process, Plaintiffs will show that Defendants exercised control over the concert in the following areas:

1. Deciding to sponsor the concert. See Defendant's Response to Plaintiff's First Set of Interrogatories, Interrogatory No. 1, attached hereto and incorporated herein by reference as Exhibit "A";

2. Soliciting attendants through promotion, advertising and the distribution of free tickets. See Affidavits of C. Truong and K. Pangelinan;

3. Coordinating promotional activities with the other sponsors before and during the concert. See Affidavit of C. Truong;

4. Providing assistance to radio stations in coordinating interviews and call in spots to promote the concert; and

Case 1:06-cv-00022    Document 21-3    Filed 08/15/2008    Page 7 of 44

5.    Inviting, requesting and paying for the Master of Ceremonies to
      introduce the band and run the show.[1]

These facts support the reasonable inferences that Ambros discussed the concert with M.W.R. and Malafunkshun Productions ahead of time as well as with other sponsors. Ambros had the opportunity to set down its conditions and guidelines before it agreed to sponsor the concert. Ambros also had an agreement with M.W.R. and the other sponsors designating which group would handle which duties before, during and after the concert. See Affidavit of C. Truong.

Ambros and its employees made the decision to use golf carts for various purposes throughout the day and had the opportunity to restrict and control the use of those golf carts in any manner that they deemed fit. Clearly, Ambros had control over the events during the day and evening of April 2, 2004, yet, negligently failed to exercise its responsibilities and breached its duty of due care to Mr. Boudreau.

Following the lead of the cases outlined above, this court should determine that Plaintiff has established that Ambros had control over the planning and operation of the concert, that the court find that Ambros owes a duty commensurate with its' measure of control to the Plaintiffs and other concert goers. That duty was breached when Ambros failed to take any steps to prevent the dangerous manner in which the golf carts were operated which directly led to the death of Mr. Boudreau.

///

///

_____

[1] These same facts were reviewed by the Court in *Grey v. Derderian*, 389 F. Supp. 2d 308, 316 (D.Ct. RI 2005).

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4

## IV.

## RESPONDEAT SUPERIOR

As a general rule, a principal is responsible for the acts of his agents. *Harris v. Trojan Fireworks Co.*, 120 Cal.App. 3d 157 (1981). In the case of *Rodgers v. Kemper Construction Co.*, 50 Cal. App. 3d 608 (1975), the California Appellate Court stated:

> "under the modern rational for Respondeat Superior, the test for determining whether an employer is vicariously liable for the tortuous conduct of his employee is closely related to the test applied in worker's compensation cases for determining whether an injury arose out of or in the course of employment. This must necessarily be so because the theoretical basis for placing a loss on the employer in both the tort and worker's compensation fields is the allocation of economic cost of an injury resulting from a risk incident to the enterprise." 50 Cal. APP. 3d at 619.

The law recognizes that the entire subject of vicarious liability is a reflection of social policies which fix financial responsibility for harm done. The law recognizes a departure from liability from one's own act or conduct and enter into the arena of vicarious liability, the quest of liability is frequently determined by who is best able to spread the risk of loss through the prices charged for its product or liability insurance. See *Hinman v. Westinghouse Elec. Co.*, 2 Cal. 3d 956, 959-960 (1970); *Fields v. Sanders*, 180 P. 2d 684 (1947). The underlying philosophy which holds an employer liable for an employee's negligent acts is the deeply rooted sentiment that a business enterprise should not be able to disclaim responsibility for accidents which may fairly be said to be the result of its activity. *Ira S. Bushy & Sons, Inc. v. United States*, 398 F. 2d 167 (2nd Cir. 1968); *See* also Keeton, *Conditional Fault in the Law of Torts,* 72 Harv. L. Rev. 401, (1959).

Thus, it can be fairly stated that said liability attaches were a nexus exists between the employment or the activity which results in an injury that is foreseeable. Foreseeable is used in

Case 1:06-cv-00022    Document 21-3    Filed 08/15/2008    Page 9 of 44

the sense that the employees conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business. *Rodgers* at 619. For example, in *Bonetti v. Double Play Tavern*, 126 Cal.App.2d (1954), the court upheld liability of the Double Play Tavern when the left fielder of a sponsored semi-professional baseball team, angered at dropping a pop fly, threw the ball out of the field where it hit plaintiff on the head. There, the bar operated as a team sponsor, selected the manager of the team, furnished uniforms and equipment and deducted the cost on income tax returns as a business expense; however, the players were not otherwise compensated for playing on the team and in no real sense did an "employer/employee relationship" exist, nevertheless, it was the activity of "sponsoring of the team" that led to the injury.

Applying these standards of business purpose or business activity and foreseeability to the facts of the instant case, there is sufficient connection between the sponsoring of the concert and the requirement of Ambros employees to attend, control and ensure that their guests, *i.e.*, concert goers were having a good time and were protected. Ambros was negligent for failing to exercise due care to inspect the premises or have training and rules enforced to prevent the dangerous conditions which could lead to foreseeable injuries of the type suffered by Mr. Boudreau. Ambros Marketing Manager was also a negligent party and the proximate cause of the concert goer's death. These facts justify imposing a duty on Ambros and holding the employer financially responsible for the injuries occasioned by the employees accident. Although the accident occurred away from the employer's premises, it occurred during work hours and during an event sponsored by the employer. Thus, the accident occurred during the course and scope of Ambros' marketing manager's responsibilities on the day of the concert.

///

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4

-10-

## V.

### 18 G.C.A. SECTION 90108

Section 18 G.C.A. 90108 states:

> "Contributory negligence shall not bar recovery in any action by any person or his legal representative to recover damages for negligence resulting in death or in injury to person or property, if such negligence was not as great as the negligence of the person against whom recovery is sought, but any damages allowed under the law on Compensatory Relief shall be diminished in proportion to the amount of negligence attributable to person recovering."

This Statute was designed to grant a credit or reduction to the estate based on the negligence of the injured party. Defendant would like this court to believe Ms. Truong's negligence should be included. However, the law imputes Ms. Truong's negligence to that of her employer. AIOI would like not to pay this claim because they believe that is fortunate that Ms. Truong was responsible for the death of her own husband.

The reality is Ambros and their negligence is a cause of Mr. Boudreau's death. Plaintiff can recover for the negligence of Ambros. The example of the "verdict form" to illustrate Defendant's legal theory is severely flawed. The verdict form has yet to be determined and should not read Ambros/Plaintiff because the Estate of Roland A. Boudreau (the "Estate") is not contributorily negligent in this case. In fact, the Estate was not at the concert. Therefore, the verdict form will be entitled "Ambros' negligence." Section 90108 provides no legal technicality whatsoever. Finally, because the Estate is not the contributorily negligent, Ambros is free to attempt to enforce any indemnification rights it believes it can prove. It is important to point out to the Court that no judgement will be taken against Ambros. They are not a party to this case.

///

///

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTNA, GUAM 96910
TELEPHONE: (671) 477-9891-4

- 11 -

## VI.

## OPEN AND OBVIOUS DOCTRINE

Defendant states that the pot holes are open and obvious and thus they do not need to warn the Plaintiff about them. Nobody warned Mr. Boudreau or Ambros' Marketing Manager. Additionally, pot holes may be open and obvious during daylight hours, but are not open and obvious at night while driving a vehicle provided by Ambros without headlights. Defendant claims Ms. Truong saw these pot holes during the day. Was she supposed to make a mental map of every dangerous location in the more than five (5) football field radius? No. If Defendant would like to avail itself of the open and obvious doctrine, the golf carts should have had headlights. Ambros had a number of other options, *i.e.*, passing out the flashlights to employees, marking the dangerous areas with cones or flares.

