Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone (671) 646-1222
Facsimile (671) 646-1223

Attorneys for Defendant

FILED
SUPERIOR COURT
OF GUAM

2007 AUG 28 PM 5: 01

CLERK OF COURT

BY:_____

## IN THE SUPERIOR COURT

## OF GUAM

| | |
|---|---|
| CASSANDRA CHAU TROUNG, Administratrix of the Estate of ROLAND ANTHONY BOUDREAU, Deceased, | ) ) ) ) CIVIL CASE NO. CV1082-06 |
| Plaintiff, | ) ) |
| vs. | ) **MOTION FOR SUMMARY JUDGMENT** ) |
| AIOI INSURANCE COMPANY, LTD., | ) ) |
| Defendant. | ) ) ) |

### MOTION

Pursuant to Rule 56 of the Rules of Civil Procedure for the Superior Court of Guam, Defendant Aioi Insurance Company, Ltd. moves the Court for an order granting summary judgment. This Motion is based on the accompanying Memorandum in Support of Motion, the Declarations of Tim Roberts, Pierre "Tim" Aguon, Paul S.N. Shimizu, Tom Shimizu, Aurelio A. Espinola, M.D., and Emmanuel Cruz, all filings and records in this matter, and any other evidence which may be adduced at a hearing on this motion.

DOOLEY ROBERTS & FOWLER LLP

Date: 8/28/07

RECEIVED

AUG 2 8 2007

By: D Time: 5:00

Teker Torres & Teker, P.C.

TIM ROBERTS, ESQ.
Attorneys for Defendant



Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone (671) 646-1222
Facsimile  (671) 646-1223

Attorneys for Defendant

FILED
SUPERIOR COURT
OF GUAM

2007 AUG 28  PM 5: 01

CLERK OF COURT

BY:_____ _____

IN THE SUPERIOR COURT

OF GUAM

RECEIVED

AUG 2 8 2007
By__D__ time: 5:00
Teker Torres & Teker, P.C.

| | |
|---|---|
| CASSANDRA CHAU TROUNG,<br>Administratrix of the Estate of ROLAND<br>ANTHONY BOUDREAU, Deceased,<br><br>Plaintiff,<br><br>vs.<br><br>AIOI INSURANCE COMPANY, LTD.,<br><br>Defendant. | CIVIL CASE NO. CV1082-06<br><br><br><br><br>**MEMORANDUM IN SUPPORT OF<br>MOTION FOR SUMMARY JUDGMENT** |

Defendant Aioi Insurance Company, Ltd. ("Aioi"), the liability insurer for Ambros, Inc.,
submits the following memorandum in support of the accompanying motion for summary
judgment.

I.    **UNDISPUTED FACTS.**

On April 2, 2005, after the "Three Doors Down" concert at Polaris Point on Naval
Station, Roland Boudreau fell or jumped off the back of a golf cart being driven by his wife,
Plaintiff Cassandra Truong, struck his head on the pavement, and died at Naval Hospital the next
day.   Her husband was hanging on to the back of the cart because the passenger seat was

occupied by Ms. Truong's friend. Deposition of Cassandra Truong ("Truong Depo."), p. 42, lines 16-24. Another person was riding in the back of the cart with Ms. Truong's husband, for a total of four (4) passengers, two seated, and two hanging on to vertical poles on the back of the cart. Id. The back of the cart is designed to carry golf clubs, not people. Truong Depo., p. 34, lines 21-28; p. 35, lines 1-9. The golf car being driving by Ms. Truong had been loaned to Ambros by the Navy for use at the concert. Declaration of Pierre ("Tim") Aguon, ¶ 4 ("Aguon Dec."). Ms. Truong was, and still is, Ambros' Marketing Manager. Truong Depo., p. 10, lines 10-11. In this lawsuit, Ms. Truong claims that Ambros is to blame for her husband's death.

At her March 27, 2007 deposition, Ms. Truong was asked how the accident happened. She replied, "Because we hit a pothole and he fell off." Truong Depo., p. 27, line 1. Asked whether she held Ambros responsible for this, Ms. Truong said she could think of two (2) reasons for holding Ambros liable. First, Ambros "could have talked to the Navy to pour some cement to fix it or they could have roped off that cement area." Truong Depo., p. 21, lines 6-14. Second, "we never got instructions on how to drive it or whatnot ... nobody briefed us and said, you know, the grounds are unleveled (sic), you need to be careful and things like that. There was no safety briefing or anything." Truong Depo., p. 21, lines 5-14. Additionally, "I'm just saying there should have been some kind of safety briefing on how to operate the golf cart, how to drive it, how to make sure that – I mean, are passengers allowed on the golf cart, you know, things like that." Truong Depo., p. 32, lines 8-11)[1]

On May 16, 2005, only six (6) weeks after the accident, Ms. Truong sat down with a Navy investigator to give a detailed statement about the incident. That statement is Exhibit 16 to

---

[1] At her deposition, Ms. Truong was given the opportunity to think of other reasons why Ambros was negligent, but she was unable to. "Q: What else did Ambros do or not do that you think caused or contributed to your husband's death? A: Beside the cart and making sure the grounds were leveled? Q: Yeah. A: That's it." Truong Depo., p. 25, lines 21-25; p. 26, line 1.

2

the transcript of Ms. Truong's sworn deposition ("Truong Depo."), a copy of which is attached to the accompanying Declaration of Tim Roberts, Esq. ("Roberts Dec.") as Exhibit 1 and incorporated herein by this reference. Ms. Truong reaffirmed at her deposition in this case that everything in her sworn statement to the Navy was true. Truong Depo., p. 29, line 25, p. 30, line 1. She also testified that she knew it was important to tell the truth to the Navy, to remember as many details as possible, and to not leave anything out. Truong Depo., p. 29. After the sworn statement was typed, Ms. Truong was given the opportunity to make any necessary handwritten changes, which she did, after which she also placed her initials before and after each paragraph of the statement to signify its accuracy. Truong Depo., pp. 28-30.

At no place in Ms. Truong's sworn statement to the Navy is there any mention of potholes or inadequate golf cart training. Instead, Ms. Truong swore to the Navy that "it appeared to me that one of his slippers fell off while Roland was on the cart and he jumped off to get it and fell and (hit) his head." Truong Depo., Exhibit 16.

At her deposition, Ms. Truong insisted that she was not negligent in any way and that nothing she did, or didn't do, contributed to her husband's death. Truong Depo. p. 27:4-9; p. 61:1-5:

> Q: (By Mr. Roberts) Casey, did anything that you did or didn't do cause or contribute to your husband's death?"
>
> A: No.
>
> Q: You're completely blameless and faultless for the accident?
>
> A: Yes.
>
> &ast; &ast; &ast;
>
> Q: But it's your testimony that you personally did not cause or contribute to this accident by anything you did or didn't do?

3

**Mr. Razzano:** Objection, asked and answered.

**The Witness:** That's correct.

The complaint alleges only two (2) grounds for liability on Ambros' negligence, both of which are found in paragraph 13. These are that "Shimbos (sic), and its agents and employees, negligently and carelessly allowed its employees to operate said golf carts without proper instructions and negligently operated the golf cart, thereby causing the Decedent to fall from the golf cart, thereby proximately causing the Decedent's death." Complaint, ¶13. This paragraph must be read several times to understand what Ms. Truong is actually alleging. What she is alleging is that (1) Ambros negligently allowed Ms. Truong to operate a golf cart, and (2) Ms. Truong, acting in the course of her employment with Ambros, negligently operated the golf cart, which negligence is imputed to Ambros. The first ground for liability is a "negligent entrustment" or "inadequate training" theory, under which Ms. Truong seeks to hold Ambros liable for Ambros' own independent negligence. The second ground is a *respondeat superior* theory, under which Ms. Truong seeks to hold Ambros liable for <u>her</u> own negligent operation of the golf cart. In other words, on this second alleged basis for liability Ms. Truong is saying "Ambros didn't do anything wrong, but since I was acting in the course and scope of my employment for Ambros when my own negligence caused my husband's death, Ambros must pay me damages."

