IN THE SUPERIOR COURT OF GUAM

CASSANDRA CHAU TRUONG,
Administratrix of the Estate
of ROLAND ANTHONY BOUDREAU,
deceased,

        Plaintiff,

    vs.

AIOI INSURANCE COMPANY, LTD.,

        Defendant.

) CIVIL CASE NO. CV1082-06
)
)
)
)
)
)
)
)
)
)
)
)
)

TRANSCRIPTION

OF

**HEARING BEFORE THE HONORABLE**

**JUDGE ARTHUR R. BARCINAS**

November 14, 2007

**COPY**



BY:  GEORGE B. CASTRO
    **DEPO RESOURCES**
    #49 Anacoco Lane
    Nimitz Hill Estates
    Piti, Guam 96915
    Tel:(671)688-**DEPO** • Fax:(671)472-3094

1  thing as a theory of recovery doesn't apply.

2       JUDGE BARCINAS:  Thank you.

3       MR. RAZZANO:  Of course, Judge, we

4  completely disagree.  I mean, let's just think

5  about this whole concept of Ms. Truong saying,

6  "Well, I wasn't negligent."  Well, if that was

7  all an employer had to view, and every time an

8  employer was sued for negligence, they would

9  simply bring in the employee, sign an affidavit

10 that says, "I didn't do anything wrong," and

11 then all of a sudden the employer would be

12 relieved of liability.

13      And in fact, the McDonald's case that

14 Mr. Roberts cites, says exactly that on Page 6

15 of the opinion.  It says, "We acknowledge that

16 a balance is necessary, on the one hand,

17 Plaintiff cannot be burdened with having to

18 show the Defendant's subjective knowledge of a

19 dangerous condition."  This is virtually

20 impossible because then a store owner needs

21 simply disavow knowledge -- the dangerous

22 condition and he avoids all liability.  That's

23 exactly what this is about.

24      Mr. Roberts wants to say that because

25 Ms. Truong says she's not negligent during this

1  that she actually wasn't negligent. That's not

2  true. You have to look at the facts of what

3  was on, and here are the facts. Ms. Truong is

4  at work for Ambros at this concert, she is the

5  marketing manager for Ambros. Ms. Truong has

6  submitted an affidavit, and said she was

7  drinking on the day of the concert, and then in

8  fact many employees were drinking on the day of

9  the concert. In addition, Mr. Roberts submits

10  her deposition transcript and on Page 18, line

11  20 through 25. He says, "Were you drinking?

12  Yes." So she's drinking at work. Now, whether

13  she thinks that drinking at work is negligent

14  or not, the fact of the matter is she drinking.

15      All right. Next, she decides that she

16  is going to put six people in a golf cart.

17  Okay? Now, this is an Ambros employee, comes

18  over to six people and invites them to get in

19  the golf cart. Six people, Judge. Mr. Roberts

20  says to her, "Well, why did you put six people

21  in the cart? I don't know. They all needed a

22  ride." Okay, they all needed a ride so she

23  puts six people in a golf cart after she's been

24  drinking, and she starts to drive the golf cart

25  going across a bumpy area with potholes. And

1  we submitted depositions and photographs to
2  show you the condition of the property.

3  Another Ambros employee, Sean Pascua
4  (phonetic), he realizes, "That's dangerous. I
5  better go over there and do something." He
6  goes over and says, "Hey, let me take some
7  people in this cart." Two people then get out
8  of the cart and they get on to Mr. Pascua's
9  cart, another Ambros employee. He puts two --
10 he puts three people in that cart, and has one
11 person standing on the back of the golf cart
12 where the golf bags go.

13 Mr. Aguon submitted a declaration and
14 had his deposition taken. He says, "I told
15 people not to do that." So that means that
16 Sean Pascua is in fact -- well, we know that
17 this is the facts. Sean Pascua then violated
18 what Ambros told him and put three people in a
19 cart when he wasn't supposed to have three
20 people.

21 Now, you've got two golf carts with too
22 many people in it, employees drinking and
23 they're driving down a bumpy road full of
24 potholes and railroad tracks, by the way,
25 there's railroad tracks in the middle of this

concrete. All the evidence for that is on Casey Truong's deposition Page 43 Line 9 through Page 44 Line 3.

In addition, this accident happens at 7:00 at night. So when he tells you that these potholes are open and obvious, they're not open and obvious. We all know what it's like 7:00 at night in April. It's pitch black outside. How are you supposed to see? No headlights on these golf carts, and you've got, so now you've got two Ambros employees at night, no headlights on the cart, driving, more people than Ambros told them to have in the carts, directly down the road after being, after having cocktails. That's what you got so far.

And then the next is, of course we know, I told you about the un-level ground full of potholes, that's even -- look at Carlos Lizama's affidavit and a photo submitted, and well, you can take a look at the Truong Deposition Page 19 Line 19 through Page 21 Line 19. That'll tell you about the condition of the road. And in fact Mr. Roberts asked her, "Tell me about the condition of what you think Ambros did." And she says, "Ambros had the