## VII.

## CONCLUSION

In conclusion, it is clear that Ambros, Inc. and/or Shimbros, Inc. had control over the concert and owed a duty of due care to their guests and other concert goers so that they would enjoy the concert in a safe environment. Ambros knew or should have known that the negligent operation of golf carts by employees who were drinking and serving free alcohol could result in foreseeable bodily injuries. Ambros purchased an insurance policy to pay for any claims or damages resulting of their negligence so they were aware that a breach of their duty of due care in an environment of concert goers consuming alcohol could result in foreseeable injuries. See Shimbros Insurance Policy attached hereto as Exhibit "B".

Ambros has sponsored other concert events and is well aware of their duties and obligations when sponsoring and promoting an event. This is why several meetings were held,

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4

Case 1:06-cv-00022    Document 21-3    Filed 08/15/2008    Page 12 of 44

1   contracts were executed and job responsibilities were assigned on the day of the concert. Ambros

2   dictated how the concert would be handled and was in control of the show.

3         Accordingly, Defendant's motion should be denied.

4         Dated at Hagåtña, Guam, this 31st day of October, 2007.

5                                              TEKER TORRES & TEKER, P.C.

6

7                                       By _____

8                                          JOSEPH C. RAZZANO, ESQ.
                                           Attorneys for Plaintiff, *Cassandra Truong*,
                                           Administratrix of the *Estate of Roland Anthony*
9                                          *Boudreau*, deceased.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# Exhibit
# A

Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone (671) 646-1222
Facsimile (671) 646-1223

Attorneys for Defendant

IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| CASSANDRA CHAU TRUONG, Administratrix of the Estate of ROLAND ANTHONY BOUDREAU, Deceased, <br><br> Plaintiff, <br><br> vs. <br><br> AIOI INSURANCE COMPANY, LTD., <br><br> Defendant. | CIVIL CASE NO. CV1082-06 <br><br><br><br> **AIOI'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** |

COMES NOW Defendant Aioi Insurance Company, Ltd., through counsel, Dooley Roberts & Fowler LLP, by Tim Roberts, Esq., and hereby responds to Plaintiff Cassandra Chau Truong's First Set of Interrogatories.

    1.    Who made the decision on behalf of Shimbros Productions to sponsor or not sponsor the Three Doors Down concert held on April 2, 2005.

<u>Response to Interrogatory No. 1.</u>    **According to Shimbros, it was Lee Babb of Anheiser Busch and Tom Shimizu of Ambros.**

    2.    Who was responsible at Shimbros Productions to solicit attendance through promotion, advertising and/or the distribution of free tickets to the Three Doors Down concert held on April 2, 2005.

ORIGINAL

Response to Interrogatory No. 2.     According to Shimbros, (1) Ambros, Inc., through its marketing manager, Plaintiff Casey Truong; (2) the Navy's Moral, Welfare and Recreation ("MWR"), and (3) Malafunkshun Productions.

    3.    Who at Shimbros Productions, Ambros, Inc. ("Ambros") or both was in charge of coordinating promotional activities with the other sponsors before and during the Three Doors Down concert held on April 2, 2005.

Response to Interrogatory No. 3.     According to Shimbros, there was no particular person who was in charge of coordinating promotional activities with other sponsors before and during the concert. Paul Shimizu and Tom Shimizu performed some tasks. Plaintiff Casey Truong performed other tasks.

    4.    Who, on behalf of Shimbros Productions, made radio station appearances to promote the Three Doors Down concert held on April 2, 2005.

Response to Interrogatory No. 4.     According to Shimbros, no Shimbros representative made radio station appearances to promote the concert on behalf of Shimbros. They believe Karl Pangelinan and Chris Barnett of Malafunkshun Productions made radio station appearances on behalf of Malafunkshun Productions.

    5.    From who did Shimbros Productions or Ambros rent, lease, or purchase the golf carts, one of which was involved in the accident which caused the death of Roland Boudreau.

Response to Interrogatory No. 5.   According to Shimbros, the golf carts were not rented, leased or purchased. Instead, the golf carts were made available to Shimbros by MWR for the concert.

    6.    How many golf carts were rented, leased or purchased.

<u>Response to Interrogatory No. 6.</u>      **Shimbros remembers that a total of six (6) of the twenty**

**golf carts at the concert were made available to Shimbros/Ambros for the concert.**

      7.    For what purpose were the golf carts, rented, leased or purchased.

<u>Response to Interrogatory No. 7.</u>      **According to Shimbros, four (4) golf carts were**

**designated by MWR to service seven regular concession stations and two (2) carts were**

**designated for the draft-beer concession. Finally, at some point, a flat-bed golf cart was made**

**available by MWR to Shimbros for the concert.**

      8.    Please confirm that the Defendant in this lawsuit has been named correctly.

<u>Response to Interrogatory No. 8.</u>      **Confirmed.**

      9.    Please provide the name, address and telephone number of any potential parties to

this suit.

<u>Response to Interrogatory No. 9.</u>      **Aioi objects to this interrogatory on the grounds that it**

**calls for information protected by the attorney client and work product privileges, and on the**

**grounds that it calls for Aioi to speculate as to whom or how many people or entities Plaintiff**

**wishes to sue, and for what.**

      10.    Please describe the legal theories and, in general, the factual basis of the responding

party's defenses.

<u>Response to Interrogatory No. 10.</u>      **Aioi objects to this interrogatory on the grounds that its**

**legal theories are protected by the work-product and attorney client privileges. Without**

**waiving this objection, Aioi states that its legal theories are self evident from its answer to the**

**complaint and the accompanying affirmative defenses. The factual bases for Aioi's defenses**

**are also self evident, for the most part, from its affirmative defenses set forth in its answer.**

**Plaintiff told the Navy that the accident happened when her husband jumped off the back of**

3

the golf cart. According to an expert witness retained by Aioi, Dr. Aurelio Espinola, who is the Territorial Medical Examiner, Plaintiff's husband was intoxicated when he was admitted to Naval Hospital. Aioi also refers Plaintiff to its response to interrogatory number 12, below. According to Shimbros, Plaintiff had driven golf carts on numerous occasions prior to the concert without incident. According to Shimbros, it is also possible that Plaintiff was not acting in the course and scope of her employment when her husband fell or jumped off the back of the golf cart. The golf carts were supposed to be used to shuttle beer from refrigerated containers to the concession stands before and during the concert, but not after the concert had ended. Shimbros states, and Plaintiff told the Navy, that the concert had ended at approximately 5:30 p.m., while the accident happened at approximately 7:00 p.m. Plaintiff was not a part of the Ambros crew designated to "break down" the concert set-up. Ambros does not know, at this point, what job-related purpose was being served by Plaintiff driving her husband around an hour and a half after the concert was over.

Aioi reserves the right to amend or supplement its response to this interrogatory after adequate discovery, including Plaintiff's deposition, has been conducted.

11. Please provide the name, address and telephone number of persons having knowledge of relevant facts, and a brief statement of each identified person's connection with the case.

Response to Interrogatory No. 11.

According to Shimbros:

      a. Plaintiff Casey Truong, whose contact information is known to her.