There is another aspect to this case, one that is not necessarily relevant to this motion, but which would certainly be enormously relevant in the event a trial is necessary. When Ms. Truong's husband was admitted to Naval Hospital after the accident, his Blood Alcohol Level was a staggering .2258, nearly three (3) times the legal limit for driving an automobile. Declaration of Emmanuel Cruz; ¶¶ 2-4; Declaration of Dr. Aurelio Espinola, ¶¶ 3-7.

4

Ms. Truong has not sued Ambros. Instead, she has sued Ambros' liability insurer, Aioi.

## II. LAW AND ARGUMENT.

### A. As a Matter of Law, If Plaintiff Truong Was Not Negligent, Any Alleged Negligence on Ambros' Part Did Not Contribute to the Accident.

As mentioned above, Ms. Truong firmly testified twice under oath at her deposition that she was not negligent in connection with the death of her husband. Truong Depo. p. 27:4-9; p. 61:1-5. This means that she is legally precluded from recovering any damages in this case. Both of Ms. Truong's theories of recovery -- direct liability on Ambros' part for negligent entrustment and/or training and *respondeat superior* liability based on Ms. Truong's negligence -- require proof that Ms. Truong was <u>herself</u> negligent. Since she has sworn that she was <u>not</u> negligent, she cannot recover.

#### 1. *Respondeat Superior* Liability.

In a *respondeat superior* case, the employer is innocent, but the employee acting in the course and scope of her employment is negligent, so the employer must pay. See generally, <u>Fajardo v. Liberty House Guam</u>, 2000 Guam 4. By definition, in a *respondeat superior* case the employee must be found negligent, or there is no case against the employer. Ms. Truong has sworn she was not negligent, so she cannot recover on her *respondeat superior* theory of liability.

#### 2. Direct Liability.

This theory of liability also requires proof that Ms. Truong herself was negligent. As an example, if a tire shop negligently installs a right rear tire, and an accident results when a front

5

left tire falls off, the tire shop is not liable, because its negligence was not the legal or proximate cause of the accident. In other words, if Ambros negligently trained Ms. Truong to drive a golf cart, but Ms Truong was in fact not driving the golf cart negligently when her husband was killed, there is no proximate cause between Ambros' negligence and the accident. "A negligent-entrustment claim has five elements: (1) entrustment of a vehicle by an owner; (2) to an unlicensed, incompetent, or reckless driver; (3) the owner knew or should have known that the driver was unlicensed, incompetent, or reckless; (4) the driver was negligent on the occasion in question; and (5) the driver's negligence proximately caused the accident." Bates v. Railtech Boutet, Inc., 2007 U.S. Dist. LEXIS 46474 (D. Tex. 2007). That is, a negligent entrustment/training plaintiff must show that "the inexperience or recklessness of the person to whom the property was entrusted was the proximate cause of the [plaintiff's] injury." Gardner v. Star Transp., Inc., 2006 U.S. Dist. LEXIS 41191 (D. Ill. 2006). See generally, Guidry v. Harp's food Stores, Inc., 66 Ark.App. 93, 98 (1999 ("[w]ith regard to the negligence claim, the judge found that there was no causation between appellee's alleged negligence in training Jones and appellant's damages."); Bettis v. United States, 635 F.2d 1144, 1148 (5th Cir. 1981) ("The negligence in entrusting the automobile must concur, as a part of the proximate cause, with the negligent conduct of the driver on account of his incompetency and recklessness.")

Since Ms. Truong adamantly swore at her deposition that she was not negligent in connection with the death of her husband, she cannot recover under her negligent entrustment or negligent training theories of recovery.

6

**B.** **As a Matter of Law, Ms. Truong Cannot Recover Under a _Respondeat Superior_ Theory. Her Negligence and Ambros' Negligence are the Same Negligence. Her Negligence Must Necessarily Be "As Great As" Ambros' Negligence Under 18 GCA § 90108**

There aren't many, or actually even any, cases dealing with this precise legal issue. This isn't surprising. This is because the issue boils down to this question, which Aioi will ask on Ms. Truong's behalf: "If my negligence causes my husband's death while I am acting in the course and scope of my employment, can I make my admittedly innocent employer pay me damages?" The answer to Ms. Truong's question is no. 18 GCA § 90108 provides that "Contributory negligence shall not bar recovery in an action by any person or his legal representative to recover damages for negligence resulting in death or in injury to person or property, if such negligence was not as great as the negligence of the person against whom recovery is sought." After all of the testimony at the trial of this case has been concluded, and after closing arguments of counsel, the jury will be given a verdict form to fill out. The verdict form will have "boxes" to enable the jury to assign percentages of negligence to each of the parties and to others whose negligence may have contributed to the accident. But there will be only one combined box for Ambros and Ms. Truong, entitled "Ambros/Plaintiff". This is because for the purposes of Guam's contributory negligence statute, Ambros' negligence and Ms. Truong's negligence are one and the same. Under a _respondeat superior_ theory of recovery, the employer is by definition <u>not</u> negligent; rather, the employee's negligence is imputed to the employer. <u>Fajardo v. Liberty House</u>, supra. This being the case, Plaintiff Truong cannot recover by virtue of 18 GCA § 90108. Her negligence will by definition be "as great as" the person from whom she seeks to recover, Ambros.

Another way of saying all this is that under a _respondeat superior_ theory of recovery, Ambros will by definition have no percentage of negligence, and cannot therefore be made to

7

pay anything, since *respondeat superior* liability assumes that there is no negligence on the part of the employer, only the employee.

Still another way of saying all this is to answer Ms. Truong's question for her: "No, Ms. Truong, if your negligence causes your husband's death while you are acting in the course and scope of your employment, you cannot make your admittedly innocent employer pay you damages". In fact, even if the law somehow allowed Ms. Truong to recover damages from Ambros on a *respondeat superior* basis, Ambros would have the right to be indemnified by Ms. Truong for any such damages. "Where a judgment has been rendered against an employer for damages occasioned by the unauthorized negligent act of his employee, the employer may recoup his loss in an action against the negligent employee". Continental Casualty Company v. Phoenix Construction Company, 46 Cal.2d 423, 428-29 (Cal. 1956).

### C. As a Matter of Law, Ambros is Not Liable Under A Premises Liability Theory of Relief.

As mentioned above, at her deposition Ms. Truong mentioned two potential grounds for liability on Ambros' part. First, she argues that no one at Ambros taught her how to safely operate a golf cart. This is both a "negligent entrustment" and an "inadequate training" theory. As the court will see below, under the undisputed facts and established case law, Ambros had no duty of care to Ms. Truong under this theory of relief. Ambros' lack of a duty of care to Ms. Truong under this theory of relief is explained in Sections D.1. through D.5. of this memorandum, at pp. 10-20. Ambros' satisfaction of any duty of care it may have owed to Ms. Truong is explained in Section E. of this memorandum.

On her premises liability theory, Ms. Truong says Ambros is liable because the area where the accident happened, which is owned and controlled by the Navy, has potholes in it.