1 opportunity to, and had a duty to make sure
2 that when they invite 5,000 people at Polaris
3 Point, that it's safe to have a concert there."
4       Mr. Roberts in his declaration, Tom
5 Shimizu and a couple other Ambros employees,
6 who say they went out there and they inspected
7 it. Now his argument is, well, because Tom
8 went out there and said he inspected it, he
9 thought it was okay. Well then, it's fine.
10 There's no negligence. There's nothing wrong
11 with the property. Tom said it was fine.
12 Well, that can't be right, Judge.
13       We have to look at the facts and
14 circumstances on what went on that day. Not
15 Mr. Shimizu's opinion of whether he should have
16 to pay damages in this case or not. And of
17 course, that is directly what McDonald's and
18 Guerrero's report says.
19       So, when he says that Casey simply says
20 she's not negligent, I mean, you basically got
21 a woman who's involved in an accident, her
22 husband passes away, and he asked her, is it
23 your fault? I mean, what is she going to say?
24 Well, that's why negligence historically for
25 the last, well, since basically the beginning

1  of jurisprudence, has always been a fact issue

2  because even if somebody thinks they're not

3  negligent, you have to determine on the facts

4  and circumstances whether they actually acted

5  in a negligent manner. I mean, certainly,

6  Judge, if the rule was, I file a lawsuit, you

7  file an answer, and says you didn't do anything

8  wrong, I mean I could clear your docket almost

9  every case in this court room today. Because

10 I'm almost positive that most people have filed

11 an answer saying they didn't do anything wrong.

12         So that's the negligent -- now, let's

13 talk about this premises liability theory.

14 Now, Mr. Roberts tells you, and he tells you

15 correctly, the general rule is you have to be

16 an owner or in control of the property in order

17 to have premises liability theory. Well,

18 that's exactly what the sponsorship liability

19 cases say. A sponsorship liability cases say

20 that if you are the sponsor and you are in

21 control of the premises, you have a duty to

22 ensure that people are taken care of. Okay.

23         And that's what this whole motion was

24 about. It's about duty. They didn't have a

25 duty to do anything. They didn't have a duty

FILED
SUPERIOR COURT
OF GUAM

2007 OCT 31 PM 4:38

CLERK OF COURT

BY:_____

1  **TEKER TORRES & TEKER, P.C.**
   SUITE 2A, 130 ASPINALL AVENUE
2  HAGÅTÑA, GUAM 96910
   TELEPHONE: (671) 477-9891-4
   FACSIMILE: (671) 472-2601
3

4  *Attorneys for the Estate of Roland*
   *Anthony Boudreau, Deceased*

5

6

7              IN THE SUPERIOR COURT OF GUAM

8                        _____

9  CASSANDRA CHAU TRUONG,            )    CIVIL CASE NO. CV1082-06
   Administratrix of the Estate of   )
10 ROLAND ANTHONY BOUDREAU,          )
   deceased,                         )
11                                   )
                Plaintiff,           )    **PLAINTIFF'S OPPOSITION TO**
12                                   )    **DEFENDANT'S MOTION FOR**
           vs.                       )    **SUMMARY JUDGMENT**
13                                   )
   AIOI INSURANCE COMPANY, LTD.,     )
14                                   )
                Defendant.           )
15                        _____

16

17        NOW COMES Plaintiff, CASSANDRA CHAU TRUONG, Administratrix of the Estate

18 of ROLAND ANTHONY BOUDREAU, deceased, through her counsel of record, Lawrence J.

19 Teker, Esq., of the law offices of Teker Torres & Teker, P.C., hereby opposes Defendant's

20 Motion for Summary Judgment for the following reasons:

21 ///

22 ///

23 ///

RECEIVED
OCT 31 2007

DOOLEY ROBERTS

GOVERNMENT
EXHIBIT
E

## I.

## FACTS

On or about March 1, 2004, Ambros, Inc., Shimbros, Inc. and Anheuser Busch Asia, Inc. were reviewing the opportunity to sponsor the Three Doors Down Concert at Polaris Point. After careful consideration, Lee Babb of Anheuser Busch Asia, Inc. and Tom Shimizu of Ambros, Inc. decided to sponsor the concert. In accordance with their decision, Ambros, Inc. took control of the marketing of the concert and ticket sales.

On April 2, 2005, the decedent, Roland A. Boudreau, was attending the Three Doors Down concert at Polaris Point, Guam, which concert was sponsored by Budweiser and Bud Light, by and through Ambros, Inc. and Shimbros, Inc (hereinafter collectively referred to as "Ambros"). Mr. Boudreau was invited as a V.I.P. to attend the concert, pre-party and post-party where all Ambros brands were being supplied free of charge to all V.I.P. guests. After the concert ended, Mr. Boudreau was invited to be transported to his vehicle by an Ambros/Shimbros employee. Mr. Boudreau accepted the invitation and was told to stand on the back of the golf cart. The golf cart had no headlights and the sun had already gone down making visibility difficult. The group of six (6) headed to the cars all in one cart. A second cart, realizing the first cart was overloaded, then arrived and took two (2) passengers in their cart.

After the passenger exchange, the first cart containing Mr. Boudreau and three (3) other passengers, pulled away. Mr. Boudreau was hanging onto the back of the golf cart, the area designed to transport golf bags. While decedent was being transported on the golf cart, the golf cart hit a bump and the decedent fell off the golf cart and violently hit his head on the pavement. See Deposition transcript of Donovan Rivera taken on March 26, 2007 at P. 10 Lines 8 through P. 11 Line 4, a copy of relevant transcript pages are attached to the Declaration of Joseph C.

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4

1   Razzano filed contemporaneously herewith. The decedent was transported to the U.S. Naval

2   Hospital in Guam that same day for treatment, but died there the next morning as a result of the

3   injuries sustained in that accident.