4

b.    Julia Pocaigue, Plaintiff's assistant, whose contact information is known to Plaintiff. She was riding in the passenger seat of the golf cart with Plaintiff at the time of the accident.

c.    Julia Pocaigue's son, whose name Shimbros believes is Donovan Rivera, whose contact information is known to Plaintiff. He was standing on the back of the golf cart with Mr. Boudreau at the time of the accident.

d.    Plaintiff's Asian female friend, "Kaoru", last name unknown, whose full name and contact information are known to Plaintiff. She was in a golf cart being driven by Ambros employee Shaun Pascua ahead of the cart being driven by Plaintiff at the time of the accident.

e.    Eric, last name unknown, but which is known to Plaintiff. He is the husband or boyfriend of Plaintiff's Asian female friend, Kaoru. He was standing on the back of golf cart being driven by Shaun Pascua at the time of the accident.

f.    John Myers, c/o Ambros, concert VIP entertainment.

g.    Tim Aguon, c/o Ambros. Mr. Aguon is Ambros Military Sales Manager. Mr. Aguon was in a golf cart near Plaintiff's golf cart at the time of the accident.

h.    Shaun Pascua, c/o Ambros. Military Account Representative working under Ambros' Tim Aguon. He was driving a golf cart ahead of Plaintiff's golf cart at the time of the accident.

i.    Dennis Camacho, c/o Ambros, VIP entertainment.

j.    Paul Shimizu, c/o Ambros, concert lighting.

k.    Tom Shimizu, c/o Ambros, Ambros General Manager.

l.    Nate Arii, c/o Ambros, handyman, refrigerator repair and servicing.

5

  m.  John Shimizu, c/o Ambros, maintenance, generator repair and servicing, fuel for the generator.

  n.  Patrick Barnum, c/o Ambros, VIP entertainment.

  o.  Jay Luce, c/o Ambros, signs/banners at concert.

  p.  Pete Guzman, c/o Ambros, signs/banners at concert.

  q.  Kenneth Artero, c/o Ambros, signs/banners at concert.

  r.  Paul Claros, c/o Ambros, signs/banners at concert.

12. For any testifying expert, please provide:

  a)  the expert's name, address and telephone number.

Response to Interrogatory No. 12(a). Dr. Aurelio Espinola, Guam's Territorial Medical Examiner. Aioi reserves the right to retain additional experts at any time prior to or on any applicable court-ordered deadline.

  b)  the subject matter on which the expert will testify.

Response to Interrogatory No. 12(b). Roland Boudreau's intoxication level at the time of the accident.

  c)  the general substance of the expert's mental impressions and opinions and a brief summary for this basis for them, or the expert is not retained by, employed by, or otherwise subject to the control of the responding party, documents reflecting such information.

Response to Interrogatory No. 12(c). Dr. Espinola will testify about Plaintiff's husband's intoxication and the likely effect of that intoxication. Plaintiff's husband's blood alcohol content ("BAC") upon admission to Naval Hospital was 225.8 milligrams per deciliter ("mg/dl"), which translates into a .2258 blood alcohol content ("BAC"). Dr. Espinola will also explain that the blood alcohol results delivered by Plaintiff's attorneys to Aioi before the

lawsuit were Mr. Boudreau's blood alcohol levels at his autopsy, not his blood alcohol levels at the time of his admission to the hospital.

        d)     If the expert is retained by, employed by or otherwise subject to the control of the responding party:

        i.     all documents, tangible things, reports, models or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony.

<u>Response to Interrogatory No. 12(d)(i).</u>  **All responsive documents are attached to the answers to these interrogatories.**

        ii.     the expert's current resume and bibliography.

<u>Response to Interrogatory No. 12(d)(ii).</u>  **Aioi is not in possession of Dr. Espinola's current resume or bibliography, if any exists.**

     13.    Who is Tim Aguon and what are his responsibilities with Ambros?

<u>Response to Interrogatory No. 13.</u>  **See answer to interrogatory number 11.g.**

DOOLEY ROBERTS & FOWLER LLP

Date: _2/6/07_                By: _____

                                **TIM ROBERTS, ESQ.**
                                Attorneys for Defendants

## VERIFICATION

I, **Timothy C.S.A. Lujan,** do hereby declare that I am the Vice President, Claims Services Department of Defendant Aioi Insurance Company, Ltd., in the above-captioned action. I have read the foregoing Responses to First Set of Interrogatories and based on my conversations with Shimbros, they are true, except as to those matters alleged upon information and belief, and as to those matters, and I believe them to be true, and except for the objections, which were made by my attorney.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _6th_ day of February, 2007, in Tamuning, Guam.

_____

**TIMOTHY C.S.A. LUJAN**

8

Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone (671) 646-1222
Facsimile  (671) 646-1223

Attorneys for Defendant



FILED
SUPERIOR COURT
OF GUAM

2007 NOV -7 PM 4: 28

CLERK OF COURT

BY:_____ _____

IN THE SUPERIOR COURT OF GUAM

CASSANDRA CHAU TROUNG,　　　　) 　CIVIL CASE NO. CV1082-06
Administratrix of the Estate of ROLAND　)
ANTHONY BOUDREAU, Deceased,　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　　　)　　REPLY MEMORANDUM IN SUPPORT
　　　　　　　　　　　　　　　　　)　　OF MOTION FOR SUMMARY
　　vs.　　　　　　　　　　　　　)　　JUDGMENT
　　　　　　　　　　　　　　　　　)
AIOI INSURANCE COMPANY, LTD.,　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　　)
　　　　　　　　　　　　　　　　　)

　　　　Defendant's memorandum in support of the motion for summary judgment is 24 pages

long.  But it is almost as if Ms. Truong stopped reading after page 10.  She totally ignores

Sections D.1. D.2., D.3. and D.5. of as well as Section E. of Defendant's memorandum.  For this

reason, the court must rule in Defendant's favor on the issues raised by these sections of

Defendant's memorandum.  That is, on this motion, the court must rule, at a minimum, as

follows:

　　　D.　　As a matter of law, Ambros is not liable under a "failure to train" or
　　　　　　"negligent entrustment" theory of relief.

　　　　　1.　Ambros had no duty to train Ms. Truong how to drive a golf cart
　　　　　　　because it is undisputed she already knew how to drive a golf cart.

　　　　　2.　Ambros had no duty to warn or train Ms. Truong not to drive a golf cart
　　　　　　　through potholes because Ms. Truong admittedly knew the attendant
　　　　　　　risks are (in her own words) "common sense."



COPY

GOVERNMENT
EXHIBIT
5

3. Ambros had no duty to warn or train Ms. Truong how to drive a golf cart because there is no evidence that golf carts are inherently dangerous.

5. Ambros had no duty to warn or train Ms. Truong because Ambros had no knowledge of any dangerous condition at Polaris Point.

E. Ambros breached no duty of care it may have owed to Ms. Truong because she *was* provided with an adequate warning.

Since Ms. Truong has now conceded a ruling in Defendant's favor on each of the points raised above, what is left of her case? Nothing, actually. The case is over. Sections D.5 and E, above, are complete defenses to liability. If there is a dangerous condition on property, a possessor of land's only duty is to inspect or warn. A warning on the steering wheel of the golf cart being driven by Ms. Truong cautioned that only two (2) passengers were permitted. This was an adequate warning. Ms. Truong, by failing to address this issue in her brief, has admitted this. The case is therefore over.