8

"The existence of a legal duty in a given factual situation is a question of law" for the court to decide, not for the jury to decide. Nissan Motor Corp. v. Sea Star Group, 2002 Guam 5, 10. Accordingly, the existence of a duty is an issue of law properly resolvable on summary judgment. "In a negligence action, the existence of a duty of care owed by a defendant to a plaintiff is a legal issue that is particularly amenable to resolution on summary judgment ... A defendant in a negligence action may obtain summary judgment by demonstrating that the evidence shows it owed no duty to the plaintiff that could have been breached." Vournas v. Fid. Nat. Tit. Ins. Co, 73 Cal. App. 4th 668, 672 (Cal. Ct. App. 1999).

The Three Doors Down Concert was held on April 2, 2005 on United States Navy property at Polaris Point, Guam. Declaration of Paul Shimizu ("Paul Shimizu Dec."), ¶¶ 2, 3. Malafunkshun Productions was the concert's promoter, not Ambros. Paul Shimizu Dec., ¶ 2. Ambros did not own, lease occupy, or control the area where the concert was held. Paul Shimizu Dec., ¶ 3. There is no evidence that the Navy would have done anything had Ambros asked it to "pour some cement" or "rope off" the cement area. For these reasons, Ambros therefore cannot be held liable on a premises liability theory of negligence based on condition of Polaris Point. If a defendant does not own or control an area, it has no duty of care to people who are injured by reason of the area's unsafe condition. "When a person is injured as a result of the conditions of land or buildings or structures on the land, it is the possession or control of land that imposes liability for those injuries ...". Nicholas v. Stop & Shop Corp., 1998 Conn. Super. LEXIS 3392 (Conn. App. Ct. 1998). "(T)he duty of care resides in the party who controls the premises ... 'an owner or occupier who has no control has no duty to warn against the danger or to take any action to relieve the danger.'" Kibbons v. Union Electric Co., 823 S.W.2d 485, 489 (Mo. 1992); see also, Schulman v. City of N.Y., 190 A.D.2d 663 (N.Y. App. Div. 1993) ("since the City did

9

not own the roadway on which the accident involving the plaintiff's decedent occurred, it had no duty to warn users of the roadway of known dangers on it"); <u>Vela v. Cameron County</u>, 703 S.W.2d 721, 723 (Tex. App. 1985) ("Because neither the accident in question occurred on 'premises' owned, occupied or controlled by the County, nor was the hazard located on its premises, the County owed no legal duty to warn Vela of the dangers off its premises"); <u>Sollami v. Eaton</u>, 201 Ill. 2d 1, 17-18 (Ill. 2002). ("The mere fact that Eaton may be aware that teenagers such as Kathleen use his trampoline and may injure themselves while performing inappropriate maneuvers ... does not translate into a legal duty to provide warnings or supervision or to prevent use of the trampoline").

If Polaris Point is unsafe, which it isn't, Ambros is not liable for that. The United States government owns and controls Polaris Point, not Ambros. And in fact, Ms. Truong has sued the United States in federal court for the allegedly unsafe "potholes" at Polaris Point. The court may wish to take judicial notice of the complaint Ms. Truong filed in District Court Case CV 06-00022, <u>Cassandra Truong vs. United States of America</u>.

D.   <u>As a Matter of Law, Ambros is Not Liable Under a "Failure to Train" or "Negligent Entrustment" Theory of Relief.</u>

    1.   **Ambros Had No Duty To Train Ms. Truong How To Drive A Golf Cart Because It Is Undisputed She Already Knew How To Drive A Golf Cart.**

Ms. Truong is a golfer. Truong depo, p. 36, lines 4-18. Prior to the day of the accident, Ms. Truong had driven golf carts numerous times. Id. For this reason, Ambros had no duty to train her how to drive a golf cart. "We reject the plaintiffs' contention that the appellants created a dangerous condition by instructing the injured plaintiff to carry a bucket of dirty water down the stairs to dump it into the street. The task was not inherently dangerous, and the appellants

10

had no duty to train, instruct, or direct the injured plaintiff in this common and ordinary activity, which had been performed by the injured plaintiff many times before the accident without incident ... Accordingly, the appellants' motion for summary judgment should have been granted." Viskovic v. ENK Enters., 282 A.D.2d 672, 673 (N.Y. App. Div. 2001). "While the appellant argues that there are questions of fact as to whether Ogden provided training and instruction to Wisloh, his injuries resulted from his opening a door -- a common activity for which an employer has no duty to train an employee." Wisloh v. Air-A-Plane Corp., 251 A.D.2d 657, 658 (N.Y. App. Div. 1998). "Plaintiff's employer had no duty to train, instruct or direct its employee in the common and ordinary activity, previously performed many times by plaintiff, of walking up a ramp." Cummings v. Arde Realty Corp., N. V., 154 A.D.2d 321 (N.Y. App. Div. 1989). "There is certainly no basis to believe that the defendant The Sports Authority had any duty to warn or to notify the plaintiff about the dangers of using in-line skates because she already appreciated such dangers ... . For the same reason, the defendant seller had no duty to train or supervise the plaintiff or its employees in the proper use of the product." Rose v. Sports Auth., 14 Mass. L. Rep. 721 (Mass. Super. Ct. 2002).

For a golfer like Ms. Truong, driving a golf cart is a "common and ordinary activity" for which no training was necessary. Ambros had no legal duty to train her or provide her with any warnings. Aioi is entitled to summary judgment on this ground.

        2.        **Ambros Had No Duty to Warn pr Train Ms. Truong Not To Drive a Golf Cart Through Potholes Because Ms. Truong Admittedly Knew The Attendant Risks Are "Common Sense."**

Ms. Truong admitted, in her own sworn words at her deposition, that "common sense" holds that it is dangerous to drive golf carts through potholes with people standing on the back. Truong Depo., p. 33, lines 15-19. She also admitted that it is "common sense" that a person

11

standing on the back of a golf cart might fall off if the driver drives over bumps. Truong Depo., p. 34, lines 6-13. Since Ms. Truong already knew that these things were "common sense," Ambros had no duty to warn her about them. "Where a danger is readily apparent as a matter of common sense, 'there should be no liability for failing to warn someone of a risk or hazard which he [or she] appreciated to the same extent as a warning would have provided.' Put differently, when a warning would have added nothing to the user's appreciation of the danger, no duty to warn exists as no benefit would be gained by requiring a warning." Westbrook v. WR Activities-Cabrera Mkts., 5 A.D.3d 69, 71 (N.Y. App. Div. 2004) quoting Liriano v Hobart Corp., 92 N.Y.2d 232, 242, 700 N.E.2d 303, 677 N.Y.S.2d 764 [1998], and Prosser and Keeton, Torts §96, at 686 [5th ed]). "Because the injured employee admitted he knew of the dangers involved in servicing the machine while it was running, a warning would not reduce the likelihood of injury. When as in this case, a danger associated with a machine is fully obvious and generally appreciated, there is no additional duty on the part of the manufacturer to include a warning. ... The danger here was one that no one who thought about it . . . could fail to appreciate. The plaintiff was no less knowledgeable than the defendant about the danger". Brook v. Black Clawson Co., 2001 Mass. Super. LEXIS 158, 11-14 (Mass. Super. Ct. 2001)[2]

In Vela v. Yamaha Motor Corp., 2002 Tex. App. LEXIS 3185, 1-4 (Tex. App. 2002) (unpublished), golf cart driver Vela left his foot hanging out of the cart as he drove along. His foot caught on a pole and he was injured. He sued everyone, including the golf cart manufacturer, Yamaha, and the retail seller, Easy Ride. As for Easy Ride, Vela said the cart failed to have a sticker or other label warning him to keep his foot inside the cart while it was

---

[2] Book v. Black Carlson was a products liability case rather than a negligence case. However, "(T)he duty to warn analysis in a negligence action is essentially similar to the analysis under strict liability." Toys "R" Us, Inc. v. Criterion Coating Sys., 1986 U.S. Dist. LEXIS 24315 (D. Ill. 1986).

moving. He characterized his cause of action as a "failure to warn." This is essentially what Ms. Truong is claiming in this case – that Ambros failed to warn her not to drive though potholes with people hanging on the back of the cart. According to the <u>Vela</u> court, however, "there is no duty to warn of obvious risks -- risks that are 'within the ordinary knowledge common to the community' ... <u>All witnesses, including Vela and his co-worker Sergio Garcia, testified that it is common sense to keep your hands and feet inside the car.</u>" The trial court's dismissal of Easy Ride was affirmed on appeal. <u>Vela v. Yamaha Motor Corp.</u>, 2002 Tex. App. LEXIS 3185, 1-4 (Tex. App. 2002).