4        The decedent was an invitee to the Ambros sponsored event at the time of the accident and

5   Ambros owed an affirmative duty of due care to Mr. Boudreau. The duty included the obligation

6   to inspect the Premises and to exercise reasonable care to make the Premises safe for decedent's

7   entry thereon.

8        Ambros and its employees and agents, negligently maintained, managed, controlled and

9   operated said event in that they were operating golf carts on road conditions with bumps, holes

10   and imperfections on the roadways and other portions of the Premises which the sponsors knew,

11   or in the exercise of reasonable care, should have known constituted a dangerous condition and

12   foreseeable risk of harm of which decedent was at all times herein mentioned unaware.

13        Ambros had the opportunity to easily remedy the dangerous conditions, but negligently

14   failed to take steps to either make the conditions safe or to warn decedent of the dangerous

15   conditions, all of which caused the decedent to fall from the golf cart, hit his head on the

16   pavement and die as a result thereof.

17        In addition to the foregoing, Ambros permitted the use of the golf cart by persons either

18   who were not trained in operating same or Ambros negligently trained and/or supervised the

19   operators of said golf carts. Ambros failed to have in place any rules for the safe operation of the

20   golf carts and/or failed to enforce any such rules and Ambros actions and non-actions negligently

21   contributed to this tragic accident. In fact, Ambros permitted the operation of golf carts without

22   operating headlights at night despite limited visibility.

23        The breach of the duty to Mr. Boudreau was the direct and proximate cause of his death

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGATNA, GUAM 96910
TELEPHONE: (671) 477-9891-4

as described above.

On April 3, 2005, the date of decedent's death, decedent was thirty-six (36) years old and had a life expectancy of forty-one (41) more years. He was married to Cassandra Chau Truong and they had one minor child.

## II.

## NEGLIGENCE

Negligence is a mixed question of fact and law *Van Prog v. Gayle*, 40 P. 555 (1895); *Gray v. Breakerhoff*, 258 P.2d 834 (1953); *Callahan v. Gray*, 279 P. 2d 963 (1955); *Hudson v. Rainville*, 297 P. 2d 434 (1956). The questions of causality and reasonableness of behavior are factual, and thus constitute questions for the trier of fact. *Warner v. Santa Catalina Island Com.*, 282 P. 2d 12 (1955); *Budette v. Rollefson Construction Co.*, 344 P. 2d 307 (1959); *Ewing v. Cloverleaf Bowl*, 572 P. 2d 1155 (1978). Negligence is determined as a matter of law only when reasonable men following the law can draw but one conclusion from the evidence presented. However, as a practical matter, the courts rarely consider negligence to be a matter of law. Ordinarily, the question is left to the trier of fact. *Wikbers v. Olson, Co.*, 71 P. 511 (1903); *Rudd v. Byrnes*, 105 P. 957 (1909); *Kelly v. Santa Barbara C. R. Co.*, 153 P. 903 (1916); *Jacobson v. Northwestern P. R. Co.*, 166 P. 3 (1917); *Austin v. Riverside-Portland Cement Co.*, 282 P. 2d 69 (1955); *Rogers v. Los Angeles Transit Lines*, 289 P. 2d 226 (1955).

In this case, Defendant mistakenly argues the law of Respondeat Superior when they state that because Ambros' Marketing Manager does not feel she was negligent or did anything wrong, her personal opinion somehow relieves them from liability. Mrs. Truong is not a lawyer and cannot render a legal opinion in this case. If Defendant's interpretation was the law, every negligence case could be dismissed by simply drafting an affidavit stating that they did not do

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4

1  anything wrong,  Defendant cites no case authority for this proposition because there is no

2  authority for this novel legal theory.

### III.

### DUTY OF CARE/SPONSORSHIP LIABILITY

5  Every negligence case begins with a consideration of whether a legally cognizable duty

6  runs from the defendant to the plaintiff.  The existence of a duty is a question of law to be

7  determined by the court. However, there is no universal test to determine the existence of a duty,

8  but instead courts employ an ad hoc approach of considering all relevant factors.  Where there

9  is a claim of **sponsor liability**, courts generally review the facts and circumstances to determine

10  whether the sponsor had any control over the sponsored event.  For example, in ***Lambert v.***

11  ***PEPSICO Inc.***, 698 So. 2d 1031 (4th CIR 1997), summary judgment was granted in favor of a

12  beverage company that sponsored a fair  where a carnival ride caught on fire, seriously injuring

13  passengers.  In support of their motion, the sponsors produced written contracts among three co-

14  defendant entities allocating responsibilities for the rides and concessions at the fair as well as

15  liability insurance for same.  Consequently, the sponsors were able to demonstrate that they had

16  no custody or control over the rides or their operation.  ***Id.*** at 1032.

17  In ***Sullivan v. Hemisphere Broadcasting Corp.***, 520 N.E. 2d 1301 (1988), the Supreme

18  Judicial Court of Massachusetts engaged in a similar analysis.  In that case, a radio station and

19  a brewery company sponsored a party at which free beer was distributed. The Court held that

20  defendants were not liable because they had no control over the distribution of free beer.  The

21  pivotal issue was the defendants lack of control.  Had the defendant controlled the distribution of

22  free beer, the matter would have been decided differently.  Similarly, as in the instant matter,

23  Ambros, who sponsored the event,  advertised the event, and instructed its personnel to appear

1    at radio stations promoting the event. See Declaration of Karl Pangelinan. During this event,

2    Mr. Boudreau one of the attendees invited by Ambros, who allegedly became intoxicated,

3    accepted a ride to his vehicle in a golf cart driven by an Ambros employee. During the ride Mr.