Significantly, though, Ambros also inspected the property and found no dangerous conditions. Paul Shimizu Dec., ¶ 4; Tom Shimizu Dec., ¶ 4; Tim Aguon Dec., ¶¶ 3-4. Ms. Truong has also admitted this fact by failing to address it in her brief and by failing to identify any evidence, admissible or otherwise, tending to contradict it. This fact also ends this case as a matter of law.

Although it is not technically necessarily, given what has just been said, the remainder of this reply memorandum will address the arguments under Section II of her brief ("Negligence"), Section III ("Duty of Care/Sponsorship Liability"), Section IV ("Respondeat Superior"), Section V ("18 G.C.A. Section 90108"), and Section VI ("Open and Obvious Doctrine"). Defendant will address the arguments raised under each of these sections of Ms. Truong's brief in turn. As it does this, the court should keep one question firmly in mind: Where is the admissible evidence to support Ms. Truong's factual contentions and arguments?

2

## I.    Facts.

All but one of the facts recited in this section of Ms. Truong's brief have no citations to any depositions or supporting declarations. They are just counsel's words. Pursuant to GRCP 56, all such factual recitations should be ignored on this motion for summary judgment. "A trial court can only consider admissible evidence in ruling on a motion for summary judgment". Orr v. Bank of Am., 285 F.3d 764, 773 (9th Cir. 2002)

## II.    Negligence.

Ms. Truong argues, apparently quoting from some dusty old ALR article, that "courts rarely consider negligence to be a matter of law". Opposition memorandum, at p. 4. This is not the law any more, as might be inferred from the fact that Ms. Truong's actually cites a case decided in the year 1895 to support her argument (and 1903, and 1916, and 1917, etc.). It has not been the law for over thirty (30) years, ever since the United States Supreme Court's 1986 opinions in Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348 (1986); Andersen v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505 (1986), and Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). Guam's highest court is certainly aware of this. See, Guerrero v. McDonald's Int'l Prop. Co., Ltd., 2006 Guam 2, ¶26-27 ("Guerrero cannot survive summary judgment ... by a mere allegation that she stepped on something and was caused to fall because 'no inference of negligence arises based simply upon proof of a fall upon the owner's floor.' Guerrero's failure to present evidence of the basic facts prevents even an inference that McDonald's had actual or constructive knowledge of the transitory hazard and failed to exercise reasonable care to eliminate it. ... Where, as here, the opposition to a motion for summary judgment presented speculation in lieu of specific facts, the granting of summary judgment is appropriate"). Whatever a party's cause of action, when opposing a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by

3

affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial". Custodio v. Boonprakong, 1999 Guam 5, 12 (Guam Sup. Ct. 1999), citing GRCP 56(e). Ms. Truong has utterly failed to do this.

In the "Negligence" section of her brief, with respect to the *respondeat superior* issue, Ms. Truong argues that "her personal opinion" that she did not cause or contribute to her husband's death does not relieve Ambros of liability. Ms. Truong's testimony was not her "personal opinion". She stated as a fact, under oath, three (3) times, that she did nothing to contribute to her husband's death. Because of her uncontradicted testimony, she cannot recover under a *respondeat superior* basis. Significantly, though, even if Ms. Truong had said, "I don't know" in response to the questions posed to her, summary judgment would still have to be entered against her on her *respondeat superior* theory. In that event, on this motion for summary judgment there would be no evidence one way or the other on the issue. This would mean that the motion would have to be granted anyway on the *respondeat superior* issue, since it is Ms. Truong's burden to come forward, with "affidavits or as otherwise provided" in GRCP 56, with sufficient admissible evidence to support a finding that her conduct contributed to her husband's death. Guerrero v. McDonald's, *supra*; Custodio v. Boonprakong, *supra*. She has not done this, so she loses, and it's that simple. Without any testimony from Ms. Truong or anyone else tending to establish that she failed to exercise reasonable care for the safety of her husband, and that her failure proximately caused her husband's death, she is legally barred from recovering on a *respondeat superior* theory.

Ms. Truong nonetheless proceeds to argue, at page 4-5 of her opposition memorandum, that if "Defendant's interpretation was the law, every negligence case could be dismissed by simply drafting an affidavit stating that they did not do anything wrong." This makes no sense whatsoever. Defendant did not create the testimony in question itself, as it would by "drafting an affidavit". The testimony came out of Ms. Truong's mouth. Asked if she did anything wrong,

4

she said "no", three times. She needed to say "yes", just one time, to salvage her *respondeat superior* theory of recovery. Ms. Truong then writes, "Defendant cites no case authority for this proposition because there is no authority for this proposition." Sure there is. It's cited on page 5 of Defendant's initial brief under the *"respondeat superior"* discussion, Fajardo v. Liberty House, 2000 Guam 4 ("a principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency"), citing 7 GCA §20309. In other words, for an employer to be held liable on a *respondeat superior* basis, one of its employees has to be found negligent. Here, the employee has testified that she was not negligent, and she has not cited to any testimony that she was negligent.

For the reasons just discussed, there is currently no evidence in the record sufficient to support a jury finding of *respondeat superior* liability against Ambros, and summary judgment must be granted on this issue.[1]

## III. Duty of Care/Sponsorship Liability

Under the "Duty of Care/Sponsorship Liability" section of her brief, Ms. Truong argues for the first time in this case that Ambros can be held liable based on the fact that Roland Boudreau may have consumed too much free beer at the Three Doors Down concert. There are numerous insurmountable problems with this argument in connection with the pending motion for summary judgment. First, there is absolutely no mention of it in Ms. Truong's complaint on file in this case.

---

[1] In fact, Ms. Truong's testimony precludes her ability to recover on her "negligent training" theories of recovery, as well. If Ms. Truong herself was not negligent, then Ambros' failure to train her how to use a golf cart could not logically or legally have been a proximate cause of the accident. In Justice Cordozo's famous words, "negligence in the air is not enough". Palsgraf v. Long Island Railroad Company, 162 N.E. 99, 248 N.Y. 339 (1928). Rather, there must be proof of some causal connection between the defendant's negligence and the plaintiff's harm. *Id.* What this means is that if Ambros was negligent, but Ms. Truong was not, there is no casual connection between Ambros' negligence and Ms. Truong's harm, and Ambros cannot be held liable.

5

Second, there is no "dram shop" liability on Guam. That is to say, no Guam statute or Guam Supreme Court decision imposes civil liability for the negligent service of alcohol. At common law, civil liability could not be premised upon the service of alcohol to a third person. The rationale for the common law rule is that it is the consuming of alcohol, not the supplying of alcohol, which is the proximate cause of intoxication. 45 Am. Jur. 2d Intoxicating Liquors § 553 (1969); 4-19 Premises Liability -- Law and Practice § 19.06. See, Tobias v. Sports Club, 323 S.C. 345, 349 (S.C. Ct. App. 1996). In Tobias, the court explained that a rule that allows an intoxicated individual to hold his server liable without regard to his or her own actions in continuing to consume alcohol promotes irresponsibility and rewards drunk driving. And in Kone v. Joe Lang Tap, Inc., 418 N.W.2d 377 (Iowa App. 1987), an intoxicated plaintiff hurt himself trying to board a moving train after walking home from a bar. The court upheld summary judgment in favor of the defendant, since there was no duty owed by the defendant to a voluntarily intoxicated patron. Similarly, in Allen v. Westchester, 109 A.D.2d 475, 492 N.Y.S.2d 772 (1985), the court upheld a lower court's denial of pain and suffering damages brought on behalf of a deceased intoxicated bar customer who managed to fall and kill himself in the defendant's bar. The bar owed no duty to the decedent, who had voluntarily drank himself into oblivion.