The same is true here. Ms. Truong stated under oath at her deposition that it is "common sense" that if someone drives a golf cart through a pothole with a person hanging on the back, that person might fall off and get hurt. Because this is a "common sense" proposition, there was no duty on Ambros' part to warn Ms. Truong not to do it. Summary judgment should be granted on this ground to Aioi.

### 3. Ambros Had No Duty To Warn Or Train Ms. Truong How To Drive A Golf Cart Because There Is No Evidence That Golf Carts Are Inherently Dangerous.

Ambros did not supply Ms. Truong with explosives, or weapons, or poison. It supplied her with a golf cart. In opposing this motion for summary judgment, Ms. Truong needs to be able to point to some credible evidence that golf carts are inherently dangerous when put to their intended use. She will not be able to do this.

The vast majority of things people come into contact with in their daily lives are not inherently dangerous, but can nevertheless cause injury if used wrong. If someone stubs his toe on a planter on his way to get the morning newspaper, it will injure him. If he jabs his finger with a fork while eating his eggs, it will injure him. If someone slips on the floor while he is in

13

the shower, it will injure him. If someone hits his thumb with a hammer, it will injure him. But the law does not require any special instructions or safety precautions with respect to planters, or forks, or showers, or hammers. The courts do "not recognize the existence of a duty to undertake safety precautions unless and until the activity is 'sufficiently dangerous'." Blevins v. Taylor, 103 N.C. App. 346 (N.C. Ct. App. 1991), citing Deitz v. Jackson, 57 N.C. App. 275 (N.C. Ct. App. 1982). Instead, the duty to provide instructions or warnings to someone exists only if "harm will likely result if precautions are not taken" by a person with general oversight over the activities. Blevins v. Taylor, supra. And, it is clear that courts "may pass upon the intrinsic dangerousness of an activity as a matter of law". Id. In making that determination, the courts will decide whether there is a "recognizable and substantial danger inherent" in the activity in question. Id. As just alluded to, "(i)ntrinsic dangerousness is not the ordinary dangerousness which accompanies countless activities when they are negligently performed." Id.

There is no evidence in this case, and there will be no evidence in this case, that golf carts are inherently dangerous when put to their intended use. "It is well established that "there is no 'duty to warn' where a product is not shown to be dangerous when put to its intended use." Donnelly v. Club Car, Inc., 724 So. 2d 25, 28 (Ala. Civ. App. 1998); Gurley v. American Honda Motor Co., 505 So. 2d 358 (Ala. 1987). Because of this, Ambros had no duty to give any particular warnings to Ms. Truong about driving a golf cart. "The purpose of a warning is to apprise the party of a danger of which she has no knowledge and thereby enable her to take appropriate measures to protect herself." Kokoyachuk v. Aeroquip Corp., 172 Ill. App. 3d 432, 526 N.E.2d 607 (1988). "Where the danger is obvious and generally appreciated, nothing is gained by a warning and none is required. ... Injuries are not compensable if they are caused by inherent propensities of a product which are obvious to all who come into contact with it."

14

<u>Timm v. Indian Springs Recreation Ass'n</u>, 226 Ill. App. 3d 760, 766 (Ill. App. Ct. 1992). Again, Plaintiff will not be able to point to any evidence that the golf cart she was driving was inherently dangerous when put to its normal use. Therefore, Ambros had no duty warn her or train her. Aioi's motion for summary judgment should be granted on this ground.

> **4.** **Ambros Had No Duty To Warn Or Train Plaintiff Not To Drive A Golf Cart Through Potholes With A Person Hanging On The Back Of The Cart Because The Attendant Risks Are "Open And Obvious."**

As mentioned above, Ms. Truong had been driving her golf cart all day long before the accident happened. She had driven on and over the concrete area where she now says the offending pothole was. Truong Depo., p. 35, lines 19-23. Asked whether she had noticed, <u>before</u> the accident, whether the concrete area had potholes and bumpy areas, Ms. Truong responded in a variety of ways:

> Q: Did you know that the ground was unlevel and there were pot holes before the accident?
>
> A: Before the accident, I didn't take notice of it.

Truong Depo., p. 19, lines 22-25; p. 20, lines 1-2.

> Q: Did you notice that it was unlevel and there were potholes?
>
> A: Did I notice? I don't remember.

Truong Depo., p. 22, lines 10-12.

> Q: And you don't remember seeing that there were pot holes and railroad tracks and other bumpy areas?
>
> A: I must have seen it, but do I remember now if I saw it?
>
> Q: Yeah.
>
> A: Before the concert? I don't remember."

15

Truong Depo., p. 35, lines 24-25; p. 36, lines 1-3.

Regardless of whether Ms. Truong saw the potholes before the accident, it is undisputed she saw them <u>after</u> the accident:

> Q:    How do you know there were potholes everywhere and that the ground wasn't level?
>
> A:    Because I was there.

The point is this: Since Ms. Truong was able to see the potholes after the accident, logically she was able to see them before the accident. Moreover, Ms. Truong drove over <u>several</u> bumps before her husband fell off the cart. Truong Depo., p. 58, lines 11-14. These facts, combined with her candid testimony that it is dangerous to drive over potholes with people hanging from the back of the cart, is fatal to her lawsuit under the well-established "open and obvious hazard" doctrine. The potholes were visible and Ms. Truong knew she was driving over bumps before the accident. "Generally, the possessor of premises must exercise reasonable care to protect invitees from an unreasonable risk of harm caused by a dangerous condition on the land. ... However, if the dangerous condition is open and obvious so that the invitee is reasonably expected to discover it, the invitor owes no duty to protect or warn the invitee. ... A dangerous condition is open and obvious where 'an average user with ordinary intelligence [would] have been able to discover the danger and the risk presented upon casual inspection.' ... The open-and-obvious analysis focuses on the objective nature of the condition, not on the subjective care or perception of the plaintiff. ... Thus, if a condition is dangerous only because a particular invitee does not discover the condition or realize its danger, the open and obvious

16

doctrine precludes liability for the possessor of the premises." Lovelace v. Course, 2006 Mich. App. LEXIS 3360 (Mich. Ct. App. 2006)[3]

A "landowner has no duty to warn an invitee 'where the anticipated harm involves dangers so obvious that no warning is necessary.' ... The rationale underlying this rule is that 'no one needs notice of what he knows or reasonably may be expected to know.' ... The test for whether a danger is so obvious that no warning is necessary 'is not whether the injured party actually saw the danger, but whether it was in fact visible.'" Schneider v. Lanesboro Golf & Country Club, 2001 Minn. App. LEXIS 558, 5-8 (Minn. Ct. App. 2001). In Schneider, the court held that the defendant had no reason to anticipate that the plaintiff would not be "aware of the surface or perpendicular angle" of a golf cart path, "since both were visible." Because any potential danger was "visible," the appellate court upheld the trial court's ruling that the golf course had no duty to warn the plaintiff about the golf cart path. Id.