4    Boudreau was thrown from the golf cart causing his death. Ambros failed to adequately supervise

5    the distribution of free beer. Ambros was the *only* party who had *complete control* and the *right*

6    *to control* the distribution of free beer to the V.I.P. tent. See Affidavit of Cassandra Truong. In

7    addition, the purpose of the golf carts was not to transport concert goers to and from their

8    vehicles, but to control the flow of beer to the V.I.P. guests. See Declaration of Pierre "Tim"

9    Aguon filed on August 18, 2007. Ambros controlled the entire concert with respect to when the

10   concert would start, how the concert grounds would be set up and how much beer would be given

11   to the guests. It was this right to control that the Sullivan Court fixated on to determine the basis

12   of liability. *Id.*

13        In *Sroka v. Haliday*, 97 A. 965 (1916), the injury occurred when a little boy found and

14   detonated an unexploded Arial Bomb that had landed in his yard during a Fourth of July fireworks

15   display put on by the city of Pawtucket. Defendants were a group of citizens who had formed a

16   Fourth of July Committee to arrange this entertainment. Evidence presented at trial showed that

17   the Committee entered into a contract with a fireworks company to furnish the fireworks "in a

18   manner satisfactory to said Fourth of July Committee." *Id.* at 965. Plaintiffs appealed after the

19   Superior Court directed a verdict in favor of the defendants. The Rhode Island Supreme Court

20   concluded that the Fourth of July Committee had not relinquished control over the fireworks

21   display to the fireworks company.

22        "This clause then applies to everything to be done, not only to the quality and
          extent of the exhibit; but also to the manner of doing the firings; and it seems to

23        be unwarranted to say that under this language, the committee or any member

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4

thereof did not have full authority to control the "manner" of doing anything which had to be done. If it had been observed in any portion of this display during the day or evening that the bombs or other fireworks were being discharged in such a manner as to be dangerous to property or to persons, or so as to show that the man engaged in the work of firing was incompetent, reckless or negligent, would have been not only the right but the duty of the committee or any member thereof, or the subcommittee or any member thereof, to have stopped the firing and either to have forbidden the continuance to the display entirely, or to have insisted that the incompetence, reckless or negligent person in charge should be removed, and that a man or men competent for the work should be substituted."

Therefore, by the terms of the contract itself and the "manner" in which responsibilities were divided, control of the concert was subject at all times to the full control of Ambros and its employees and staff. See Affidavit of C. Truong. If the decedent was in fact intoxicated, it is because he was served beer after beer after beer by Ambros employees, the same employees who should have been assisting and protecting their guests.

Turning now to the evidence adduced through the discovery process, Plaintiffs will show that Defendants exercised control over the concert in the following areas:

1.  Deciding to sponsor the concert. See Defendant's Response to Plaintiff's First Set of Interrogatories, Interrogatory No. 1, attached hereto and incorporated herein by reference as Exhibit "A";

2.  Soliciting attendants through promotion, advertising and the distribution of free tickets. See Affidavits of C. Truong and K. Pangelinan;

3.  Coordinating promotional activities with the other sponsors before and during the concert. See Affidavit of C. Truong;

4.  Providing assistance to radio stations in coordinating interviews and call in spots to promote the concert; and

1     5.     Inviting, requesting and paying for the Master of Ceremonies to

2         introduce the band and run the show.[1]

3     These facts support the reasonable inferences that Ambros discussed the concert with

4  M.W.R. and Malafunkshun Productions ahead of time as well as with other sponsors. Ambros

5  had the opportunity to set down its conditions and guidelines before it agreed to sponsor the

6  concert. Ambros also had an agreement with M.W.R. and the other sponsors designating which

7  group would handle which duties before, during and after the concert. See Affidavit of C.

8  Truong.

9     Ambros and its employees made the decision to use golf carts for various purposes

10  throughout the day and had the opportunity to restrict and control the use of those golf carts in

11  any manner that they deemed fit. Clearly, Ambros had control over the events during the day and

12  evening of April 2, 2004, yet, negligently failed to exercise its responsibilities and breached its

13  duty of due care to Mr. Boudreau.

14     Following the lead of the cases outlined above, this court should determine that Plaintiff

15  has established that Ambros had control over the planning and operation of the concert, that the

16  court find that Ambros owes a duty commensurate with its' measure of control to the Plaintiffs

17  and other concert goers. That duty was breached when Ambros failed to take any steps to prevent

18  the dangerous manner in which the golf carts were operated which directly led to the death of Mr.

19  Boudreau.

20  ///

21  ///

22

23     [1] These same facts were reviewed by the Court in *Grey v. Derderian*, 389 F. Supp. 2d 308, 316 (D.Ct. RI 2005).

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4

# IV.

## RESPONDEAT SUPERIOR

As a general rule, a principal is responsible for the acts of his agents. *Harris v. Trojan Fireworks Co.*, 120 Cal.App. 3d 157 (1981). In the case of *Rodgers v. Kemper Construction Co.*, 50 Cal. App. 3d 608 (1975), the California Appellate Court stated:

> "under the modern rational for Respondeat Superior, the test for determining whether an employer is vicariously liable for the tortuous conduct of his employee is closely related to the test applied in worker's compensation cases for determining whether an injury arose out of or in the course of employment. This must necessarily be so because the theoretical basis for placing a loss on the employer in both the tort and worker's compensation fields is the allocation of economic cost of an injury resulting from a risk incident to the enterprise." 50 Cal. APP. 3d at 619.