On Guam, 11 GCA §3418 states that a "licensee shall not sell or give nor permit to be sold or given any alcoholic beverages to any habitual or common drunkard or obviously intoxicated person". On its face, this statute does not purport to impose civil liability upon those who disobey it. The statute appears to have been borrowed from Cal Bus & Prof Code § 25602 as it read in 1935. In Vesely v. Sager (5 Cal. 3d 153, 95 Cal. Rptr. 623 (1971), the California Supreme court partially relied on this statute to create civil liability against servers of alcohol to obviously intoxicated people who injure others. California was outraged. California's legislature immediately amended §25602 to restore the common law rule, as follows:

6

(a) Every person who sells, furnishes, gives, or causes to be sold, furnished, or given away, any alcoholic beverage to any habitual or common drunkard or to any obviously intoxicated person is guilty of a misdemeanor.

(b) No person who sells, furnishes, gives, or causes to be sold, furnished, or given away, any alcoholic beverage pursuant to subdivision (a) of this section shall be civilly liable to any injured person or the estate of such person for injuries inflicted on that person as a result of intoxication by the consumer of such alcoholic beverage.

(c) The Legislature hereby declares that this section shall be interpreted so that the holdings in cases such as Vesely v. Sager ... be abrogated in favor of prior judicial interpretation finding the consumption of alcoholic beverages rather than the serving of alcoholic beverages as the proximate cause of injuries inflicted upon another by an intoxicated person.

Ms. Truong writes, at p. 6 of her brief, that "Ambros was the *only* party who had *complete control* and the *right to control* the distribution of free beer to the V.I.P tent". This is not what the common law rules looks at. Instead, the common law rule looks at the irrefutable fact that Ms. Truong's deceased husband "was the *only* party who had *complete control* over his decision to drink beer and the *right to control* how much beer he drank in the V.I.P tent" on the night of his death. Under the common law rule, which applies on Guam, his estate has no cause of action.

Third, regardless of whether or not Mr. Boudreau was intoxicated, Ms. Truong cannot survive summary judgment on her new-found "dram shop" theory of recovery in any event. 11 GCA §3418 only penalizes the service of alcohol to an "obviously intoxicated person". There is no evidence in this case that anyone at Ambros ever served alcohol to Roland Boudreau at a time when he was "obviously intoxicated".

Fourth, at her deposition in this Superior Court case, Ms. Truong testified under oath that her husband did not appear intoxicated, and testified that it was not possible that he fell off the back of the golf cart because he had been drinking. Superior Court Truong Depo., p. 60:9-21,

7

previously filed with the court. Moreover, at her recent District Court deposition in her case against the Navy, District Court Civil Case No. 06-00022, Ms. Truong was even more adamant that her husband was not visibly intoxicated:

> Q. Has there ever been a time when you didn't recognize that he was drunk but later it turned out he was?
> A. No.
> Q. So, it would be something you would know?
> A. Yeah.
> Q. You knew him well enough and had drank with him enough to know when he was drunk?
> A. Yes.

Federal Truong Deposition, p. 27:10-17.

> Q. If your husband were ever drunk, would you recognize it?
> A. Yes.

Federal Truong Deposition, p. 30:17-19.

> Q: When you went up to say hi to him, did you smell alcohol at all?
> A: No.

Federal Truong Deposition, p. 49:14-16.

> Q: But you couldn't tell he was drinking when you saw him?
> A: No.
> Q: If you don't mind telling me, why is that? …
> A: There was no smell, there was nothing. He looked normal. …

Federal Truong Deposition, p. 50:16-24.

> Q: And during those four or five hours, did he ever doing anything that appeared to look like he had a lot to drink to you?
> A: No.
> Q: Did you see him stumble?
> A: No.

Federal Truong Deposition, p. 52:5-10.

> Q. If your husband had been drunk, you would have recognized it?
> A. Yes.

8

Q.	And that's because you know him when he's drunk?
A.	Yes.

Federal Truong Deposition, p. 53:12-16.

Q.	Maybe it's more precise to say impaired.   You would recognize whenever he was impaired; that is, unable to walk properly or operate a vehicle?
A.	Yes.
Q.	And you didn't observe him to be impaired?
A.	No.

Federal Truong Deposition, p. 54:20-25.

Q.	And that's something you would have been able to recognize from your experience with him?
A.	Yes.

Federal Truong Deposition, p. 55:1-3.

Q.	Do you think (the accident) had anything to do with him drinking? ...
A.	No.  I told you, he did not look drunk to me.

Federal Truong Deposition, p. 115:13-25.

On Guam, as elsewhere, "inconsistencies between the deposition testimony given by the plaintiff under oath and the affidavit which he filed in opposition to a motion for summary judgment (do) not create genuine issues of material fact precluding summary judgment." Manvil Corp. v. E.C. Gozum & Co., 1998 Guam 20, 10 (Guam Sup. Ct. 1998), citing Radobenko v. Automated Equip.Corp., 520 F.2d 540, 544 (9th Cir. 1975).  Simply put, a party "cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991). "'If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" Id.  So, while Ms. Truong has not submitted any affidavit or declaration stating that her husband was intoxicated, her attorney is nonetheless barred from

9

arguing on her behalf that Mr. Boudreau was intoxicated in an effort to create a triable issue of fact. For the reasons set forth above, summary judgment must be granted.

To the extent Ms. Truong's "Duty of Care/Sponsorship Liability" section also relies on the golf cart issue, this has already been dealt with in Defendant's initial brief, and above. As noted, Ms. Truong has conceded that Ambros had no duty to train her how to drive a golf cart because it is undisputed she already knew how to drive a golf cart, conceded that Ambros had no duty to warn or train her not to drive a golf cart through potholes because Ms. Truong admittedly knew that the risks in doing so are (in her own words) "common sense", conceded that Ambros had no duty to warn or train her how to drive a golf cart because there is no evidence that golf carts are inherently dangerous, conceded that Ambros had no duty to warn or train her because Ambros had no knowledge of any dangerous condition at Polaris Point, and conceded that Ambros breached no duty of care it may have owed to Ms. Truong because she *was* provided with an adequate warning. On this last issue, at her federal deposition, Ms. Truong explained that she simply must not have been paying attention. Federal Truong Depo., p 69:8-23

## IV.   Respondeat Superior

At page 9-10 of her opposition memorandum, Ms. Truong again argues, as she does under the "negligence" section of her brief, that summary judgment should be denied based on the doctrine of *respondeat superior*. That is, she argues that Ambros can be held liable based on the negligence of its marketing manager in driving the golf cart that Roland Boudreau fell or jumped off the back of and was killed. Of course, that "marketing manager" was none other than Ms. Truong herself. In other words, Ms. Truong is arguing that Ambros can be held liable under *respondeat superior* principles based on her own negligence in causing her husband's death. It is true that *respondeat superior* is pled in the complaint on file in this case. However, in opposing a motion for summary judgment, "a party many not rest upon the pleadings", etc., GRCP Rule 56(c). Instead, there must be evidence adduced sufficient for a jury to return a finding in a non-

10

movant's favor. In this case, on this motion for summary judgment, Ms. Truong has denied that she herself was negligent. Indeed, in recognition of how critical this issue is in this case, at Ms. Truong's deposition, Ambros' counsel gave Ms. Truong not one, not two, but three opportunities to say that she was negligent in causing her husband's death:

> Q:  (By Mr. Roberts) Casey, did anything that you did or didn't do cause or contribute to your husband's death?"
> A:  No.
> Q:  You're completely blameless and faultless for the accident?
> A:  Yes.
>
> * * *
>
> Q:  But it's your testimony that you personally did not cause or contribute to this accident by anything you did or didn't do?
>
> **Mr. Razzano**: Objection, asked and answered.
> **The Witness**: That's correct.