"(I)t is well-settled that there is no duty to warn of a risk which is open and obvious. ... Generally, if a product possesses dangerous propensities, a duty to warn arises when there is unequal knowledge, actual or constructive, and the defendant possessed with such knowledge, knows or should know that harm might occur if no warning is given. ... Since the purpose of a warning is to apprise a party of a danger of which he has no knowledge and thereby enable him to take appropriate measures to protect himself, it logically follows that warnings serve no purpose and, hence, are not required where the dangers are open and obvious." Gillman v. Crown Equip. Corp., 1996 U.S. Dist. LEXIS 11667, 6-9 (D. Ill. 1996). "Generally, a duty to warn exists when there is unequal knowledge and the defendant, possessed of such knowledge,

---

[3] Lovelace itself is unpublished and not citable, at least in Michigan, but the cited portions of Lovelace above are all quotes from published opinions, namely Bertrand v Alan Ford, Inc, 449 Mich. 606, 609; 537 N.W.2d 185 (1995); Novotney v Burger King Corp (On Remand), 198 Mich. App. 470, 475; 499 N.W.2d 379 (1993), and Lugo v Ameritech Corp, Inc, 464 Mich. 512, 524; 629 N.W.2d 384 (2001).

17

knows or should know that harm might occur if no warning is given … The purpose of a warning is to apprise the party of a danger of which he has no knowledge and thereby enable him to take appropriate measures to protect himself. … Where the danger is obvious and generally appreciated, nothing is gained by a warning and none is required." Kokoyachuk v. Aeroquip Corp., 172 Ill. App. 3d 432, 439 (Ill. App. Ct. 1988). "The cases have uniformly held that the purpose of a warning is to apprise a party of danger of which he has no knowledge and thereby enable him to take measures which will protect him against those dangers; however, when a danger is obvious and generally appreciated, nothing of value is had by a warning and none is required under those circumstances." Midwest Specialties v. Crown Indus. Prods. Co., 940 F. Supp. 1160, 1165-1166 (D. Ohio 1996). "(T)he open-and-obvious doctrine obviates the duty to warn and acts as a complete bar to any negligence claims." Armstrong v. Best Buy Co., Inc., 99 Ohio St. 3d 79, 2003 Ohio 2573, 788 N.E.2d 1088, at P5. "A duty to warn is not imposed by law as a mindless ritual. A warning is not required unless 'the person on whom [the] duty rests has some reason to suppose a warning is needed.' The duty to warn extends to concealed, nonobvious dangers." Killeen v. Harmon Grain Products, Inc., 11 Mass. App. Ct. 20, 24, 413 N.E.2d 767 (1980). "(I)t is clear that there should be no liability for failing to warn someone of a risk or hazard which he appreciated to the same extent as a warning would have provided". Slate v. Bethlehem Steel Corp., 400 Mass. 378, 382, 510 N.E.2d 249 (1987), quoting W. Prosser & W. Keeton, Torts § 96, at 686 (5th ed. 1984)

Ms. Truong cannot recover against Ambros because of the "open and obvious hazard" doctrine. Potholes are open and obvious. Ms. Truong admitted it was "common sense" that she shouldn't have driven through a pothole with her husband riding on the back of the cart, in a space designed to carry golf bags, not people.

18

Ambros had no legal duty to warn Ms. Truong about potholes. Ambros had no legal duty to warn Ms. Truong to not drive her golf cart through potholes. And Ambros certainly had no duty to warn her not to drive through potholes with a person hanging from the back of the cart. Aioi's motion for summary judgment should be granted on this ground.

### 5. Ambros Had No Duty To Warn Or Train Plaintiff Because Ambros Had No Knowledge Of Any Dangerous Condition At Polaris Point.

Ms. Truong also bears the burden of pointing to evidence that Ambros had actual or constructive notice of a dangerous condition at Polaris Point before the accident. Guerrero v. McDonalds, 2006 Guam 2; Lopez v. Superior Court, 45 Cal. App. 4th 705; 52 Cal. Rptr. 2d 821 (1996). In the absence of actual or constructive knowledge of a dangerous condition, premises owners and others have no duty to warn or make repairs. Moore v. Wal-Mart Stores, Inc., 111 Cal. App. 4th 472, 476, 3 Cal. Rptr. 3d 813 (2003). The existence of a duty, the scope of the duty, and the formulation of the standard of care are questions of law for the court to decide. Ann M. v. Pacific Shopping Center, 6 Cal. 4th 666, 674 (1993). In responding to a motion for summary judgment, a plaintiff must "allege and prove that the defendants had actual or constructive notice of the presence of the specific unsafe condition that caused [his] fall . . . Either type of notice must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it . . . On the question of notice the trier's consideration must be confined to the defendant's knowledge and realization of the specific condition causing the injury, and such knowledge cannot be found to exist from a knowledge of the general or overall conditions obtaining on the premises." Mitchell v. Covone, 2002 Conn. Super. LEXIS 2346, 9-10 (Conn. Super. Ct. 2002).

Ms. Truong cannot sustain her burden here. It is undisputed that Ambros did <u>not</u> have any actual or constructive notice of any dangerous condition at Polaris Point before the accident. Before the Three Doors Down concert, Ambros had co-sponsored several concerts at Polaris Point over the years. Paul Shimizu Dec., ¶ 4. Before those concerts, and before the Three Doors Down concert, Ambros representatives had inspected the concert site and found nothing dangerous. Paul Shimizu Dec., ¶ 4. During the Three Doors Down concert, no person or entity or co-sponsor ever complained or said anything at all to Ambros about the condition of any portion of the concrete area where the concert was held. Aguon Dec., ¶ 3; Paul Shimizu Dec., ¶ 5. At other concerts prior to the Three Doors Down concert, no person or entity or co-sponsor ever complained or said anything at all to Ambros about the condition of any portion of the concrete area where the prior concerts were held. Shimizu Dec., ¶ 5; Declaration of Tom Shimizu ("Tom Shimizu Dec."), ¶ 4. There were no accidents involving potholes or golf carts at any Ambros-sponsored prior Polaris Point concert, or at the Three Doors Down concert, until Ms. Truong's accident. Aguon Dec., ¶ 4 Truong Depo., p. 59, lines 20-25; p. 60, lines 1-8; Before the Three Doors Down concert, Ambros knew that Ms. Truong had driven golf carts before (Aguon Dec., ¶ 6) and knew that she drove one all day long without difficulty on the day of the accident. Aguon Dec., ¶ 5. Because there is no evidence that Ambros was on notice of any unsafe conditions at Polaris Point after reasonable inspections, Ambros had no duty to train or warn Ms. Truong about any such conditions. Aioi's motion for summary judgment should be granted on this ground.

//

//

//

### E.    Ambros Breached No Duty Of Care It May Have Owed To Plaintiff Because She *Was* Provided With A Proper Warning.

The accident happened around 6:30 or 7:00 p.m.  Truong Depo., p. 39, line 12.  Ms. Truong had been driving the golf cart all day long.  Truong Depo., p. 13, lines 7-25; 14, lines 1-16.  There was a warning sign on the dashboard of the golf cart, right in front of her face.  Aguon Dec., ¶ 7.  The relevant portions are set forth below:



**READ AND FOLLOW THESE WARNINGS AND THE OPERATING INSTRUCTIONS BEFORE USING VEHICLE.  FAILURE TO DO SO CAN CAUSE SEVERE INJURY OR DEATH**

**DO NOT start vehicle until all occupants (two (2) per seat maximum) are seated.**

**Remain seated with entire body inside vehicle and hold on to seat handle or handrail at all times.**

Aguon Dec., Exhibit 1.  Asked about the warning sign at her deposition, Ms. Truong said "I don't remember seeing this."  Truong Depo., p. 15, line 14.  Asked whether she would have let her husband ride on the back of the golf cart if she had seen the warning sign prior to the accident, Ms. Truong replied, "Probably not."  Truong Depo., p. 33, lines 4-7.