The law recognizes that the entire subject of vicarious liability is a reflection of social policies which fix financial responsibility for harm done. The law recognizes a departure from liability from one's own act or conduct and enter into the arena of vicarious liability, the quest of liability is frequently determined by who is best able to spread the risk of loss through the prices charged for its product or liability insurance. See *Hinman v. Westinghouse Elec. Co.*, 2 Cal. 3d 956, 959-960 (1970); *Fields v. Sanders*, 180 P. 2d 684 (1947). The underlying philosophy which holds an employer liable for an employee's negligent acts is the deeply rooted sentiment that a business enterprise should not be able to disclaim responsibility for accidents which may fairly be said to be the result of its activity. *Ira S. Bushy & Sons, Inc. v. United States*, 398 F. 2d 167 (2nd Cir. 1968); *See* also *Keeton, Conditional Fault in the Law of Torts*, 72 Harv. L. Rev. 401, (1959).

Thus, it can be fairly stated that said liability attaches were a nexus exists between the employment or the activity which results in an injury that is foreseeable. Foreseeable is used in

the sense that the employees conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business. *Rodgers* at 619. For example, in ***Bonetti v. Double Play Tavern***, 126 Cal.App.2d (1954), the court upheld liability of the Double Play Tavern when the left fielder of a sponsored semi-professional baseball team, angered at dropping a pop fly, threw the ball out of the field where it hit plaintiff on the head. There, the bar operated as a team sponsor, selected the manager of the team, furnished uniforms and equipment and deducted the cost on income tax returns as a business expense; however, the players were not otherwise compensated for playing on the team and in no real sense did an "employer/employee relationship" exist, nevertheless, it was the activity of "sponsoring of the team" that led to the injury.

Applying these standards of business purpose or business activity and foreseeability to the facts of the instant case, there is sufficient connection between the sponsoring of the concert and the requirement of Ambros employees to attend, control and ensure that their guests, *i.e.*, concert goers were having a good time and were protected. Ambros was negligent for failing to exercise due care to inspect the premises or have training and rules enforced to prevent the dangerous conditions which could lead to foreseeable injuries of the type suffered by Mr. Boudreau. Ambros Marketing Manager was also a negligent party and the proximate cause of the concert goer's death. These facts justify imposing a duty on Ambros and holding the employer financially responsible for the injuries occasioned by the employees accident. Although the accident occurred away from the employer's premises, it occurred during work hours and during an event sponsored by the employer. Thus, the accident occurred during the course and scope of Ambros' marketing manager's responsibilities on the day of the concert.

///

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4

# V.

## 18 G.C.A. SECTION 90108

Section 18 G.C.A. 90108 states:

> "Contributory negligence shall not bar recovery in any action by any person or his legal representative to recover damages for negligence resulting in death or in injury to person or property, if such negligence was not as great as the negligence of the person against whom recovery is sought, but any damages allowed under the law on Compensatory Relief shall be diminished in proportion to the amount of negligence attributable to person recovering."

This Statute was designed to grant a credit or reduction to the estate based on the negligence of the injured party. Defendant would like this court to believe Ms. Truong's negligence should be included. However, the law imputes Ms. Truong's negligence to that of her employer. AIOI would like not to pay this claim because they believe that is fortunate that Ms. Truong was responsible for the death of her own husband.

The reality is Ambros and their negligence is a cause of Mr. Boudreau's death. Plaintiff can recover for the negligence of Ambros. The example of the "verdict form" to illustrate Defendant's legal theory is severely flawed. The verdict form has yet to be determined and should not read Ambros/Plaintiff because the Estate of Roland A. Boudreau (the "Estate") is not contributorily negligent in this case. In fact, the Estate was not at the concert. Therefore, the verdict form will be entitled "Ambros' negligence." Section 90108 provides no legal technicality whatsoever. Finally, because the Estate is not the contributorily negligent, Ambros is free to attempt to enforce any indemnification rights it believes it can prove. It is important to point out to the Court that no judgement will be taken against Ambros. They are not a party to this case.

///

///

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4

**VI.**

**OPEN AND OBVIOUS DOCTRINE**

Defendant states that the pot holes are open and obvious and thus they do not need to warn the Plaintiff about them. Nobody warned Mr. Boudreau or Ambros' Marketing Manager. Additionally, pot holes may be open and obvious during daylight hours, but are not open and obvious at night while driving a vehicle provided by Ambros without headlights. Defendant claims Ms. Truong saw these pot holes during the day. Was she supposed to make a mental map of every dangerous location in the more than five (5) football field radius? No. If Defendant would like to avail itself of the open and obvious doctrine, the golf carts should have had headlights. Ambros had a number of other options, *i.e.*, passing out the flashlights to employees, marking the dangerous areas with cones or flares.

**VII.**

**CONCLUSION**

In conclusion, it is clear that Ambros, Inc. and/or Shimbros, Inc. had control over the concert and owed a duty of due care to their guests and other concert goers so that they would enjoy the concert in a safe environment. Ambros knew or should have known that the negligent operation of golf carts by employees who were drinking and serving free alcohol could result in foreseeable bodily injuries. Ambros purchased an insurance policy to pay for any claims or damages resulting of their negligence so they were aware that a breach of their duty of due care in an environment of concert goers consuming alcohol could result in foreseeable injuries. See Shimbros Insurance Policy attached hereto as Exhibit "B".