Superior Court Truong Depo., p.

As the court can see, Ambros' counsel asked simple, open ended questions designed for only one purpose: To allow Ms. Truong to state her true belief. She did that, three times. She testified under oath that she had no fault whatsoever in causing her husband's death. And she was just as adamant that she did nothing wrong when the federal government took her deposition on August 28, 2007 in her case against the Navy:

> Q.  So it (the accident) had nothing to do with your driving?
> A.  No.
> Q.  Nothing to do with the speed you were going?
> A.  No.
> Q.  Or any safety concerns that you perhaps weren't taking?
> A.  No.
> Q.  Do you think it had anything to do with him sitting on the back of the cart rather than on the seat?
> A.  No.

Federal Truong Deposition, p. 115:13-25.

As demonstrated earlier, *respondeat superior* liability requires that there be proof of an employee's negligence before the employer can be held liable. Fajardo v. Liberty House, 2000

11

Guam 4 ("a principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency"), citing 7 GCA §20309. In other words, for an employer to be held liable on a *respondeat superior* basis based on the conduct of its employee, the employee has to be found negligent. Here, Ms. Truong has pointed to no evidence that she was negligent. She has, in fact, denied it, under oath, numerous times, in two separate lawsuits.

## V.     18 G.C.A. §90108

This section of Ms. Truong's brief, which comes in response to Section II.B. of Defendant's brief in connection with the *respondeat superior* issue, evidences Ms. Truong's fundamental misunderstanding of Guam law. Guam's contributory negligence statute, 18 G.C.A. §90108, states that if the negligence of "any person or his legal representative" is "as great as" the defendant's negligence, there can be no recovery. Ms. Truong is her husband's "legal representative" in this case within the meaning of 18 G.C.A. §90108, or at least that is what her complaint alleges. See Complaint, paragraph 2 ("Plaintiff is the duly appointed, qualified, and acting Personal Representative of the estate of Roland Anthony Boudreau, Deceased, having been appointed by the Superior Court of Guam in Probate Case No. PR0151-05").

Ms. Truong's negligence as her husband's "legal representative" is therefore very much in issue in this case. If Ms. Truong's negligence is as great as Ambros' negligence, she cannot recover. As far as her *respondeat superior* allegations go, as a matter of law she cannot recover, because her negligence is the negligence of Ambros, her negligence will always be "as great as" the negligence of Ambros. It cannot be any different. It is the same negligence. Under a *respondeat superior* theory of liability, there is no independent negligence on the part of the employer. The employer is instead held liable solely and exclusively based on the negligence of its employee.

Ms. Truong's musings about the "estate" not being "at the concert" and not being "contributorily negligent" are nonsense. An estate is not a legal entity. It cannot sue or be sued.

12

"An estate is neither a person, natural or artificial, nor a legal entity, and cannot sue or be sued. It is merely a name to indicate the sum total of the assets and liabilities of the decedent, and the only way in which an action can be brought against an estate is to sue the executor or administrator in his representative capacity. Hence, an action against an estate and against others should be dismissed as to the estate." Toledo v. Superior Court, 19 Cal. App. 3d 450, 454 (Cal. Ct. App. 1971). An estate is represented in court by its court-appointed personal representative. Ms. Truong is the named plaintiff in this case, in her capacity as her husband's personal representative. It is her negligence that is in play. Her husband's "estate" is not a party and not a named plaintiff, nor could it be, as a legal matter.

As far as the verdict form goes, under the *respondeat superior* theory of liability, there is no way that Ms. Truong's negligence can be separated from Ambros' negligence. The negligence of Ms. Truong is the negligence of Ambros, and vice-versa. Her negligence is by definition "as great as" that of Ambros. Whatever percentage of negligence the jury assigns to Ambros, it necessarily assigns to Ms. Truong. Her negligence will always be "as great as" Ambros' negligence.

Defendant asks the court to step back and think about the consequences of the rule proposed by Ms. Truong. Ms. Truong's would allow a wife who kills her husband while performing any job related activity to get herself appointed administratrix and proceed to hold her employer strictly liable for damages under the *respondeat superior* doctrine. Society cannot have a rule like that.

In conclusion, on this particular aspect of this *respondeat superior* doctrine, if the rule proposed by Ms. Truong were actually the law, wouldn't the court expect there to be some case, somewhere, saying so?

13

## VI.   Open and Obvious Doctrine.

To get a handle on this issue, the court needs to do little more than look at the lower photograph of Exhibit A to the recently filed Affidavit of Kaoru Hizama. Could anything be more "open and obvious" that the pothole that her right foot is standing in?

The lower photograph in Exhibit A to Ms. Hizama's recent affidavit illustrates the basic point of the "open and obvious" doctrine. Ms. Hizama went to Polaris Point to look for potholes. She found one. How did she do that? She looked down and saw it, that's how. It was open and it was obvious. The fact that the accident did not occur until twilight had set in is of no significance. The only significance is that the potholes were plainly visible all day long, as Ms. Truong drove her golf cart back and forth, and back and forth, and back and forth, over the asphalt area the concert was held at.

Ms. Truong writes, at p. 12:7-8 of her opposition memorandum, "Was she supposed to make a mental map of every dangerous condition in the more than five (5) football field radius?" Ms. Truong's rhetorical question is not the actual question the court must answer on this motion for summary judgment. The question is whether "an average user with ordinary intelligence (would) have been able to discover the danger and the risk presented upon casual inspection". Lovelace v. Course, cited in Defendant's initial brief, at p. 17.

Potholes are open and obvious and they are not inherently dangerous. In Lugo v. Ameritech Corp., 464 Mich. 512, 514-515 (Mich. 2001), the plaintiff was walking through a parking lot toward defendant's building to pay a telephone bill when she apparently stepped in a pothole and fell. Plaintiff testified at her deposition that she was not watching the ground and that she was concentrating on a truck in the parking lot at the time. However, she also testified that nothing would have prevented her from seeing the pothole. The trial court granted defendant's motion for summary judgment on the grounds that the pothole was an "open and obvious" danger from which it had no duty to protect plaintiff. The Michigan Supreme Court

14

affirmed. "When §§ 343 and 343A [of the Restatement Torts, 2d] are read together, the rule generated is that if the particular activity or condition creates a risk of harm <u>only</u> because the invitee does not discover the condition or realize its danger, then the open and obvious doctrine will cut off liability if the invitee should have discovered the condition and realized its danger." <u>Lugo v. Ameritech Corp.</u>, 464 Mich. 512, 516 (Mich. 2001). Here, Ms. Truong admits she "must have seen" the potholes as she repeatedly drove back and forth over them all day long before the accident. The "open and obvious" doctrine therefore "cuts off liability". In this regard, Ms. Truong had already admitted that Ambros had no duty to warn her not to drive a golf cart through potholes with people hanging off the back because it is "common sense" that they might fall off and get hurt.