In Gillman v. Crown Equip. Corp., 1996 U.S. Dist. LEXIS 11667, 6-9 (D. Ill. 1996), supra, plaintiff was injured while being lifted on a forklift without any restraints.  She sued.  The court held that the defendant had no duty to warn plaintiff about the risk of falling because the "danger of falling under such circumstances is a matter of common knowledge and perception."  Notwithstanding this, the court found that the defendant had, in fact, supplied plaintiff with an adequate warning in the form of stickers placed on the forklift.  One sticker stated: "Warning: Standing or riding on the forks can cause a fall.  You can be seriously injured or killed."

Another stated: "Warning: Lifting people without a proper platform can cause a fall and serious injury." These were deemed sufficient warnings as a matter of law. If they were sufficient as a matter of law in <u>Gilman v. Crown</u>, they are sufficient as a matter of law here. As the <u>Gillman</u> court explained, a "warning is adequate as a matter of law when it is stated with a degree of intensity that would cause a reasonable man to exercise caution commensurate with the potential danger involved." <u>Gillman</u> involved heavy equipment. This case merely involves a golf cart.

Of course, Ms. Truong insisted at her deposition that she hadn't read the warning on the dashboard of the golf cart before the accident, even though she had been driving the golf cart around all day long. This has no legal significance. "Plaintiff's failure to read the warning is of no moment however if the warning is adequate as a matter of law." <u>Tripolone v. Genova Prods.</u>, 1997 U.S. Dist. LEXIS 13800 (D.N.Y. 1997).

## III.   CONCLUSION.

Ms. Truong has sworn under oath that she was not negligent. For this reason, Ambros cannot be held liable, since any negligence on its part logically could not have contributed to the accidental death of Ms. Truong's husband.

It is also undisputable that Ms. Truong cannot recover under her *respondeat* superior theory. By definition, Ambros has no percentage of negligence in this situation. Instead, Ms. Truong's negligence is attributed to Ambros. Ms. Truong's negligence will always be "as great as" Ambros' negligence. Her negligence and Ambros' negligence are the same negligence. She therefore cannot recover under 18 GCA § 90108.

Nor can Ms. Truong prove that Ambros owed her a duty of care or breached any duty of care it might have owed her. In a negligence action, a plaintiff still has to show duty, breach of duty, causation, and damages. <u>Guerrero v. McDonald's Int'l Prop. Co., Ltd.</u>, 2006 Guam 2, 9

22

(Guam Sup. Ct. 2006) ("establishment of tort liability requires the existence of a duty, the breach of such duty, causation and damages"). In this case, to avoid the entry of summary judgment against her, Ms. Truong must point to some admissible evidence that Ambros (1) had a duty of care to her, and that (2) it breached its duty of care to her.[4] Now that her deposition has been taken and her sworn testimony preserved, she will be unable to this. It is undisputed that Ms. Truong was familiar with how to operate golf carts, since she is a golfer and she frequently operated golf carts before the accident. It is undisputed Ambros knew this before the concert. It is undisputed that Ambros knew before the concert that golf carts are not inherently dangerous when put to their intended use. It is undisputed that Ambros knew there was a warning sticker on the golf cart cautioning drivers to make sure all passengers are seated, that they are seated inside the golf cart, and that they are holding on to a seat handle or a hand rail. It is undisputed that Ambros knew that golf carts have been used at all Polaris Point concerts prior to the Three Doors Down concert, and that before Ms. Truong's accident there had never been any other accidents involving the use of a golf cart. It is undisputed that Ambros inspected Polaris Point before the Three Doors Down concert, and before other concerts, and that Ambros never discovered any dangerous or unsafe conditions. Finally, before Ms. Truong's accident, it is undisputed that Ambros knew, and undisputed that Ms. Truong knew, that "common sense" holds that it is dangerous for people to drive golf carts through potholes with people hanging from the back of the cart.

Aioi submits that on the undisputed evidence and under the established case law, the court should determine that Ambros had no duty of care to Ms. Truong, and grant summary judgment on this basis. Aioi also submits that on the undisputed evidence and under the

---

[4] In the event a trial is necessary, Plaintiff's decedent's extreme and undisputed intoxication level, and the fact that Ms. Truong also admitted to drinking alcohol before the accident, would bring into play the "causation" element of her cause of action for negligence.

established case law, the court should determine that no reasonable jury could find that Ambros breached any duty of care to Ms. Truong, and grant summary judgment on this basis, as well.

DOOLEY ROBERTS & FOWLER LLP

Date: 8/28/07

By: _____
TIM ROBERTS, ESQ.
Attorneys for Defendants

F:\Documents\TLR (07-04)\D109\D109-58\D109-58.MSJ Memorandum (3).doc

FILED
SUPERIOR COURT
OF GUAM

2007 AUG 28 PM 4: 59

CLERK OF COURT

BY:_____

Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone (671) 646-1222
Facsimile  (671) 646-1223

Attorneys for Defendant

IN THE SUPERIOR COURT

OF GUAM

| | |
|---|---|
| CASSANDRA CHAU TRUONG, Administratrix of the Estate of ROLAND ANTHONY BOUDREAU, Deceased,<br><br>Plaintiff,<br><br>vs.<br><br>AIOI INSURANCE COMPANY, LTD.,<br><br>Defendant. | CIVIL CASE NO. CV1082-06<br><br><br><br><br><br>**DECLARATION OF PIERRE "TIM" AGUON** |



RECEIVED

AUG 2 8 2007

By:_____ 5:00

Teker Torres & Teker, P.C.

I, **Pierre "Tim" Aguon**, do hereby declare as follows:

1.     I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2.     I am the Military Sales Manager for Ambros, Inc.  I was involved in Ambros' co-sponsorship of the Three Doors Down Concert at Polaris Point on April 2, 2005, and I was in attendance at the concert.   Other companies also co-sponsored the concert.   Malafunkshun Productions was the concert's promoter.

3.     To my knowledge, no person ever complained or said anything at all to Ambros about the condition of the concert area before or during the Three Doors Down concert or before or during prior Polaris Point concerts and events co-sponsored by Ambros.

4.     For the Three Doors Down concert, the Navy loaned golf carts to Ambros to assist in servicing concession stands. Ambros had the use of four (4) regular golf carts and one (1) flat bed golf cart at the Three Doors Down concert. Each of these carts was driven by Ambros employees on the day of the concert. In total, there were about twenty (20) Navy-supplied golf carts at the Three Doors Down concert. There were no accidents or other unusual incidents involving the use of any of these golf carts until Ms. Truong's accident, which occurred long after the concert had ended. To my knowledge, at prior Polaris Point concerts and events co-sponsored by Ambros there were no other accidents or unusual incidents related to golf carts or the physical condition of the area where the Three Doors Down concert took place.

5.     At the Three Doors Down concert, Ms. Truong operated a golf cart on numerous occasions all day long. I never saw her have any apparent difficulty driving the cart. To my knowledge, no other Ambros employee ever saw her have any apparent difficulty driving the cart, either.

6.     Exhibit 1 to this declaration is a true and correct copy of simple operating instructions posted on the steering wheels of the carts the Navy supplied for the Three Doors Down concert. I and other Ambros employees were also aware, prior to the Three Doors Down concert, that Ms. Truong was a golfer who had operated golf carts on numerous occasions.