Ambros has sponsored other concert events and is well aware of their duties and obligations when sponsoring and promoting an event. This is why several meetings were held,

TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4

1    contracts were executed and job responsibilities were assigned on the day of the concert. Ambros

2    dictated how the concert would be handled and was in control of the show.

3         Accordingly, Defendant's motion should be denied.

4         Dated at Hagåtña, Guam, this 31st day of October, 2007.

5                 **TEKER TORRES & TEKER, P.C.**

6

7                 By _____

8                   JOSEPH C. RAZZANO, ESQ.
Attorneys for Plaintiff, *Cassandra Truong,*
Administratrix of the *Estate of Roland Anthony*

9                   *Boudreau,* deceased.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# Exhibit

# A

Dooley Roberts & Fowler LLP
Suite 201, Orlean Pacific Plaza
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone (671) 646-1222
Facsimile  (671) 646-1223

Attorneys for Defendant

## IN THE SUPERIOR COURT OF GUAM

| | |
|---|---|
| CASSANDRA CHAU TRUONG, Administratrix of the Estate of ROLAND ANTHONY BOUDREAU, Deceased,<br><br>Plaintiff,<br><br>vs.<br><br>AIOI INSURANCE COMPANY, LTD.,<br><br>Defendant. | ) CIVIL CASE NO. CV1082-06<br>)<br>)<br>)<br>)<br>)<br>) **AIOI'S RESPONSE TO PLAINTIFF'S**<br>) **FIRST SET OF INTERROGATORIES**<br>)<br>)<br>)<br>)<br>)<br>) |

COMES NOW Defendant Aioi Insurance Company, Ltd., through counsel, Dooley Roberts & Fowler LLP, by Tim Roberts, Esq., and hereby responds to Plaintiff Cassandra Chau Truong's First Set of Interrogatories.

1.     Who made the decision on behalf of Shimbros Productions to sponsor or not sponsor the Three Doors Down concert held on April 2, 2005.

Response to Interrogatory No. 1.     **According to Shimbros, it was Lee Babb of Anheiser Busch and Tom Shimizu of Ambros.**

2.     Who was responsible at Shimbros Productions to solicit attendance through promotion, advertising and/or the distribution of free tickets to the Three Doors Down concert held on April 2, 2005.

ORIGINAL

<u>Response to Interrogatory No. 2.</u>    **According to Shimbros, (1) Ambros, Inc., through its marketing manager, Plaintiff Casey Truong; (2) the Navy's Moral, Welfare and Recreation ("MWR"), and (3) Malafunkshun Productions.**

3.    Who at Shimbros Productions, Ambros, Inc. ("Ambros") or both was in charge of coordinating promotional activities with the other sponsors before and during the Three Doors Down concert held on April 2, 2005.

<u>Response to Interrogatory No. 3.</u>    **According to Shimbros, there was no particular person who was in charge of coordinating promotional activities with other sponsors before and during the concert. Paul Shimizu and Tom Shimizu performed some tasks. Plaintiff Casey Truong performed other tasks.**

4.    Who, on behalf of Shimbros Productions, made radio station appearances to promote the Three Doors Down concert held on April 2, 2005.

<u>Response to Interrogatory No. 4.</u>    **According to Shimbros, no Shimbros representative made radio station appearances to promote the concert on behalf of Shimbros. They believe Karl Pangelinan and Chris Barnett of Malafunkshun Productions made radio station appearances on behalf of Malafunkshun Productions.**

5.    From who did Shimbros Productions or Ambros rent, lease, or purchase the golf carts, one of which was involved in the accident which caused the death of Roland Boudreau.

<u>Response to Interrogatory No. 5.</u>    **According to Shimbros, the golf carts were not rented, leased or purchased. Instead, the golf carts were made available to Shimbros by MWR for the concert.**

6.    How many golf carts were rented, leased or purchased.

<u>Response to Interrogatory No. 6.</u> **Shimbros remembers that a total of six (6) of the twenty golf carts at the concert were made available to Shimbros/Ambros for the concert.**

7. For what purpose were the golf carts, rented, leased or purchased.

<u>Response to Interrogatory No. 7.</u> **According to Shimbros, four (4) golf carts were designated by MWR to service seven regular concession stations and two (2) carts were designated for the draft-beer concession. Finally, at some point, a flat-bed golf cart was made available by MWR to Shimbros for the concert.**

8. Please confirm that the Defendant in this lawsuit has been named correctly.

<u>Response to Interrogatory No. 8.</u> **Confirmed.**

9. Please provide the name, address and telephone number of any potential parties to this suit.

<u>Response to Interrogatory No. 9.</u> **Aioi objects to this interrogatory on the grounds that it calls for information protected by the attorney client and work product privileges, and on the grounds that it calls for Aioi to speculate as to whom or how many people or entities Plaintiff wishes to sue, and for what.**

10. Please describe the legal theories and, in general, the factual basis of the responding party's defenses.

<u>Response to Interrogatory No. 10.</u> **Aioi objects to this interrogatory on the grounds that its legal theories are protected by the work-product and attorney client privileges. Without waiving this objection, Aioi states that its legal theories are self evident from its answer to the complaint and the accompanying affirmative defenses. The factual bases for Aioi's defenses are also self evident, for the most part, from its affirmative defenses set forth in its answer. Plaintiff told the Navy that the accident happened when her husband jumped off the back of**