## VII. Conclusion.

Here, in the conclusion section of her brief, Ms. Truong lamely argues that Ambros' purchase of insurance coverage evidences its knowledge that people were going to be injured by drinking alcohol at the Three Doors Down concert. This is nothing more that a naked and somewhat desperate plea for mercy on this motion for summary judgment based on the potential availability of insurance money. It should be ignored by the court. It has nothing to do with anything. Ambros isn't liable, so Aioi doesn't have to pay, and that's that.

DOOLEY ROBERTS & FOWLER LLP

Dated: __November 7, 2007__       By: _____

**TIM ROBERTS**
Attorneys for Defendant

15

Not Reported in F.Supp.2d, 2002 WL 33920256 (N. Mariana Islands), 6 N.M.I. 346,
2002 MP 01

Supreme Court of the Commonwealth of the Northern Mariana Islands.
Ignacio VILLANUEVA, Plaintiff-Appellee,
v.
CITY TRUST BANK Defendant-Appellant.
Argued and submitted Dec. 13, 2000.
Decided Feb. 6, 2002.

Eric S. Smith, Saipan, MP, for Appellee.

James S. Sirok, Saipan, MP, for Appellant.

BEFORE: MIGUEL S. DEMAPAN, Chief Justice, ALEXANDRO C. CASTRO, Associate
Justice and JOHN A. MANGLONA, Associate Justice.

OPINION

MANGLONA, J.

INTRODUCTION

**\*1** City Trust Bank appeals the trial court's order grant of summary judgment which
quieted title in a parcel of real property to Ignacio Villanueva. We have jurisdiction
pursuant to N.M.I. Const. art. IV, § 3 (amended 1997) and 1 CMC § 3102(a). We
affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In 1987, Ignacio Villanueva ("Villanueva"), the fee simple owner of Lot No. 003108
("lot") in San Antonio, Saipan, leased the lot to Young J. Oh ("Oh") for a period of 55
years. The lease provides that Oh had the right to sublease, assign or transfer his
interest without Villanueva's consent. On February 9, 1993, Oh mortgaged his 55-year
leasehold interest to City Trust Bank ("City Trust"). On May 19, 1993, Oh assigned his
interest to the lot to Sung Chul Kim ("Kim"). The assignment acknowledged the
mortgage with City Trust. All those documents were duly filed with the Commonwealth
Recorder's Office.

On October 19, 1994, Villanueva notified Kim that he was in default for failing to pay the rent. Consequently, Villanueva filed an action seeking to evict Kim and regain possession of the lot. Neither Oh nor City Trust were named as co-defendants in the action and no notice was given to them.

Villanueva concedes that he provided no notice to either Oh or City Trust of the default in the rent. On March 28, 1996, the trial court entered judgment in favor of Villanueva and ordered Kim to vacate the premises. The judgment did not include an order or declaration terminating the lease agreement.

On August 18, 1997, City Trust sued Oh and his wife seeking to foreclose on its leasehold mortgage. Villanueva received a copy of the notice of default and intent to foreclose. At Villanueva's attorney's request, City Trust provided a copy of the mortgage and its summons and complaint. Villanueva did not appear in City Trust's suit to contest the foreclosure. On April 29, 1998, City Trust obtained a default judgment against Oh and his wife. The default judgment provided that the leasehold interest would be sold at a public auction.

On August 24, 1998, without notice to City Trust and more than two years after the entry of the original judgment, Villanueva succeeded in getting the trial court to amend the March 28, 1996 Order, nunc pro tunc, declaring the termination of Kim's leasehold interest in the lot.

Before seeking the amendment of the order, Villanueva filed this quiet title action. After the amended order was issued, he moved for summary judgment in the quiet title action asserting that he was not required to notify City Trust of Kim's default and of the subsequent termination of the lease. The trial court agreed and granted the motion in his favor.

## QUESTIONS PRESENTED AND STANDARDS OF REVIEW

I. Whether the trial court erred in ruling as a matter of law that the CNMI mortgage statute is based on the lien theory of mortgage law, and as such, that no privity of estate was created between a landowner-lessor and a bank, holding leasehold mortgage, that would have required the landowner to notify the bank of lessee's default and lease termination.

*2 II. Alternatively, whether the collateral estoppel doctrine bars a lessor from attacking a default judgment entered in favor of a bank holding a leasehold mortgage.

Since both questions arise from the trial court's grant of summary judgment, they are reviewed de novo. See Santos v. Santos, 4 N.M.I. 206, 209 (1994).

Case 1:06-cv-00022    Document 21-3    Filed 08/15/2008    Page 39 of 44

ANALYSIS

I. Notice to Bank

A. Mortgage Law Theory
   We consider two pertinent statutory provisions in examining City Trust's argument that our mortgage statutes are founded, not on the lien theory of mortgage law, but on the title theory, or alternatively, intermediate theory. [FN1]

> FN1. *See* 12 THOMPSON ON REAL PROPERTY § 101.01(a) and (b), for an overview on the history of mortgage law in England and the United States and the emergence of the three theories.

   Section 4514, Title 2 of the Commonwealth Code reads: "[a] mortgagee is not entitled to possession of mortgaged property unless the mortgage expressly grants a right of possession." [FN2] 2 CMC § 4514. Section 4533 of Title 2 requires that in the event of a default, a mortgagee may choose to institute foreclosure proceedings against the mortgagor.[FN3] Having placed our statutes in proper prospective, we now determine which of the three theories best describes our mortgage law system.

> FN2. 2 CMC § 4514 provides: "The mortgagee is not entitled to possession of mortgaged property unless the mortgage expressly grants a right of possession. However, after the execution of the mortgage, the mortgagor may deliver possession to the mortgagee without additional consideration."

> FN3. 2 CMC § 4533(b) reads: "The mortgagee may, if authorized by the terms of the note or mortgage, bring an action to foreclose or satisfy the mortgage in accordance with the provisions of this chapter."

   On one side of the conceptual spectrum, the lien theory of mortgage law recognizes that title remains in the mortgagor and that the mortgagee holds only a lien as security. *See* 12 THOMPSON ON REAL PROPERTY § 101.01(b)(2) (David A. Thomas ed.1994). Both legal and equitable title remain with the mortgagor, while the mortgagee is relegated to lienholder status. *Id.* Until the interest of the mortgagor is extinguished through foreclosure, all the usual legal incidents of ownership, including the right of possession, belong to the mortgagor. *Id.* While some lien theory jurisdictions provide by statute that mortgagees can take possession only through foreclosure, there are lien theory-based statutes allowing the parties to agree that the mortgagee may be entitled to possession before foreclosure. *Id.*

   By contrast, title theory views a mortgage as transferring, among other things, the "usual incidents of ownership of an estate," including a right of possession in mortgagees, unless otherwise agreed to by the parties. *Id.* § 101.01(b)(1). In the middle of the spectrum lies the intermediate theory of mortgage law which regards

mortgagees as holding mere liens. Under this theory, the lien ripens into a legal interest only after a default has occurred. *See id.* § 101.01(b)(3). In other words, a mortgagee is not entitled to possession until default.