7.     Exhibit 2 to this declaration is a true and correct copy of a **"WARNING"** sign posted on the dashboards of the carts the Navy supplied for the Three Doors Down concert. The warning on the dashboard states:

2



**READ AND FOLLOW THESE WARNINGS AND THE OPERATING INSTRUCTIONS BEFORE USING VEHICLE. FAILURE TO DO SO CAN CAUSE SEVERE INJURY OR DEATH!**

**DO NOT start vehicle until all occupants (two (2) per seat maximum) are seated.**

**Remain seated with entire body inside vehicle and hold on to seat handle or handrail at all times.**

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _16_ day of _MAY_ 2007, in Hagåtña, Guam.

PIERRE "TIM" AGUØN

F:\Documents\TLR (07.04)\D109\D109-58\D103-58.Declaration of Tim Aguon.doc

3

- Manual a... ...prior to driving.
  - ... ...
  - Make sure ...
- Turn key to "ON" position and be sure nothing is in your path.
  - While vehicle is stopped, select direction by placing shift lever or switch in desired position:

    F – Forward    N – Neutral    R – Reverse (Buzzer will sound)
  - Vehicle will start moving when accelerator pedal is depressed.
- Slowly depress accelerator pedal to increase speed. Park brake will release when accelerator pedal is depressed.
  - To stop, release accelerator pedal and depress brake pedal.
  - After stopping, firmly depress park brake until it locks.
  - Place forward and reverse switch in neutral position.
  - Turn key "OFF" and remove key when not in use.

CCI 1016216-01

EXHIBIT __l__

TRU 008



EXHIBIT
7

**READ AND FOLLOW THESE WARNINGS AND THE OPERATING INSTRUCTIONS BEFORE USING VEHICLE. FAILURE TO DO SO CAN CAUSE SEVERE INJURY OR DEATH.**

- Operation from driver's side by authorized persons only and only in designated areas - not on public roads.
- DO NOT start vehicle until all occupants (two (2) per seat maximum) are seated.
- Remain seated with entire body inside vehicle and hold on to seat handle or handrail at all times.
- Drive slowly in turns and straight up and down slopes.
- Never stand in front of or behind vehicle.
- DO NOT operate while under the influence of alcohol or drugs.
- DO NOT leave children unattended on vehicle at any time.

CCI 1019606-01

EXHIBIT __2__

EXHIBIT

6

TRU 007

FILED
SUPERIOR COURT
OF GUAM

2007 AUG 28 PM 4: 59

CLERK OF COURT

BY:_____

Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone (671) 646-1222
Facsimile  (671) 646-1223

Attorneys for Defendant

## IN THE SUPERIOR COURT

## OF GUAM

| | |
|---|---|
| CASSANDRA CHAU TRUONG,<br>Administratrix of the Estate of ROLAND<br>ANTHONY BOUDREAU, Deceased,<br><br>Plaintiff,<br><br>vs.<br><br>AIOI INSURANCE COMPANY, LTD.,<br><br>Defendant. | CIVIL CASE NO. CV1082-06<br><br>DECLARATION OF PAUL S.N. SHIMIZU |



RECEIVED

AUG 2 8 2007

By_____ Time: 5:00

**Teker Torres & Teker, P.C.**

I, **Paul S.N. Shimizu**, do hereby declare as follows:

1.     I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2.     I am the corporate Secretary for Ambros, Inc.  I was involved in Ambros' co-sponsorship of the Three Doors Down Concert at Polaris Point on April 2, 2005, and I was in attendance at the concert.   Other companies also co-sponsored the concert.   Malafunkshun Productions was the concert's promoter.

3.     The Three Doors Down Concert was held on United States Navy property at Polaris Point, Guam. Ambros does not own, lease occupy, or control the area where the concert was held.

4.     In the past, Ambros has co-sponsored several concerts and other public events at Polaris Point. Before those events, and before the Three Doors Down concert, I and other Ambros employees conducted "walk through" tours and visual inspections of the area where the concerts were to take place. I never saw any condition in or around the concert area that was dangerous or unsafe. To my knowledge, no other Ambros employee ever saw any dangerous or unsafe condition in or around the concert area. The area appears to be designed for vehicles to drive on. The condition of the grounds on prior occasions was substantially similar to the day of the Three Doors Down concert.

5.     To my knowledge, no person ever complained or said anything at all to any Ambros employee about the condition of the concert area before or during the Three Doors Down concert or before or during prior Polaris Point concerts or.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16 day of MAY 2007, in Hagåtña, Guam.

_____
PAUL S.N. SHIMIZU

F:\Documents\TLR (07.04)\D109\D109-58\D103-58.Declaration of Paul Shimizu.doc

2

Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone (671) 646-1222
Facsimile (671) 646-1223

Attorneys for Defendant

FILED
SUPERIOR COURT
OF GUAM

2007 AUG 28 PM 4: 59

CLERK OF COURT

BY:_____

## IN THE SUPERIOR COURT

## OF GUAM

| | |
|---|---|
| CASSANDRA CHAU TRUONG, Administratrix of the Estate of ROLAND ANTHONY BOUDREAU, Deceased, <br><br> Plaintiff, <br><br> vs. <br><br> AIOI INSURANCE COMPANY, LTD., <br><br> Defendant. | CIVIL CASE NO. CV1082-06 <br><br><br><br> **DECLARATION OF TOM SHIMIZU** |

RECEIVED

AUG 2 8 2007

By:_____ Time: 3:00

Teker Torres & Teker, P.C.

I, **Tom Shimizu**, do hereby declare as follows:

1.      I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2.      I am the General Manager for Ambros, Inc. I was involved in Ambros' co-sponsorship of the Three Doors Down Concert at Polaris Point on April 2, 2005, and I was in attendance at the concert. Other companies also co-sponsored the concert. Malafunkshun Productions was the concert's promoter.

3.      The Three Doors Down Concert was held on United States Navy property at Polaris Point, Guam. Ambros does not own, lease occupy, or control the area where the concert was held.

4.    To my knowledge, no person ever complained or said anything at all to Ambros about the condition of the concert area before or during the Three Doors Down concert or before or during prior Polaris Point concerts.

5.    I have been a golfer for over twenty (20) years. I have played golf on all courses on Guam countless times. I have also played golf at numerous courses in the mainland United States and in other countries, as well. No Guam golf course or any other golf course I have ever played golf at requires proof of a driver's license or proof of prior training in operating a golf cart as a prerequisite to allowing a person to rent a golf cart. Additionally, all Guam golf courses also allow junior golfers to rent golf carts before they are even old enough to obtain their license. Golf carts are not dangerous when put to their expected use, and driving a golf car is simple. There is a steering wheel, an acceleration pedal and a brake pedal. The cart comes to a stop without the use of the brake pedal when the acceleration pedal is not being pushed. The cart can only travel slightly in excess of ten (10) miles per hour.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16 day of May 2007, in Hagåtña, Guam.

**TOM SHIMIZU**

F:\Documents\TLR (07.04)\D109\D109-58\D103-58.Declaration of Tom Shimizu.doc

2

Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone (671) 646-1222
Facsimile (671) 646-1223

FILED
SUPERIOR COURT
OF GUAM

2007 AUG 28 PM 5: 00

CLERK OF COURT

BY:_____

Attorneys for Defendant

## IN THE SUPERIOR COURT

## OF GUAM

CASSANDRA CHAU TRUONG,           ) CIVIL CASE NO. CV1082-06
Administratrix of the Estate of ROLAND )
ANTHONY BOUDREAU, Deceased,      )
                                 )
            Plaintiff,           )
                                 )
        vs.                      ) **DECLARATION OF AURELIO A.**
                                 ) **ESPINOLA, M.D.**
AIOI INSURANCE COMPANY, LTD.,    )
                                 )
            Defendant.           )
                                 )
_____)

RECEIVED

AUG 2 8 2007

By:_____ Time: 5-00

Teker Torres & Teker, P.C.