3

the golf cart. According to an expert witness retained by Aioi, Dr. Aurelio Espinola, who is the Territorial Medical Examiner, Plaintiff's husband was intoxicated when he was admitted to Naval Hospital. Aioi also refers Plaintiff to its response to interrogatory number 12, below. According to Shimbros, Plaintiff had driven golf carts on numerous occasions prior to the concert without incident. According to Shimbros, it is also possible that Plaintiff was not acting in the course and scope of her employment when her husband fell or jumped off the back of the golf cart. The golf carts were supposed to be used to shuttle beer from refrigerated containers to the concession stands before and during the concert, but not after the concert had ended. Shimbros states, and Plaintiff told the Navy, that the concert had ended at approximately 5:30 p.m., while the accident happened at approximately 7:00 p.m. Plaintiff was not a part of the Ambros crew designated to "break down" the concert set-up. Ambros does not know, at this point, what job-related purpose was being served by Plaintiff driving her husband around an hour and a half after the concert was over.

Aioi reserves the right to amend or supplement its response to this interrogatory after adequate discovery, including Plaintiff's deposition, has been conducted.

11.    Please provide the name, address and telephone number of persons having knowledge of relevant facts, and a brief statement of each identified person's connection with the case.

Response to Interrogatory No. 11.

According to Shimbros:

a.    Plaintiff Casey Truong, whose contact information is known to her.

4

b.      Julia Pocaigue, Plaintiff's assistant, whose contact information is known to Plaintiff.  She was riding in the passenger seat of the golf cart with Plaintiff at the time of the accident.

c.      Julia Pocaigue's son, whose name Shimbros believes is Donovan Rivera, whose contact information is known to Plaintiff.  He was standing on the back of the golf cart with Mr. Boudreau at the time of the accident.

d.      Plaintiff's Asian female friend, "Kaoru", last name unknown, whose full name and contact information are known to Plaintiff.  She was in a golf cart being driven by Ambros employee Shaun Pascua ahead of the cart being driven by Plaintiff at the time of the accident.

e.      Eric, last name unknown, but which is known to Plaintiff.  He is the husband or boyfriend of Plaintiff's Asian female friend, Kaoru.  He was standing on the back of golf cart being driven by Shaun Pascua at the time of the accident.

f.      John Myers, c/o Ambros, concert VIP entertainment.

g.      Tim Aguon, c/o Ambros.  Mr. Aguon is Ambros Military Sales Manager.  Mr. Aguon was in a golf cart near Plaintiff's golf cart at the time of the accident.

h.      Shaun Pascua, c/o Ambros.  Military Account Representative working under Ambros' Tim Aguon.  He was driving a golf cart ahead of Plaintiff's golf cart at the time of the accident.

i.      Dennis Camacho, c/o Ambros, VIP entertainment.

j.      Paul Shimizu, c/o Ambros, concert lighting.

k.      Tom Shimizu, c/o Ambros, Ambros General Manager.

l.      Nate Arii, c/o Ambros, handyman, refrigerator repair and servicing.

5

      m.     John Shimizu, c/o Ambros, maintenance, generator repair and servicing, fuel for the generator.

      n.     Patrick Barnum, c/o Ambros, VIP entertainment.

      o.     Jay Luce, c/o Ambros, signs/banners at concert.

      p.     Pete Guzman, c/o Ambros, signs/banners at concert.

      q.     Kenneth Artero, c/o Ambros, signs/banners at concert.

      r.     Paul Claros, c/o Ambros, signs/banners at concert.

12.    For any testifying expert, please provide:

      a)     the expert's name, address and telephone number.

**Response to Interrogatory No. 12(a).** **Dr. Aurelio Espinola, Guam's Territorial Medical Examiner. Aioi reserves the right to retain additional experts at any time prior to or on any applicable court-ordered deadline.**

      b)     the subject matter on which the expert will testify.

**Response to Interrogatory No. 12(b).** **Roland Boudreau's intoxication level at the time of the accident.**

      c)     the general substance of the expert's mental impressions and opinions and a brief summary for this basis for them, or the expert is not retained by, employed by, or otherwise subject to the control of the responding party, documents reflecting such information.

**Response to Interrogatory No. 12(c).** **Dr. Espinola will testify about Plaintiff's husband's intoxication and the likely effect of that intoxication. Plaintiff's husband's blood alcohol content ("BAC") upon admission to Naval Hospital was 225.8 milligrams per deciliter ("mg/dl"), which translates into a .2258 blood alcohol content ("BAC"). Dr. Espinola will also explain that the blood alcohol results delivered by Plaintiff's attorneys to Aioi before the**

6

lawsuit were Mr. Boudreau's blood alcohol levels at his autopsy, not his blood alcohol levels at the time of his admission to the hospital.

        d)     If the expert is retained by, employed by or otherwise subject to the control of the responding party:

        i.     all documents, tangible things, reports, models or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony.

Response to Interrogatory No. 12(d)(i). **All responsive documents are attached to the answers to these interrogatories.**

        ii.     the expert's current resume and bibliography.