In comparing the principles of the three theories to our system of mortgage law, it is apparent that our statutes are akin to the lien theory. The title theory is unworkable because of its inapposite view that a mortgage agreement automatically confers a right of possession on a mortgagee.[FN4] Neither are we an intermediate theory jurisdiction since our statutes compel a foreclosure action when a default occurs and the mortgagee seeks possession. *See* 2 CMC §§ 4531 and 4533. Because possessory rights are not transferred automatically to the mortgagee except by the parties' agreement and because, absent such agreement, a mortgagee must file a foreclosure action to acquire possession, we find no error in the trial court's ruling that, as a matter of law, our system of mortgage law is based on the lien theory.[FN5]

> FN4. The common law, as expressed by the Restatements of Law, only applies to the Commonwealth where there is no written or local customary law to the contrary. *See* 7 CMC § 3401. As indicated, because our mortgage law is based on the lien theory, we cannot apply, as City Trust urges us to do, the title theory even if it is the "common law" theory of mortgage law.

> FN5. Having confined our analysis strictly on the mortgage statutes, we need not consider Villanueva's constitutional argument that the title theory is unworkable in this jurisdiction in light of Article XII of the N.M.I. Constitution.

## B. Notice Requirement

**\*3** City Trust's contention that it is entitled to notice in the eviction proceeding requires that we take into account the nature of such a proceeding. A landlord files an eviction action to recover possession of real property from a tenant in wrongful possession. *See Glendale Federal Bank v. Hadden,* 73 Cal.App.4th 1150, 87 Cal.Rptr.2d 102, 104 (Cal.Ct.App.1999) (examining unlawful detainer action analogous to eviction or ejectment proceeding). "In fact, possession is the fundamental issue in an unlawful detainer action and an action does not lie against a defendant who is not in possession of the premises at the commencement of the lawsuit." [FN6] *Id.* (citing *Briggs v. Electronic Memories & Magnetics Corp.,* 53 Cal.App.3d 900, 126 Cal.Rptr. 34 (Cal.Ct.App.1975)). As such, to defeat Villanueva's summary judgment motion, City Trust should have disputed the issue of who had possession of the lot at the time of the eviction proceeding. Having failed to do so, the only available recourse, as we shall explain, is to uphold the trial court's ruling.

> FN6. The rationale is that the summary character of the action would be defeated since issues irrelevant to the right of immediate possession could be introduced. *Id.* (citing *Knowles, supra* ).

Addressing a situation strikingly similar to the facts here, the court in *Glendale Federal Bank* refused to set aside a judgment in an unlawful detainer action. The trial court had ordered the eviction of tenants, who had mortgaged their leasehold interest in favor of a bank, for failure to pay rent, and declared the forfeiture of the lease. Since the bank was not in possession of the premises, the court ruled that it was not an indispensable party in the unlawful detainer action.

The court explained that the bank acquired its deed of trust with notice of the provisions in the lease, including the clause providing for forfeiture in the event of nonpayment. *See* 87 Cal.Rptr.2d at 104. "By accepting a leasehold as collateral, a lender takes subject to all the terms of the lease; the collateral may become worthless if the lease terminates in accordance with its terms." *Id.; See also 61 Associates v. 425 Fifth Avenue Realty Assocs.,* 207 A.D.2d 323, 615 N.Y.S.2d 687, 688 (N.Y.App.Div.1994). The court found that the bank could have protected its interest by obtaining a contractual right to receive notice of the tenant's defaults and the opportunity to cure the defaults. 87 Cal.Rptr.2d at 104-05. This could have been effectuated by separate agreement with the landlords, by amending the lease, or by obtaining an option for a new lease. *Id.* (citing 1 RUDA, ASSET-BASED FINANCING: A TRANSACTIONAL GUIDEEE § 8.03(f)(a) (Matthew Bender 1999) and 1 FRIEDMAN ON LEASES § 7.801). The court also noted that "[t]he normal lender-protective agreement includes provisions requiring the landlord to give notice to the lender of any defaults and providing time for the lender to cure those defaults." [FN7] *Id.* By failing to follow such common procedures to secure an agreement with the landlord, the court concluded that the bank must bear the cost of its mistake. *Id.*

> FN7. That such procedures are considered normal practices in the mortgage lending business leaves us somewhat baffled at City Trust's failure to secure an agreement on such a provision with the landlord.

Here, as indicated, by operation of 2 CMC § 4514, City Trust had no right to possession by virtue of its mortgage on Oh's leasehold interest. The lease agreement, moreover, did not confer on City Trust any possessory right; nor is there any evidence in the record that City Trust, at the time Villanueva filed the eviction action against Kim, was in possession of the lot. Indeed, City Trust does not dispute that Kim, to whom Oh assigned the lease, was in possession of the property. Accordingly, absent the requisite possessory right or any evidence demonstrating City Trust's actual possession of the lot, we are unable to hold that City Trust was entitled to be notified of the eviction action and that consequently, the judgment entered there is unenforceable. Like *Glendale Federal Bank*, City Trust must also face the consequence of its failure to protect its interest in the leasehold.

## II. Collateral Estoppel

*\*4* Alternatively, City Trust argues that Villanueva's express knowledge of its foreclosure suit against Oh bars him from challenging the default judgment entered

against Oh. According to City Trust, Villanueva is collaterally estopped from attacking its foreclosure judgment when he stood idly as it obtained an order authorizing the sale of the leasehold estate.[FN8]

> FN8. The trial court's order does not examine this question but City Trust asserts that it was raised in its opposition memorandum and at the hearing below. We shall consider the question since Villanueva does not dispute that it was properly preserved for our review.

Collateral estoppel generally prevents a party from relitigating an issue that the party has litigated and lost. See *Catholic Social Servs., Inc. v. I.N.S.,* 232 F.3d 1139, 1152 (9th Cir.2000); *In re Roussos,* 251 B.R. 86, 92 (9th Cir.2000); *Estate of Guerrero v. Quitugua,* App. No. 98-010 (N.M.I.Sup.Ct. Feb. 10, 2000) (opinion at 2) ("Under the doctrine of collateral estoppel, a judgment in a prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action.") (quotation and citation omitted); RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982). The general rule on collateral estoppel consists of five elements: (1) the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding; (2) the issue must have been actually litigated in the former proceeding; (3) it must have been necessarily decided in the former proceeding; (4) the decision in the former proceeding must be final and on the merits; and (5) the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. *Roussos,* 251 B.R. at 92.

Where a default judgment has been entered, it is generally recognized that none of the issues are deemed "actually litigated" for purposes of invoking collateral estoppel. RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. e. "Therefore, the rule of [§ 27] ... does not apply with respect to any issue in a subsequent action." *Id.*

Not only was Villanueva a non-party to the foreclosure action, but the judgment he seeks to have set aside was entered by default. As indicated, in a default judgment, none of the issues are "actually litigated" under the collateral estoppel doctrine. Since the doctrine is inapplicable here, it was appropriate for Villanueva to attack the foreclosure judgment by way of this quiet title action. Consequently, even if the trial court had considered City Trust's collateral estoppel argument, it would not have affected the substance of its ruling that Villanueva is entitled to summary judgment.

## CONCLUSION

Based on the foregoing reasons, the trial court's grant of summary judgment in favor of Villanueva is AFFIRMED.

SO ORDERED THIS 6TH DAY OF FEBRUARY 2002.

Case 1:06-cv-00022   Document 21-3   Filed 08/15/2008   Page 43 of 44

N. Mariana Islands,2002.
Villanueva v. City Trust Bank
Not Reported in F.Supp.2d, 2002 WL 33920256 (N. Mariana Islands), 6 N.M.I. 346,
2002 MP 01

END OF DOCUMENT

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:06-cv-00022    Document 21-3    Filed 08/15/2008    Page 44 of 44