I, **Aurelio A. Espinola, M.D.**, being first duly sworn, do hereby declare as follows:

1.      I am Guam's Chief Medical Examiner (Anatomic Clinical and Forensic Pathologist). I have held this position for thirteen (13) years. For the fourteen (14) years before that, I was the Deputy Chief Medical Examiner in Harris County, Houston, Texas, 1and the Harris County Assistant Medical Examiner for the one (1) year before that. Before working in Houston, I was a Forensic Pathology Fellow in the Wayne County Medical Examiner's Office in Detroit, Michigan. I have been a practicing physician for forty four (44) years. In the course of those forty four (44) years, I have performed or supervised countless autopsies, a large number of which

involved investigations into the decedent's level of alcohol intoxication to determine whether alcohol was a factor in the decedent's death.

2.      I have personal knowledge of the matters attested to herein, except for the matters stated as my expert opinion, and could and would testify truthfully and competently about each of these matters if called as a witness at trial.

3.      Exhibit 1 hereto is a laboratory report generated by Naval Hospital, Guam, which measured the level of alcohol in Roland Boudreau's blood shortly after his arrival at the hospital on the evening of April 2, 2005. The lab records show that the level of alcohol in Mr. Boudreau's body was "225.8 mg/dl."

4.      "Alcohol" is a generic name for large group of organic chemical compounds. Ethyl Alcohol, the scientific name for which is ethanol, is the kind of alcohol found in alcoholic beverages. The amount of alcohol in the body can be determined by several tests, such as by taking samples of blood. The alcohol content of blood is commonly measured by determining the mass of alcohol in a given volume of blood. Laws pertaining to alcohol, such as Guam's statutory prohibition against operating a vehicle with a "Blood Alcohol Concentration" ("BAC") of .08 or more, are commonly based on the number of grams of alcohol per milliliter of blood.

5.      Another common way of measuring alcohol in blood, such as the "Stat Alcohol Ethyl" tests used by Naval Hospital to test Mr. Boudreau's blood, is by determining the number of grams of alcohol per gram of blood in a person's body. Typically, this measurement uses a "milligrams of alcohol per deciliter of blood" format, which is abbreviated as "mg/dl." If a milliliter of blood had a mass of exactly one gram, this measure would be identical to the "mass of alcohol per mass of blood" measurement mentioned above. In fact, a milliliter of blood has a mass of 1.05 grams. If this small departure from 1.05 grams is ignored as inconsequential, then

2

the statutory BAC measure of "grams of alcohol per milliliter of blood" standard would be the same as the "grams of alcohol per gram of blood" standard, which again is usually expressed in a "milligrams of alcohol per deciliter of blood" format, i.e., "mg/dl."

6.     Setting aside the 1.05 conversion factor, then, a "mg/dl" concentration of 80 is the same as BAC of .08, which again is the legal limit for operating a vehicle on Guam. Similarly, a "mg/dl" concentration of 225.8 is equal to a BAC of .2258. Exhibit 1 hereto establishes that BAC upon his arrival at Naval Hospital on the evening of April 2, 2005, Mr. Boudreau had a .2258 BAC. This is nearly three times (3x) the legal limit for driving a vehicle on Guam.

7.     With a BAC of .2258, most people experience an extreme loss of balance and motor coordination. For some people, a .2258 BAC will cause unconsciousness. A .2253 BAC is a very high level of alcoholic intoxication. In my opinion, it is very difficult, if not impossible, to reach a .2258 BAC drinking beer alone. It is much more likely that Mr. Boudreau had been consuming wine or "hard" liquor along with beer before his accident.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16TH day of _____MAY_____ 2007, in Hagåtña, Guam.

AURELIO A. ESPINOLA, M.D.

F:\Documents\TLR (07.04)\D109\D109-58\D103-58.Declaration of Dr Espinola (3).doc

3

------------------------------------------------------------------------
BOUDREAU, ROLAND A                    98/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  M/36              ph# 647 044
                                      Mil. Unit: UNKNOWN
------------------------------------------------------------------------
Ordered by: BAUGH, THOMAS C           Col: 02 Apr 2005@1959    Acc#: 050402 CH 51925
   Specimen: BLOOD (PLASMA)           Pri: STAT                Ord#: 050402-00220
   Res Lab: NHLAB                                           Req Loc: ER
     Test name                        Result        Units        Normal range
     ALCOHOL ETHYL                    225.8 H       mg/dl         0 - 80
Interpretation(s):
        This alcohol test is intended for medical purposes only.  It's intent is
to obtain information which will direct the course of urgent medical care.


                          *** End of Report ***


EXHIBIT __I__                          TRU 228

Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone (671) 646-1222
Facsimile (671) 646-1223

Attorneys for Defendant

FILED
SUPERIOR COURT
OF GUAM

2007 AUG 28 PM 5: 00

CLERK OF COURT

BY: _____

## IN THE SUPERIOR COURT OF GUAM

CASSANDRA CHAU TRUONG,                )   CIVIL CASE NO. CV1082-06
Administratrix of the Estate of ROLAND )
ANTHONY BOUDREAU, Deceased,           )
                                       )
                Plaintiff,             )
                                       )
        vs.                            )   **DECLARATION OF EMMANUEL CRUZ**
                                       )
AIOI INSURANCE COMPANY, LTD.,          )
                                       )
                Defendant.             )
                                       )

RECEIVED

AUG 2 8 2007

By: _____ Time: 5:00

Tekar Torres & Tekar, P.C.

I, Emmanuel Cruz, do hereby declare as follows:

1.      I am the Custodian of Medical Records for the United States Naval Hospital, Guam.
I have personal knowledge of the matters stated herein.

2.      Exhibit 1 to this declaration is true and correct copy of a hospital record generated as
a result of the admission of Roland Boudreau to Naval Hospital on April 2, 2005.  Exhibit 1 hereto
is a true and correct duplicate of a domestic record of regularly conducted Naval Hospital activity
that was (a) made at or near the time of the occurrence of the matters set forth by, or from
information transmitted by, a person with knowledge of those matters, (B) was kept in the course
of the Navy's regularly conducted activity; and (C) was made during the Navy's regularly
conducted activity as a regular practice.

3.      Exhibit 1 hereto is a true and correct duplicate of a record of acts, events, and
conditions made at or near the time by, or from information transmitted by, a person with

knowledge, which was and is kept in the course of the Navy's regularly conducted business activity, and it was the regular practice of the Navy to make the record.

    4.       Neither the source of information or the method or circumstances of preparation of Exhibit 1 indicate any lack of trustworthiness.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this /ᵇ day of _____ MAY _____ 2007, in Hagåtña, Guam.

F:\Documents\TLR (07.04)\D109\D109-58\D103-58.Declaration of USN Hospital 01.doc

LABORATORY,USNH
Personal Data - Privacy Act of 1974 (PL 93-579)
Priority Result Notification
Report requested by: System Generated
------------------------------------------------------------
BOUDREAU,ROLAND A               98/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  M/36          ph# 647 044
                                Mil. Unit: UNKNOWN
------------------------------------------------------------
Ordered by: BAUGH,THOMAS C      Col: 02 Apr 2005@1959    Acc#: 050402 CH 51925
  Specimen: BLOOD (PLASMA)      Pri: STAT                Ord#: 050402-00220
   Res Lab: NHLAB                                    Req Loc: ER
       Test name                Result       Units       Normal range
        ALCOHOL ETHYL           225.8 H      mg/dl          0 - 80
  Interpretation(s):
        This alcohol test is intended for medical purposes only.  It's intent is
  to obtain information which will direct the course of urgent medical care.


                        *** End of Report ***


TRU 228