Response to Interrogatory No. 12(d)(ii). **Aioi is not in possession of Dr. Espinola's current resume or bibliography, if any exists.**

    13.     Who is Tim Aguon and what are his responsibilities with Ambros?

Response to Interrogatory No. 13.    **See answer to interrogatory number 11.g.**

DOOLEY ROBERTS & FOWLER LLP

Date: 2/6/07

By: _____
        **TIM ROBERTS, ESQ.**
        Attorneys for Defendants

7

## VERIFICATION

I, **Timothy C.S.A. Lujan**, do hereby declare that I am the Vice President, Claims Services Department of Defendant Aioi Insurance Company, Ltd., in the above-captioned action. I have read the foregoing Responses to First Set of Interrogatories and based on my conversations with Shimbros, they are true, except as to those matters alleged upon information and belief, and as to those matters, and I believe them to be true, and except for the objections, which were made by my attorney.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 6th day of February, 2007, in Tamuning, Guam.

_____

**TIMOTHY C.S.A. LUJAN**

8

# Exhibit
# B

# ⚫ Aioi Insurance Co.,Ltd.

## Shibuya-ku Ebisu 1-28-1
## Tokyo, Japan

| Producer's Name and Address | TAKAGI & ASSOCIATES, INC.<br>P.O. BOX 22409<br>GMF, GUAM  96921<br>TEL#: (671) 648-5350          FAX#: (671) 648-5373 | Policy No.          Acct.#:  1521<br>**CGL-00323**          TAA/gcp<br>Reference of: CGL-00006 |
|---|---|---|

| Named Insured and Address | AMBROS, INC.  DBA: SHIMBROS PRODUCTION<br>P.O. BOX A<br>HAGATNA, GUAM  96932 |
|---|---|

THIS IS A RESTRICTED POLICY PLEASE READ IT CAREFULLY.

POLICY PERIOD :  From   **MARCH 11, 2005**   to   **MARCH 11, 2006**
12:01 A.M. Standard Time at address of the Named Insured as stated herein.

TOTAL PREMIUM:  **$2,500.00**

THE NAMED INSURED IS:  CORPORATION
THEIR BUSINESS IS    :  ENTERTAINMENT PRODUCTION

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE STATED IN THIS POLICY.**

**FORM NUMBERS OF OTHER ENDORSEMENTS THAT ARE ATTACHED TO THIS POLICY AS OF THE ISSUE DATE:**
CGL-02A/0104; GL-E1, E2, E3, E4, E5, E6, MP-E1, TRIA 001 GU

Countersigned by

_____
Takagi & Associates, Inc.
General Agents

_Tadashi Kodama_
President

_03/24/05_
Countersignature Date

_Naotatsu Momoi_
Secretary

THIS DECLARATION PAGE SHALL NOT BE BINDING UPON THE COMPANY UNLESS COUNTERSIGNED BY A DULY AUTHORIZED REPRESENTATIVE OF THE COMPANY.

CGL-01/0204                          03/24/05                          Page 1 of 2

# COMPREHENSIVE GENERAL LIABILITY INSURANCE

## SCHEDULE OF HAZARDS

| COVERAGES | LIMITS OF LIABILITY | |
|---|---|---|
| | EACH OCCURRENCE | AGGREGATE |
| A – Bodily Injury Liability | NOT APPLICABLE | NOT APPLICABLE |
| B – Property Damage Liability | NOT APPLICABLE | NOT APPLICABLE |
| | OR | |
| C – Single Limit for Bodily Injury and Property Damage, Combined | $1,000,000. | $1,000,000. |

| DESCRIPTION OF HAZARDS | CODE NO. | PREMIUM BASIS | RATES | | ADVANCE PREMIUM | |
|---|---|---|---|---|---|---|
| | | | BODILY INJURY | PROPERTY DAMAGE | BODILY INJURY | PROPERTY DAMAGE |
| Premises – Operations Liability<br><br>CONCERTS – ON PREMISES NOT OWNED OR OPERATED BY THE INSURED | 314-79222S | (PER LOCATION / PER DAY) TBA | 250.00 | INCLUDED | $2,500.00 | INCLUDED |
| Broad Form Comprehensive General Liability<br><br>INCLUDED | | | | | INCLUDED | INCLUDED |
| Independent Contractors Liability<br><br>NOT COVERED | | | | | | |
| Products-Completed Operations Liability<br><br>NOT COVERED | | | | | | |
| | | Subtotal – BI and PD Advance Premium | | | $2,500.00 | |
| | | Guam Environmental Trust Assessment | | | $ 50.00 | |

| Location of premises occupied by the Named Insured | Loc. 1 |
|---|---|
| | Loc. 2 |
| | Loc. 3 |
| | Loc. 4 |
| Interest in Named Insured in premises | Loc. 1 |
| | Loc. 2 |
| | Loc. 3 |
| | Loc. 4 |

# SINGLE LIMIT ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that notwithstanding anything to the contrary contained in this Policy and attachments thereto, the company agrees to pay on behalf of the insured, subject to all the terms and conditions of the Policy, for whatever amount the insured may be obligated to pay or may be required by law to pay and shall pay such amount not to exceed __$1,000,000.__ as the total limit of liability for any one occurrence, subject however to an aggregate limit of ____ $1,000,000. ____ with respect to Bodily Injury and Property Damage.

Such SINGLE LIMIT shall be the total limit of the Company's Liability for each occurrence with respect to all damages including damages for care and loss of service arising out of Bodily Injury, including death at any time resulting therefrom, sustained by one or more persons, and/or arising out of injury to or destruction of property including the loss of use thereof.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of the Policy, except as hereinabove set forth.

This endorsements is effective as of _____ MARCH 11, 2005 _____

Attached to and forming part of Policy No. _____ CGL-00323 _____
of AIOI INSURANCE COMPANY, LTD.

GL-E1
00/14/86